UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOFI FEDERAL BANK, | ) |
| *Plaintiff*, | ) CASE NO.   14-CV-00484-BJR |
| v. | ) |
| | ) ORDER GRANTING DEFENDANTS' |
| | ) MOTION FOR SUMMARY JUDGMENT |
| ADVANCE FUNDING LLC, *et al.*, | ) |
| *Defendants*. | ) |

Before the Court is Defendants' Motion for Summary Judgment of Dismissal [29], filed on February 19, 2015. The Motion is fully briefed and ripe for resolution. For the reasons set forth below, Defendants' Motion is granted.

## I.   Factual and Procedural Background

This case concerns the lottery winnings of Sheena Venzant,[1] who on November 16, 2011, won the Washington State "Lucky for Life" lottery drawing, which entitled her to received $52,000 annually for the rest of her life or a lump sum payment of $750,000. Venzant elected to receive $52,000 annually. Decl. of Sheena Venzant [30] ("Venzant Decl.") ¶ 2; Decl. of Daniel Hefner [39] ("Hefner Decl."), Ex. A. After winning the lottery, Venzant was contacted by various companies with offers to provide her a lump sum payment in return for assignment of her future lottery payments. Venzant Decl. ¶ 3. Venzant discussed an agreement with McLloyd Onwubere, then an employee of Plaintiff BOFI Federal Bank ("BOFI"). *Id.* On March 7, 2012, Venzant entered into an agreement ("the Agreeement") with BOFI to assign twenty-five annual payments of $47,000 each to BOFI in return for a lump sum payment of $318,40175. *Id.*; Hefner Decl., Ex. C., p. 18, Ex. D, p. 10, Ex. F. The first payment to BOFI was to be due on November

---

[1] Ms. Venzant is not a party to this case, but has filed a declaration on behalf of Defendants.

1

16, 2012.  Hefner Decl., Ex. D, p. 10.  BOFI was to provide a lump sum payment to Venzant no later than three business days after the satisfaction of the conditions precedent listed in the Agreement.  Hefner Decl., Ex. C, p. 13.

On the same date Venzant also entered into a "Life Contingent Payment Addendum" in which Venzant agreed to cooperate with BOFI to obtain a life insurance agreement that would pay benefits to BOFI should Venzant die prior to the payment of the twenty-five annual payments of $47,000 that Venzant had agreed to assign to BOFI.  Hefner Decl., Ex. D.  On June 14, 2012, Venzant received a letter acknowledging the purchase of such a life insurance policy.  Hefner Decl., Ex. I.  BOFI made the first policy payment of $3308 on September 14, 2012.  Hefner Decl. ¶ 11.  The policy contained an incontestability provision (which took effect after two years) and a suicide exclusion (which expired after two years).  Hefner Decl., Ex. I at 9.  According to BOFI, due to regulatory constraints with respect to speculative investments, it was constrained from paying Venzant the lump sum contemplated by the Agreement until the two years had run.  Hefner Decl. ¶ 12.  According to Venzant, she never agreed to a delay in receiving the lump sum payment.  Venzant Decl. ¶ 5.

On March 9, 2012, and March 14, 2012, BOFI filed a UCC Financing Statement and Financing Statement Amendment, respectively, providing public notice of the BOFI agreement.  Hefner Decl., Exs. G and H.

Between March 7, 2012, and October 12, 2012, BOFI paid Venzant $15,750 as "advances."  Hefner Decl. ¶ 16, Hefner Decl., Ex. B, Venzant Decl., Ex. C.

At this point the facts presented by the parties differ dramatically.  According to Defendants, who provide Venzant's declaration, Venzant became "increasingly unhappy and frustrated" because "month after month passed, and I still had not received the lump sum

2

payment." Venzant Decl. ¶¶ 4-5.  Venzant states that on February 5, 2013, she wrote a letter to BOFI purporting to cancel the Assignment and life insurance policy.  Venzant Decl. ¶ 5, Venzant Decl., Ex. C.  In the letter Venzant stated that she would pay back the $15,000 advances and $3,308 life insurance premium; however, according to Plaintiff, Venzant has not done so.  Venzant Decl., Ex. C; Hefner Decl. ¶ 23.  Several months later, Venzant contacted an account representative at Defendant Advance Funding LLC, Barbara Guerra, and agreed to assign her lottery winnings to Advance Funding.  Venzant Decl. ¶¶ 8, 10.  Venzant entered into an agreement with Advance Funding on or about May 17, 2013.  Decl. of Dan Cevallos [31] ("Cevallos Decl.") ¶ 3.  Venzant states that while she had spoken to Guerra when she was being solicited shortly after winning the lottery, she did not consult Guerra prior to cancelling her agreement with BOFI, and no one at Advance Funding attempted to persuade her to cancel her agreement with BOFI.  Venzant Decl. ¶ 9.  According to Defendant Advance Funding Venzant assured Advance Funding that she did not have "conflicting commitments" and provided a copy of the letter she had sent to BOFI.  Cevallos Decl. ¶ 3.

According to Plaintiff, there is no evidence that Venzant's letter purporting to cancel the Agreement was sent, and Plaintiff denies ever receiving the letter.  Hefner Decl. ¶ 18, Hefner Decl., Ex. B.  Plaintiff also denies any knowledge that Venzant intended to cancel her agreement with BOFI until February, 2014.  Hefner Decl. ¶¶ 18, 22.  Plaintiff provides further evidence in the form of an internal customer information sheet for Venzant, in which Plaintiff's employee, Chrus Husong, made notes indicating that he continued to speak to Venzant throughout April and May 2013, that Venzant requested further advances, and that Plaintiff sent her approximately $350 in gift cards during this period.  Hefner Decl., Ex. B.  Plaintiff states that it was not aware of Venzant's agreement with Advance Funding until February 2014 when it contacted the

3

Washington Lottery to verify processing information. Hefner Decl. ¶ 22. Plaintiff also argues that Defendant Advance Funding should have known of the Agreement with BOFI given the UCC financing statement filed by Plaintiff. Pl.'s Opp'n at 7.

Plaintiff filed their Complaint on April 2, 2014. Plaintiff brought claims of tortious interference with a contract and unjust enrichment. Plaintiff sought declaratory relief, money damages, attorney's fees, and costs. Defendants filed their motion for summary judgment on February 19, 2015, prior to discovery.

## II. Standard of Review

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court "should review all of the evidence in the record . . . [and] draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[t]he mere existence of a scintilla of evidence" in support of a nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson*, 477 U.S. at 252.

## III. Analysis

Defendants argue that Plaintiff's tortious interference with contract claim fails because

the Agreement between Plaintiff and Venzant is not a valid contract, and that even if it is, it is unenforceable.[2]

### A. Elements of a Claim of Tortious Interference

In Washington, a claim for tortious interference requires that the plaintiff establish the following elements: (1) a valid contract; (2) that the defendant had knowledge of the contract; (3) that the defendant intentionally interfered with the contract and caused a breach or termination; (4) that the defendant interfered for an improper purpose or used improper means; (5) resultant damages. *Kane v. City of Bainbridge Island*, 866 F. Supp. 2d 1254, 1265 (W.D. Wash. 2011) (citing *Commodore v. Univ. Mech. Contractors, Inc.*, 839 P.2d 314, 322 (Wash. 1992).

Defendants attack the first element of a tortious interference claim, arguing that the Agreement between Plaintiff and Venzant was not a valid contract. Defendants note that Revised Code of Washington § 67.70.100(2) prohibits the assignment of a lottery prize absent "an appropriate judicial order of the Thurston county superior court or the superior court of the county in which the prize winner resides . . . ." Because Plaintiff never obtained a court order validating the assignment of Venzant's winnings, Defendants argue, Plaintiff's contract with Venzant was invalid.

In response, Plaintiff argues that the Agreement with Venzant was a valid contract that explicitly contemplated obtaining a court order as a condition precedent to fulfillment. *See* Pl.'s Opp'n, Ex. C at p. 2 (section of Agreement noting the requirements of RCW § 67.70.100 and requiring Venzant to "cooperate with [Plaintiff] in obtaining the Court Order . . . .").

---

[2] Defendants' original Motion contained additional arguments concerning whether Defendants wrongfully interfered with the contract and Plaintiff's additional claims of unjust enrichment and for declaratory relief. However, the parties later stipulated to limit the scope of the motion to only those sections discussed by the Court in this Order. *See* Notice [33].

### B. Elements of a Contract

The essential elements that must be set out in a contract in Washington State are "the subject matter of the contract, the parties, the promise, the terms and conditions, and . . . the price or consideration." *DePhillips v. Zolt Const. Co., Inc.*, 959 P.2d 1104, 1107 (Wash. 1998) (quoting *Family Med. Bldg., Inc. v. Dep't of Soc. & Health Servs.*, 702 P.2d 459, 461 (Wash. 1985)). "[F]or a contract to form, the parties must objectively manifest their mutual assent . . . [and] the terms assented to must be sufficiently definite." *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004). Finally, "the contract must be supported by consideration to enforceable." *Id.* "[P]arties are free to enter into, and courts are generally willing to enforce, contracts that do not contravene public policy." *Id.* at 948. There is no dispute that the Agreement contained the essential elements of a contract.

### C. Conditions Precedent

A condition precedent is a condition or event set out in a contract "occurring subsequent to the making of a valid contract which must exist or occur before there is a right to immediate performance." *Walter Implement, Inc. v. Focht*, 730 P.2d 1340, 1342 (Wash. 1987) (citing *Ross v. Harding*, 391 P.2d 526, 530 (Wash. 1964). A condition precedent is contrasted with a promise, which "subjects the promisor to liability for damages, but does not necessarily discharge the other party's duty of performance . . . ." *Jones Assocs., Inc. v. Eastside Props., Inc.*, 704 P.2d 681, 684 (Wash. App. 1985). The nonoccurrence of a condition precedent "prevents the promisee from acquiring a right or deprives him of one but subjects him to no liability." *Id.* "Any words which express, when properly interpreted, the idea that the performance of a promise is dependent on some other event will create a condition." *Ross*, 391 P.2d at 531.

Absent the legislative requirement of court approval set out in RCW § 60.70.100, it is undisputed that Plaintiff could have entered a binding contract with Venzant. As such, the primary question before the Court is whether the necessity of gaining court approval for the assignment of Venzant's winnings, which created a condition precedent to the Agreement, causes the Agreement to be "invalid" prior to said court approval.

The Court is not aware of any Washington cases that explicitly discuss the effect of a condition precedent on a tortious interference claim. Generally, however, a condition precedent, which may render a contract voidable should the condition not be fulfilled, will not bar a claim for tortious interference with contract if the interference occurs prior to the failure of the condition precedent. *See* Restatement (Second) of Torts § 766, cmt. f (1979). In *Jewel Cos., Inc. v. Pay Less Drug Stores Nw., Inc.*, 741 F.3d 1555, 1558 (9th Cir. 1984), the court reversed a district court's grant of summary judgment on a claim of tortious interference with a merger agreement. The Ninth Circuit found that the merger's requirement of shareholder approval as a condition precedent did not bar a claim for tortious interference as a matter of law.

Even if that condition precedent is approval by a regulatory body or court, a third party is not free to interfere with the contract. In *SCEcorp v. Superior Court*, 4 Cal. Rptr. 2d 372 (Cal. Ct. App. 1992), the court held that an electric utility could bring a claim for tortious interference against a corporation where the corporation had interfered with a proposed merger between the utility and another utility even though the merger required regulatory approval. The court found that "the general principle that the rights of contracting parties should be protected from wrongful interference by third parties" weighed again finding an exception to the law of tortious interference. *Id.* at 375. The court concluded that "[c]onditions precedent of regulatory approval should be treated no differently than other conditions precedent requiring third party approvals or

7

actions." *Id.* at 377. However, the *SCEcorp* court also considered whether there were public policy reasons for disallowing a tortious interference claim. *SCEcorp*, 4 Cal. Rptr. 2d at 377. While the *SCEcorp* court concluded that no public policy reasons required that the tortious interference claim in that case be disallowed, the Court now turns to considerations of public policy in this case.

### D.  Public Policy

It is a basic principle of tort law that a claim for tortious interference of contract fails if the contract is contrary to law or "in violation of an established public policy . . . ." Restatement (Second) of Torts § 774 (1979). In *Washington Square Financial, LLC v. RSL Funding, LLC*, 418 S.W.3d 761 (Ct. App. Tex.) the court considered whether to permit a claim for tortious interference of a contract that assigned a portion of a personal injury claimant's structured settlement to a factoring company when Texas law requires court approval of such agreements. Texas' Structured Settlement Protection Act, Tex. Civ. Prac. & Rem. Code §§ 141.001, *et seq.*, states that "[n]o direct or indirect transfer of structured settlement shall be effective . . . unless the transfer has been approved in advance in a final court order based on express findings by the court that: (1) the transfer is in the best interest of the payee," among other factors. Tex. Civ. Prac. & Rem. Code § 141.004. Prior to obtaining a final court order, the personal injury claimant in *Washington Square* decided to cancel his agreement and make an agreement with a second factoring company. The first company sued the second company for tortious interference with contract. The court found that Texas' Structured Settlement Protection Act articulated a public policy of "protect[ing] those who have entered into structured settlements . . . from transferring their rights to future periodic payments for a lump-sum payment that is inadequate." 418 S.W.3d at 769. The court thus found that "before a transfer of structure-settlement-payment rights

becomes enforceable, the court must determine that the proposed transfer is in the best interest of the payee," which "reflects the legislature's intent to promote the public policy of protecting payees through numerous substantive and procedural safeguards," chief among them the requirement of court approval. *Id.* at 770.  Because no court had approved the contract at issue in *Washington Square*, the court found the contract unenforceable on public policy grounds.  *Id.*

The *Washington Square* court also went further and addressed the issue of whether, despite its unenforceability, the contract at issue might still nevertheless form the basis of a tortious interference with contract claim.  The court found that when a contract is unenforceable because of public policy concerns, those same public policy concerns also prohibited a claim for tortious interference based on the unenforceable contract.  *Id.* at 770-71.

### E.  The Washington Statute

The Court must now consider whether RCW § 67.70.100, which sets out the requirement for court approval of agreements assigning lottery winnings, is intended to express public policy concerns sufficient to render the Agreement between Plaintiff and Venzant unenforceable on public policy grounds, and unusable as the basis for a tortious interference with contract claim.  The Court concludes that it does.

RCW § 67.70.100(2) prohibits the assignment of a lottery prize absent "an appropriate judicial order of the Thurston county superior court or the superior court of the county in which the prize winner resides . . . ."  It further requires that any petition for a court order be served on the attorney general of Washington at least ten days prior to a hearing or to entry of the court order.  *Id.*  Further, it sets out various conditions that the court must find have been met prior to issuing an order: that the assignment has been memorialized in writing and is subject to Washington law, that the assignor has provided a declaration to the court attesting to the fact that

9

he or she has had the opportunity to be represented by independent legal counsel, has received independent financial and tax advice, and is of sound mind and not acting under duress.[3] *Id.* The court must also find that the assignee has provided a one-page disclosure statement setting out various aspects of the agreement. RCW § 67.70.100 thus requires the court reviewing the petition for lottery assignment to make a number of findings related to the assignor's state of mind and intent. This strong role envisioned for the reviewing court suggests that the legislature wanted to ensure that any agreements purporting to assign lottery winnings were carefully reviewed prior to their enforcement.

Similarly, the declaration of intent in the statute itself demonstrates a public policy that is skeptical of lottery assignment agreements. In a section declaring the intent of the legislature, the statute states that "[i]t is the intent of the legislature to provide a *restrictive means* to accommodate those prize winners who wish to enjoy more of their winnings currently . . . ." RCW § 67.70.100, Notes: Intent (emphasis added). The Court finds it unlikely that the legislature would declare its intent to be "restrictive" and require court approval, and yet permit an agreement that is not yet approved by a court to be binding and enforceable on a lottery winner.

Plaintiff places great emphasis on the fact that RCW § 67.70.100 is different from the Texas statute at issue in *Washington Square* in that it contains no explicit requirement that the court make a finding that the assignment is in the "best interests" of the assignor. While this is true, as is clear from the Court's discussion, RCW § 67.70.100 is intended to restrict the assignment of lottery winnings and places the courts in the role of a backstop intended to prevent assignments

---

[3] The court must also make findings determining that the statements in the assignor's declaration are accurate.

that do not meet the requirements of the statute. As such, a contract purporting to assign lottery winnings is unenforceable absent court approval.

Having examined the requirements of RCW § 67.70.100, the Court concludes that the statute was intended to promote the public policy of protecting lottery winners by requiring court approval of assignment agreements. Because the Agreement between Plaintiff and Venzant was not approved by a court, it is unenforceable. Further, the strong public policy concerns evident in RCW § 67.70.100 speak against permitting Plaintiff's claim for tortious interference of contract based upon the unenforceable Agreement.

### IV. Conclusion

Having considered the parties' arguments, the relevant case law, and the entire record, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment of Dismissal [29] is **GRANTED**. Plaintiff's claim of tortious interference with contract is **DISMISSED**.

**IT IS SO ORDERED.**

DATED this 28th day of April, 2015.

*Barbara J Rothstein*

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE