The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

BOFI FEDERAL BANK, a federally chartered banking institution,

        Plaintiff,

        v.

ADVANCE FUNDING LLC; KIRK A. TOVEY, individually and as trustee of the KIRK A. TOVEY REVOCABLE TRUST; and SETTLEMENT COLLECTION SERVICE, LLC,

        Defendants.

NO.    2:14-cv-00484-BJR

**JOINT PRETRIAL STATEMENT**

**A.**    **Statement of the Case.**

    Plaintiff BofI Federal Bank ("BofI") filed this lawsuit on April 2, 2014, alleging that Defendants Advance Funding LLC ("Advance"), Kirk A. Tovey, individually and as trustee of the Kirk A. Tovey Revocable Trust ("Tovey"), and Settlement Collection Service, LLC ("SCS") had interfered with an assignment agreement that BofI had previously entered into with lottery winner Sheena Venzant, and were unjustly enriched when they received a valuable benefit (a lottery income stream that Ms. Venzant assigned to them) to which BofI was entitled. (Dkt. 1.)  BofI asserted claims against Advance, Tovey and SCS for tortious interference with

contract, unjust enrichment, and declaratory judgment.  (*Id.*)  On October 7, 2014, Defendants

filed an answer denying BofI's claims, and Advance asserted a counterclaim against BofI for

tortious interference with contracts or business expectancies with Tovey and SCS.  (Dkt. 24.)

On October 28, 2014, BofI filed an answer denying Advance's counterclaim.  (Dkt. 25.)

Defendants filed a motion for summary judgment on all of BofI's claims on February

19, 2015.  (Dkt. 29.)  The parties subsequently stipulated to limit the scope of the motion to

encompass only the argument that BofI's tortious-interference claim failed as a matter of law

because its lottery assignment agreement with Ms. Venzant was unenforceable since BofI had

not obtained a state court order pursuant to RCW 67.70.100(2)(a) approving the assignment.

BofI opposed Defendants' motion for summary judgment (Dkt. 38), but the Court granted the

motion on April 28, 2015 (Dkt. 42).  The Court subsequently granted summary judgment for

Defendants on BofI's unjust-enrichment and declaratory-judgment claims (Dkt. 63), and

granted summary judgment for BofI on Advance's counterclaim (Dkt. 83).

BofI appealed the Court's orders granting summary judgment against it, and the Ninth

Circuit reversed on December 11, 2017, holding that "[b]ecause the validly formed BofI

Agreement violated neither the letter nor the spirit of the Washington statute, it was not

unenforceable as contrary to public policy."  *BofI Federal Bank v. Advance Funding LLC*, No.

16-35006, 705 Fed. Appx. 668, 669 (9th Cir. Dec. 11, 2017).  Advance did not appeal this

Court's dismissal of its counterclaim against BofI.

On June 15, 2018, the Court granted a motion by Advance's counsel to withdraw as

attorneys of record for Advance.  (Dkt. 98.)  On August 20, 2018, the Court entered an order of

default against Advance.  (Dkt. 104.)  On September 20, 2018, Tovey and SCS moved for

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

summary judgment on all of BofI's claims against them.  (Dkt. 110.)  BofI opposes that motion.  (Dkt. 114.)

**B.      Undisputed Facts.**

On November 16, 2011, Sheena Venzant won the Washington State "Lucky for Life" lottery drawing.  The "Lucky for Life" game is administered through the Washington State Lottery Commission and is subject to RCW ch. 67.70.

As a "Lucky for Life" winner, Ms. Venzant had the option of receiving her prize in a single lump-sum payment of $750,000, or in annual installments of $52,000 for the rest of her life.  She opted for installments.

BofI and Ms. Venzant thereafter entered into a Lottery Payment Assignment Agreement effective as of March 7, 2012 (collectively the "BofI Agreement").

Under the BofI Agreement, Ms. Venzant agreed to assign to BofI twenty-five annual installment payments of $47,000 each, allowing her to retain the remaining amount each year.  BofI agreed to purchase those payments for $318,401.75.

The BofI Agreement provided that BofI's right to receive the installment payments referenced in the BofI Agreement was subject to the condition precedent of the Thurston County Superior Court issuing an order approving the assignment pursuant to RCW 67.70.100.

On March 9, 2012 and March 14, 2012, pursuant to Article 9 of the Washington Uniform Commercial Code, BofI filed a UCC Financing Statement and UCC Financing Statement Amendment, providing public notice of the BofI Agreement.

Ms. Venzant applied for the insurance policy, and obtained it with BofI's assistance (the "Policy").

JOINT PRETRIAL STATEMENT - 3
No. 2:14-cv-00484-BJR

**Savitt Bruce & Willey llp**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

The BofI Agreement stated that the Policy would be at BofI's expense, and BofI paid the first premium.

The Policy included a contestability period and a suicide exclusion, both running for two years from the Policy's date of issuance; in other words, the Policy would not be fully effective for a two-year period.

During its negotiations with Ms. Venzant, Advance conducted a search of court records, looking for any petition or court order concerning Ms. Venzant. Advance found no such records.

On May 21, 2013 Advance entered into a contract with Ms. Venzant (effective May 17, 2013) pertaining to essentially the same lottery installment payments that had been the subject of the BofI Agreement (the "AF Agreement").

Advance generally relied on outside funders to complete its lottery transactions.

On May 21, 2013, Ms. Ray emailed Richard E. Miller III of SCS, and offered SCS an opportunity to bid on the lottery income stream that was the subject of the AF Agreement.

The next day, SCS submitted a bid on behalf of its client, Tovey, and Advance accepted it.

On June 3, 2013, Advance petitioned the Thurston County Superior Court for an order approving Ms. Venzant's assignment of lottery installments to Tovey.

The Thurston County Superior Court issued the order sought by Advance on June 14, 2013.

JOINT PRETRIAL STATEMENT - 4
No. 2:14-cv-00484-BJR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

On February 28, 2014, Eshel Bar-Adon, Executive Vice President and Chief Legal Officer of BofI, wrote a letter to Ms. Venzant demanding the immediate return of the $15,000 that BofI had advanced to her along with 18% annual interest.

**C.      Designation of Depositions and Any Objections Thereto.**

Defendants designate portions of the Advance Funding LLC 30(b)(6) deposition (Monica Ray).  BofI counter-designates portions of that deposition. See Exhibit A.

**D.      Itemization of Damages and Summary of Other Relief Requested.**

BofI seeks to recover $663,343.97 in money damages, calculated as follows:

- $431,993.60 in lost profit on its transaction with Ms. Venzant:
    - Closing date: June 21, 2014
    - Purchase price: $318,401.75
    - Effective discount rate: 14.12%
    - WAL: 11.40
    - Bank cost of funds (10-year swap): $2.27%
    - Value at cost of funds: $750,395.35
    - Bank profit (value at cost of funds less purchase price): $431,993.60
- Plus $228,376.67, consisting Prejudgment interest on $431,993.60 from June 21, 2014 to November 15, 2018 at 12% pursuant to RCW 4.56.110(5)
- Plus $2,973.70, consisting of 18% interest on $15,000 loaned by BofI to Ms. Venzant from February 28, 2014 to April 6, 2015

In lieu of or in addition to money damages, BofI requests a declaration that BofI is the owner and beneficiary of the Policy, and a declaration that the Thurston County Superior

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Court's order approving the assignment of Ms. Venzant's lottery payments to Tovey is invalid and should be vacated and set aside.

**E.      Summary of Pending Motions in Limine and Oppositions Thereto.**

None.

**F.      Statement Concerning Whether Settlement Negotiations Have Been or Would Be Beneficial.**

The parties engaged in settlement discussions, but were unable to resolve their dispute. The parties do not believe that further settlement discussions would be beneficial.

**G.      Updated Estimate of Length of Trial.**

The parties estimate that the bench trial of this case will be completed within three court days.

**H.      Schedule of Witnesses and Brief Summary of Their Expected Testimony and Any Objections Thereto.**

See Exhibit B.

**I.      List of Numbered Exhibits and Any Objections Thereto.**

See Exhibit C.

**J.      Proposed Jury Instructions.**

N/A.

**K.      Proposed Verdict Forms**

N/A.

**L.      Proposed Questions for Voir Dire.**

N/A.

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

**M.      Additional Items Set Forth in LCR 16(h) and (i).**

**1.      Federal Jurisdiction.**

The Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are citizens of different states.

**2.      Claims and Affirmative Defenses that Parties Intend to Pursue at Trial.**

**a.      Claims.**

BofI intends to pursue claims for tortious interference with contract, unjust enrichment, and declaratory judgment at trial.

**b.      Affirmative defenses.**

Failure to state a claim upon which relief can be granted.

Lack of proper personal jurisdiction over one or more of the Defendants.

The alleged damage, if any, resulted from alleged acts or omissions by nonparties over whom the Defendants had no responsibility or control.

Damages, if any, were not caused by, or a result of any act or omission of the Defendants, their agents or employees.

Plaintiff's claims, if any, are barred for failure to mitigate damages.

**3.      Issues of Law.**

Plaintiff's proposed Issues of Law:

Is Tovey chargeable with knowledge possessed by SCS and Amy Schwartz by virtue of agency relationships between Tovey and SCS and between Tovey and Ms. Schwartz?

Is SCS chargeable with knowledge possessed by Ms. Schwartz by virtue of an agency relationship between SCS and Ms. Schwartz?

JOINT PRETRIAL STATEMENT - 7
No. 2:14-cv-00484-BJR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Is Tovey vicariously liable for the actions of SCS by virtue of an agency relationship between Tovey and SCS?

Did a valid contract exist between BofI and Sheena Venzant at the time of SCS and Tovey's alleged interference with said contract?

Did Tovey and SCS interfere with a contract between BofI and Ms. Venzant for an improper purpose or by improper means?

Did SCS and Tovey receive a benefit at BofI's expense?

Do the circumstances of this case make it unjust for SCS and Tovey to retain any benefit they received without payment?

Does the *Rooker-Feldman* doctrine bar BofI's claim for declaratory judgment?

Defendants' Proposed Issues of Law:

Should the action against the Defendants be dismissed where the Court lacks personal jurisdiction since neither Defendant transacts business in this state, have no minimum contacts in the state and no substantial, continuous or systematic contact within the state.  All of Defendants' contact regarding this matter occurred in Florida.

Should the tortious interference claim be dismissed where there is no evidence that the Defendants had knowledge of a "valid and enforceable" contract, or that they intentionally interfered with a contract causing its termination, by improper means or for an improper purpose?

Should the unjust enrichment claim be dismissed where the Plaintiff did not confer a benefit on the Defendants because, among other things, Plaintiff did not own or control the lottery payment stream?

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Should this Court decline to undo a lawfully entered Order from the Superior Court of

Thurston County Washington, pertaining exclusively to an issue of Washington State statutory

law where the Plaintiff neither intervened in, enjoin or otherwise challenge the State Court

proceeding, and this Court has no authority to modify the State Court Order?

DATED: October 19, 2018

SAVITT BRUCE & WILLEY LLP

By: _____
    James P. Savitt, WSBA #16847
    Duncan E. Manville, WSBA #30304
    1425 Fourth Avenue, Suite 800
    Seattle, Washington  98101-2272
    Telephone:  206.749.0500
    Facsimile:  206.749.0600
    Email:  jsavitt@sbwllp.com
    Email:  dmanville@sbwllp.com

Attorneys for Plaintiff BofI Federal Bank

RYAN, SWANSON & CLEVELAND, PLLC

By: _____
    Susan Rae Fox, WSBA #15278
    1201 Third Avenue, Suite 3400
    Seattle, Washington  98101-3034
    Telephone:  206.464.4224
    Facsimile:  206.583.0359
    Email:  fox@ryanlaw.com

Attorneys for Defendants Kirk A. Tovey, individually
and as trustee of the Kirk A. Tovey Revocable Trust,
and Settlement Collection Service, LLC

JOINT PRETRIAL STATEMENT - 9
No. 2:14-cv-00484-BJR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

BOFI FEDERAL BANK, a federally        )
charted banking institution,          )
                                      )
                    Plaintiff,        )   No. 2:14-CV-00484-BJR
                                      )
        vs.                           )   **PLAINTIFF**
                                      )
ADVANCE FUNDING LLC, KIRK A.          )   **DEFENDANTS**
TOVEY, individually and as            )
trustee of the KIRK A. TOVEY          )   **JOINT**
REVOCABLE TRUST; and SETTLEMENT       )
COLLECTION SERVICE, LLC,              )
                                      )
                    Defendants.       )
_____

Video 30(b)(6) Deposition Upon Oral Examination

of

ADVANCE FUNDING LLC

MONICA L. RAY

_____

Taken at 1425 Fourth Avenue, Suite 800
Seattle, Washington

DATE:  September 22, 2015

REPORTED BY:  Wade J. Johnson, RPR

CCR No.:  2574

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 2

                    A P P E A R A N C E S


     For the Plaintiff:          DUNCAN E. MANVILLE
                                 Savitt Bruce & Willey LLP
                                 1425 Fourth Avenue, Suite 800
                                 Seattle, Washington 98101
                                 dmanville@sbwllp.com



     For the Defendants:         SUSAN RAE FOX
                                 Ryan Swanson
                                 1201 3rd Avenue, Suite 3400
                                 Seattle, WA 98101-3034
                                 fox@ryanlaw.com




     The Videographer:           STEVE EWING

                                 SRS | Premier Realtime

                                 Reporting & Legal Video

                                 2200, Sixth Avenue Suite 425,

                                 Seattle, Washington




                          --oOo--

Page 3

I N D E X

EXAMINATION BY:                                    PAGE

Mr. Manville . . . . . . . . . . . . . . . . . . . . . 6


                         *   *   *


EXHIBITS FOR IDENTIFICATION:

Number                                             PAGE

Exhibit 1        Third Amended Notice of Deposition
                 of Advance Funding LLC Pursuant to
                 Fed. R. Civ. P. 30(b)(6) . . . . . . . . 18

Exhibit 2        E-mail from Monica Ray to Richard
                 Miller III, 05/22/13 . . . . . . . . . 69

Exhibit 3        E-mail from Monica Ray to Scott
                 Miller and Amy Schwartz, 05/13/14 . . . 108

Exhibit 4        One-page Handwritten Letter by
                 Sheena Venzant, 02/05/13. . . . . . . 112

Exhibit 5        E-mail from Scott Miller to Amy
                 Schwartz, Richard Miller III, and
                 Richard Miller, Jr., 03/12/14 . . . . . 118

Exhibit 6        Lottery Prize Assignment Agreement. . . 132

Exhibit 7        Spreadsheet, Defs 00584 . . . . . . . 145

Exhibit 8        Spreadsheet, Defs 00583 . . . . . . . 151

Exhibit 9        Spreadsheet, Defs 000183. . . . . . . 152

Exhibit 10       Spreadsheet, Defs 000184. . . . . . . 152

Exhibit 11       E-mail from David Bavli to Duncan
                 Manville, 07/31/15. . . . . . . . . . 156

(Index continued next page.)

Page  4

I N D E X

EXHIBITS FOR IDENTIFICATION:

Number                                                      PAGE


Exhibit 12     E-mail from Monica Ray to Richard

               Miller III, 03/19/14. . . . . . . . . . 156


Exhibit 13     E-mail from Monica Ray to Scott

               Miller, 04/03/14. . . . . . . . . . . 159


Exhibit 14     E-mail from Richard Miller III to

               Monica Ray, 10/16/14. . . . . . . . . 167


Exhibit 15     E-mail from Richard Miller III to

               Monica Ray, 12/24/14. . . . . . . . . 169


Exhibit 16     E-mail from Richard Miller III to

               Monica Ray, 07/17/14. . . . . . . . . 171

*   *   *   *

Page 5

```
 1              SEATTLE, WASHINGTON; TUESDAY, SEPTEMBER 22, 2015

 2                              8:58 A.M.

 3                              --oOo--

 4

 5              THE VIDEOGRAPHER:  We are going on the record

 6   at 8:58 a.m. on September 22nd, 2015.  This is Disc No. 1 in

 7   the video deposition of Monica Ray, taken by the plaintiff,

 8   Case No. 2:14-CV-004884-BJR, in the matter of BOFI Federal

 9   Bank vs. Advance Funding, LLC, et al., filed in the U.S.

10   District Court Western District of Washington at Seattle.

11              This deposition is taking place at Savitt

12   Bruce & Willey, 1425 Fourth Avenue, Suite 800, Seattle,

13   Washington 98101.

14              The videographer is Steve Ewing for SRS |

15   Premier Realtime Reporting & Legal Video, 2200 Sixth Avenue

16   Suite 425, Seattle, Washington.

17              The court reporter is Wade Johnson for SRS |

18   Premier Realtime Reporting and Legal Video.

19              Will counsel and all present please note their

20   appearances and affiliations for the record?

21              MR. MANVILLE:  Yes.  Duncan Manville, Savitt

22   Bruce & Willey, representing the plaintiff and the

23   counterclaim defendant in this case, BOFI Federal Bank.

24              MS. FOX:  Susan Fox, with Ryan, Swanson &

25   Cleveland, representing the defendant.
```

Page 6

1    MONICA L. RAY,              deponent herein, having been

2                               first duly sworn on oath, was

3                               examined and testified as

4                               follows:

5

6                    E X A M I N A T I O N

7    BY MR. MANVILLE:

8         Q.   Good morning.

9         A.   Good morning.

10        Q.   So I know that the videographer just identified you

11   for the record, but could you also state your name for the

12   record, please.

13        A.   Monica Ray.

14        Q.   And are you the person that Advance Funding, LLC

15   has designated to testify on its behalf today?

16        A.   Yes.

17        Q.   Have you ever been deposed before?

18        A.   I have not.

19        Q.   Let me go back over some ground rules for you.  A

20   deposition is an opportunity for me to ask you questions and

21   for you to answer them.  And do you understand that you will

22   be testifying today under oath, just as you would be

23   testifying in court?

24        A.   I do.

25        Q.   You'll need to answer audibly and verbally because

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                                September 22, 2015

Page 7

1    otherwise the court reporter is going to have some trouble

2    taking down what you're saying.

3         A.   I understand.

4         Q.   A deposition is a little bit like a conversation,

5    but it's not in some respects.  And, in one respect, it's

6    important that we not talk over each other.  I have a

7    tendency to do that; I'm from the East Coast.  You may do the

8    same thing.  I'll do my best not to interrupt you, and, if we

9    can avoid doing that, it will make for a much cleaner record.

10             If you don't understand a question, please ask me

11   to clarify it, otherwise I'll assume you understand it; is

12   that fair?

13        A.   Okay.

14        Q.   Is Ms. Fox here representing you today?

15        A.   Ms. Fox is representing Advance Funding.

16        Q.   She may be making objections for the record today,

17   and, for the most part, notwithstanding her objections,

18   you'll need to answer the questions anyway.  If there is a

19   question that I ask that touches on an issue of, for example,

20   the attorney-client privilege, she may ask you or instruct

21   you not to answer the question, but, for, the most part, if

22   she makes an objection, it's just for the record.

23             Let me know if you need a break; we'll take one

24   whenever you need one.

25             Is there any reason why you cannot give accurate

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                        September 22, 2015

Page 8

1    and truthful testimony today?

2         A.   No, sir.

3         Q.   Let's get just a little bit of background on you,

4    very, very briefly.  Tell me how you're currently employed.

5         A.   I'm currently employed with Northeastern Capital

6    Funding, a New York company.

7         Q.   And what's your position with Northeastern Capital

8    Funding?

9         A.   Director of legal.

10        Q.   What are your job responsibilities in that

11   position?

12        A.   Basically, to oversee the preparation through

13   closing of all transactions.

14        Q.   Do you have a law degree?

15        A.   I did not sit for the bar, but I did pursue a juris

16   doctorate at the University of Miami.  I did not complete.

17        Q.   How much course work did you do toward that degree?

18        A.   I had to leave due to complications with being a

19   single mother in my first semester, so very little.

20        Q.   So you have a college degree then?

21        A.   I do.

22        Q.   Where did you get your college degree?

23        A.   I have several.  I have an Associate's in Criminal

24   Justice from Montgomery College, I have a paralegal

25   certificate from FAU, and a four-year from University of

Page 9

1    Maryland.

2         Q.   Did you grow up in Maryland?

3         A.   I did.

4         Q.   I went to Bethesda Chevy Chase High School.

5         A.   I was on the police force in Bethesda.

6         Q.   Oh, were you really?

7              MS. FOX:  Do you remember him from there?

8              THE WITNESS:  No.

9              MR. MANVILLE:  You would have.

10        Q.   So how long have you been the director of legal

11   with Northwestern Capital Funding?

12        A.   Northeastern Capital.

13        Q.   Northeastern.

14        A.   May of 2006.

15        Q.   What did you do before that?

16        A.   I worked for Encore Funding.

17        Q.   Encore Funding?

18        A.   Correct.  It's another factoring company in our

19   industry.

20        Q.   Where were they located?

21        A.   West Palm Beach, Florida.

22        Q.   How long did you work for them?

23        A.   Three years.

24        Q.   What was your position there?

25        A.   Senior paralegal.

Page 10

1      Q.   When you made the move to Northeastern Capital

2   Funding, did you start there as director of legal?

3      A.   Yes.

4      Q.   So that's the same position you've held the whole

5   time?

6      A.   Correct.

7      Q.   Have your job responsibilities there changed at

8   all?

9      A.   Not -- no.

10     Q.   What did you do before your three years at Encore

11  Funding?

12     A.   I worked for Singer Asset Funding.

13     Q.   Senior Asset Funding?

14     A.   Singer.

15     Q.   Singer, like S-i-n-g-e-r?

16     A.   Correct.

17     Q.   Is that another factoring company?

18     A.   It is.

19     Q.   Were you a paralegal there?

20     A.   Yes.

21     Q.   How long did you work there?

22     A.   From October of '98 until December 31st of 2000.

23     Q.   So there seems to be a three-year gap.  Did you

24  take some time off between --

25     A.   Yes.

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                                September 22, 2015

Page 11

1     Q.   What did you doing?  Were you a mom during that

2  period?

3     A.   I was a mom during that period.

4     Q.   When did you get your degree from the University of

5  Maryland?

6     A.   '85.

7     Q.   And what is your degree, your four-year degree?

8     A.   Economics.

9     Q.   What did you do when you got out of college?

10     A.   As far as?

11     Q.   Employment.

12     A.   I worked in legal offices, basically, from the age

13  of 16.

14     Q.   And in what capacity?

15     A.   Paralegal.

16     Q.   Paralegal.

17     A.   Legal assistant, started as a legal assistant until

18  I received my certificate.

19     Q.   When did you receive your paralegal certificate?

20     A.   I received FAU in '96.

21     Q.   When did you make the move into the factoring

22  industry; was that when you started with Singer in 1998?

23     A.   Correct.

24     Q.   What prompted you to make that move?

25     A.   A friend that I bowled with suggested that I might

Page 12

1    like corporate, as opposed to personal injury.

2           Q.    What's the relationship between Northeastern
3    Capital Funding and Advance Funding?

4           A.    They are owned by brothers.

5           Q.    So who owns Northeastern Capital Funding?

6           A.    John Cevallos.

7           Q.    And what type of entity is it?

8           A.    A factor -- oh, LLC.

9           Q.    Is he the sole member of the LLC?

10          A.    I believe so.

11          Q.    Who owns Advance Funding?

12          A.    Dan Cevallos.

13          Q.    Are there any other -- he's a member of the LLC?

14          A.    Yes.

15          Q.    Is he the sole member?

16          A.    I believe so.

17          Q.    How many employees does Advance Funding have?

18          A.    To my best knowledge, I would say 12.

19          Q.    And so, getting back to my earlier question, I
20   understand that Northeastern Capital Funding is an LLC that's
21   owned by John Cevallos and Advance Funding is an LLC that's
22   owned by Dan Cevallos.  Are you an employee of Advance
23   Funding?

24          A.    I am not.

25          Q.    So what's your connection with Advance Funding

Page 13

 1    then?

 2        A.    Basically, Northeastern secures funding and has in

 3    an experience fostered several different funding sources that

 4    we have sole access to, so Advance Funding has not, and,

 5    therefore, we secure funding for Advance Funding.

 6        Q.    So tell me how that process works.  How does

 7    Northeastern secure funding for Advance Funding, just

 8    generally?

 9        A.    Northeastern secures funding for lots of different

10    companies, Advance happens to be one of them.  Basically,

11    they will contract with a winner or a structured settlement

12    annuitant.

13        Q.    They being Northeastern?

14        A.    They or any -- no, Advance Funding or any other

15    brokering company.

16        Q.    Okay.

17        A.    Will actually do the contracting with the

18    individual.  We will secure an assignee.  Sometimes

19    Northeastern handles the filing of the petition; sometimes

20    the broker will handle it.  Just each individual transaction

21    is different.

22        Q.    How is Northeastern a broker?

23        A.    Northeastern -- I wouldn't consider us a broker so

24    much so that we secure funding for lots of different

25    brokering companies.  So they broker to us, and then we find

Page 14

1   assignees for them.

2        Q.   So how is a company like Northeastern different, in

3   terms of what it does, than a company like Settlement

4   Collection Service?

5        A.   Settlement Collection Services, I believe, is a

6   wealth management company.  They have individual clients;

7   Northeastern does not.

8        Q.   But, functionally, I take it that the two companies

9   do kind of the same thing, they serve as an intermediary

10   between a factoring company, like Advance Funding, and an

11   investor?

12        A.   I, unfortunately, can't speak to what SCS or any

13   other company might do in their normal practice.  I do know

14   that they do have clients that purchase structured

15   settlements and lottery transactions from us or through us.

16        Q.   Okay.  But Northeastern -- was what I just said,

17   was that an accurate summary of what Northeastern does, it

18   essentially acts as an intermediary between a factoring

19   company like Advance Funding and a source of funding for a

20   transaction?

21        A.   That is one such thing that it does, yes.

22        Q.   And that source of funding could potentially be a

23   broker; it could be an investment company with individual

24   investors; it could potentially be an investor, correct?

25        A.   It could be.

Page 15

1        Q.   Was Northeastern involved in the Sheena Venzant

2   transaction?

3        A.   Northeastern secured the funding for that

4   transaction.

5        Q.   Is there a contractual relationship between Advance

6   Funding and Northeastern?

7        A.   There is not.

8        Q.   So there's no global contractual relationship

9   governing the business that the parties do together?

10       A.   No, sir.

11       Q.   Is there a contractual relationship that Advance

12  Funding and Northeastern enter into with regard to specific

13  transaction, like the Venzant transaction?

14       A.   No, sir.

15       Q.   When Northeastern assists Advance Funding in

16  obtaining funding for a lottery transaction, does

17  Northeastern earn a profit on that deal?

18       A.   In some instances, yes.

19       Q.   And how is that determined?  What percentage --

20  what kind of a profit does Northeastern earn on these deals?

21            MS. FOX:  Now, I'm going to object to that

22  question.  It's far outside the scope of this deposition.

23  It's about a company that's not even an entity and

24  proprietary.  This is a 30(b)(6) dep.  I've given you quite a

25  bit of latitude, but I think we need to get to the topics.

Page 16

```
 1        Q.   You can answer the question.

 2        A.   The percentages vary.  I can't give you a

 3   certain -- there is no set.

 4        Q.   I'm not asking about a specific percentage.  I just

 5   mean, when Northeastern assists Advance Funding in placing a

 6   deal, it will earn some percentage of -- some profit on that

 7   transaction, correct?

 8        A.   No, not necessarily.

 9        Q.   Sometimes, but not always?

10        A.   Sometimes, but not always.

11        Q.   Did Northeastern earn a profit on the Venzant

12   transaction?

13        A.   It did not.

14        Q.   And so, when you were communicating with Scott

15   Miller at SCS about the Venzant transaction, were you doing

16   so in your capacity as a representative of Northeastern or a

17   representative of Advance Funding?

18        A.   I don't believe I had any capacity in mind.  It was

19   a transaction that was flowing through me as far as securing

20   the funder.  So I was acting in that capacity.

21        Q.   How much insight do you have into the operations of

22   Advance Funding?

23        A.   Generally or with --

24        Q.   Generally.

25        A.   Generally, I would say I have a modicum of insight.
```

Page 17

1     Q.    So how do you know that Advance Funding has 12

2  employees?

3     A.    I've been to their holiday party.

4     Q.    Counted heads?

5     A.    When you asked, I literally counted in my head.

6     Q.    Do you have access to Advance Funding's books and

7  records?

8     A.    Books and records in what regard?

9     Q.    Financial documents, profit and loss statements,

10  tax filings, anything like that?

11     A.    No, sir.

12     Q.    Do you have any personal knowledge regarding

13  what -- the profit that Advance Funding might earn on a

14  particular lottery transaction?

15     A.    In as much as I secure the funding for that

16  transaction, I would absolutely know the profit for each of

17  those transactions.

18     Q.    The profit that Advance Funding would earn on the

19  transaction?

20     A.    Correct.

21     Q.    You told me earlier that you were here to testify

22  as an authorized representative of Advance Funding; have you

23  reviewed the deposition notice pertaining to this deposition?

24     A.    I have.

25               MR. MANVILLE:  Let's make this the first

Page 18

1    exhibit.

2                           (Exhibit 1 marked for

3                             identification.)

4         Q.    Handing you Exhibit 1, is this a copy of the

5    deposition notice that you reviewed for today's deposition?

6         A.    Yes.

7                 MR. MANVILLE:   For the record here, we noticed

8    after this went out that the notice was dated September 15th,

9    although it should have been dated September 18th, and the

10   certificate of service reads September 22nd, inexplicably,

11   although it should have read September 18th.

12        Q.    Did you review this deposition notice before today?

13        A.    I did.

14        Q.    Did you review all the topics stated in the notice?

15        A.    I did.

16        Q.    And are you prepared to testify today regarding all

17   of the topics stated in this deposition notice?

18        A.    I am.

19        Q.    What did you do to prepare for your deposition

20   today?

21        A.    I reviewed the file.   I reviewed pleadings.   I

22   discussed with sales; the president; the accountant;

23   research; the legal department.   I reviewed UCC searches;

24   lien searches; court searches, in two different

25   jurisdictions.   I reviewed the affidavit of Sheena Venzant,

Page 19

1    and I reviewed the responses to the Complaint as well as the

2    interrogatory and request for production.

3         Q.    When you say you reviewed the file, what file are

4    you referring to?

5         A.    The file that is held for the purposes of securing

6    the funding.  We have a copy of all the documents that would

7    go to the funder in the closing binder.  Would you like me to

8    elaborate?

9         Q.    Yes, I would.

10        A.    That would be the contract between Advance Funding

11   and Sheena Venzant, with Exhibits A through C, which are the

12   disclosure statement; the address verification; the marital

13   status and consent page.  It includes her ID and Social

14   Security card; a W-9; evidence of winning, which in

15   Washington consists of an award letter; UCC searches; lien

16   searches; the petition, with its attachments; the order; the

17   acknowledgment letter; requests for information of the

18   lottery.  That's it.

19        Q.    And all of these documents would have gone to the

20   funder in connection with this transaction?

21        A.    All but the request for information to the lottery.

22        Q.    And are these documents, are they held by Advance

23   Funding, or are they held by Northeastern?

24        A.    They would be held by both.

25        Q.    Northeastern has a copy, and Advance Funding has a

Page 20

1  copy?

2      A.   Correct.

3      Q.   Were all of these documents produced in discovery

4  in this case; do you know?

5      A.   I believe so, yes.

6      Q.   Were all of these documents provided to SCS back in

7  2013?

8      A.   Yes, except for the request for information to the

9  lottery.

10     Q.   Are those dated at a later date?

11     A.   No, they're just not required in the closing

12  binder.

13     Q.   Do you know exactly when in 2013 this information

14  was provided to SCS?

15     A.   Exactly, no.

16     Q.   Is there a cover letter transmitting these

17  documents to SCS that's in the file?

18     A.   There's an e-mail.

19     Q.   An e-mail.  Do you know the date of that e-mail?

20     A.   I do not recall the date.

21     Q.   Who sent it?

22     A.   It would have been sent by me.

23     Q.   You sent it?

24     A.   Yes.

25     Q.   So there's, somewhere in the file or in your

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 21

1    records, there's an e-mail transmitting all of these

2    documents?

3         A.    Correct.

4         Q.    Who did you send them to?

5         A.    That would have been sent to Amy Schwartz, who is

6    counsel for SCS, copying all of the Millers and Connie

7    Younan.

8         Q.    And who is she?

9         A.    She is, in some respects, their office manager, of

10   sorts.  I don't know exactly what her position is.

11        Q.    And apologies if I already asked you this, but the

12   date of that -- do you know the date of that e-mail?

13        A.    I would imagine it was sometime in July.  I was, in

14   July, forming up things, securing documents for that closing

15   binder.

16        Q.    When you say you imagine it was sometime in July,

17   why do you say you imagine?  Are you assuming?

18        A.    Because I recall -- I'm not assuming.  I

19   specifically recall an e-mail in early July, first of July,

20   where I was looking for a certain document that was required

21   for closing binder.  So I would assume it was June or July.

22        Q.    Would that be your normal practice, to prepare a

23   closing binder and send it to the broker or the funder within

24   a month or two after the court order is obtained?

25        A.    It's actually after the acknowledgment is obtained.

Page 22

1    That is the last thing, generally.

2        Q.    All right.   And tell me what the acknowledgment

3    letter is.

4        A.    That is where the lottery has been served with a

5    copy.   I believe, in Washington, it's required that it be

6    certified, but I'm not 100 percent sure.   And they

7    acknowledge receipt of the order and that they will change

8    his records accordingly to pay the payee listed in the

9    approved court order.

10       Q.    And your normal practice is that, after you receive

11   that acknowledgment letter, you prepare a closing binder, and

12   you send it to the broker or the funder?

13       A.    Correct.

14       Q.    So your testimony is that, in this matter, in June

15   or July of 2013, you sent copies of the UCC searches to Amy

16   Schwartz and also Scott and Richard Miller?

17       A.    They were lien and judgment searches, but they do

18   include UCC searches, yes.

19       Q.    Did those searches show the UCC filings that BOFI

20   had filed in 2012?

21       A.    They did.

22       Q.    You said you talked to sales; I assume that means

23   sales at Advance Funding?

24       A.    Correct.

25       Q.    Who did you talk to?

Page 23

1       A.    Barbara Guerra.

2       Q.    And who is she?

3       A.    A salesperson for Advance Funding.

4       Q.    What did you talk about with her?

5       A.    I asked her about her initial contact with Sheena

6    Venzant, conversations she may or may not have had with --

7    I'm not even going to try to pronounce the name -- Onwubere.

8       Q.    Onwubere, yeah.

9       A.    I also asked her about the insurance documents.

10      Q.    What did she tell you about her initial contact

11   with Ms. Venzant?

12      A.    Initially, she told me that she had spoken with her

13   when she first got the information regarding the win, but had

14   very little to no contact between then and when Ms. Venzant

15   reached out to her in 2013.

16      Q.    When you say that she had -- did Ms. Guerra -- is

17   it Guerra or Guerra?

18      A.    Guerra.

19      Q.    Guerra.  Did she contact Ms. Venzant after she won

20   the lottery, shortly after she won the lottery?

21      A.    Yes.

22      Q.    What did they discuss at that time?

23      A.    She didn't have a recollection of the actual nature

24   of the conversation.  Ms. Guerra is a very social person, so

25   her conversations tend to include family matters, in both

Page 24

1    Ms. Guerra's family and the winner's family.  But I'm certain

2    it was probably geared towards a contract.

3         Q.   But, at that time, Advance Funding obviously did

4    not enter into an agreement with Ms. Venzant?

5         A.   No.

6         Q.   Did she say why?

7         A.   No.

8         Q.   Did you ask her why?

9         A.   No.

10        Q.   You said that Ms. Guerra had little to no contact

11   between then and when Ms. Venzant reached out to her in 2013;

12   is that little contact or no contact?

13        A.   When I asked her specifically, she said she

14   couldn't recall if there was possibly another e-mail

15   transaction between the two, so that's why I said little to

16   no.

17        Q.   Did Advance Funding search its records to attempt

18   to locate such an e-mail correspondence between Ms. Guerra

19   and Ms. Venzant?

20        A.   It did.

21        Q.   And didn't find anything?

22        A.   I don't believe Ms. Guerra was employed by Advance

23   Funding at that time.

24        Q.   Is she currently employed by Advance Funding?

25        A.   Yes.

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                September 22, 2015

Page 25

1        Q.    Did she leave the company for a while?

2        A.    Not to my knowledge, no.

3        Q.    So she was employed by Advance Funding when

4   Ms. Venzant won the lottery?

5        A.    I don't believe so, sir.

6        Q.    So, when she spoke with Ms. Venzant shortly after

7   Ms. Venzant won the lottery, was she an Advance Funding

8   employee?

9        A.    No, sir.

10       Q.    She was working for another company?

11       A.    Yes, sir.

12       Q.    And she was contacting Ms. Venzant on behalf of

13   that other company?

14       A.    I would assume so, yes.

15       Q.    When did she start working for Advance Funding?

16       A.    I don't know the exact date that she started.

17       Q.    So it's possible -- what you're telling me is that

18   it's possible she had some correspondence with Ms. Venzant

19   before she came to Advance Funding?

20       A.    Yes, sir.

21       Q.    And is it your testimony that Ms. Venzant reached

22   out to Ms. Guerra in 2013 and not the other way around?

23       A.    It's my testimony, from review of the affidavit of

24   Sheena Venzant, that Sheena Venzant reached out to Advance

25   Funding, specifically to Barbara Guerra.

Page 25, lines
21-25: Hearsay

Page 26

1      Q.    What did Ms. Guerra tell you about that?

2      A.    Ms. Guerra was not 100 percent certain who made

3    initial contact.  So she indicated that she did return a call

4    from Ms. Venzant.

5      Q.    But she didn't remember who initiated the contact?

6      A.    Correct.

7      Q.    Are you aware that Advance Funding stated in its

8    answers to interrogatories that Advance Funding initiated

9    that contact?

10      A.    I am.

11      Q.    Do you believe that's incorrect, or do you not know

12   one way or the other?

13      A.    I believe that Advance may have done that, and I

14   also understand that Sheena Venzant believes that she made

15   the initial contact.  We are referring to something that

16   happened years ago, so --

17      Q.    What did Ms. Guerra tell you about her

18   communications with Mr. Onwubere?

19      A.    Ms. Guerra indicated that she spoke with that

20   gentleman to confirm that Ms. Sheena Venzant cancelled her

21   contract.

22      Q.    Do you know the specifics of that conversation that

23   Ms. Guerra had with Mr. Onwubere?

24      A.    I believe those were the specifics.

25      Q.    And do you know what basis Mr. Onwubere had for

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 27

1    stating that Ms. Venzant had cancelled the contract?

2         A.   I can't speculate as to what basis he had for

3    stating that she had cancelled her contract.

4         Q.   Do you know if Ms. Guerra asked him how he knew

5    that she had cancelled the contract?

6         A.   I believe Ms. Guerra believed he was a BOFI

7    employee.

8         Q.   Do you know if he was a BOFI employee at that time?

9         A.   I have learned now that he was not.

10         Q.   You also spoke with Ms. Guerra about insurance

11    documents; what did you discuss with her about insurance

12    documents?

13         A.   I wanted to know where the insurance documents

14    initiated, whether that was something that we had secured,

15    being Advance, or whether that was something Ms. Venzant had

16    secured.

17         Q.   What did she tell you?

18         A.   That the insurance policy was secured by

19    Ms. Venzant and that the documents for change of ownership

20    were secured by Ms. Venzant, as well.

21         Q.   Why was Ms. Guerra the person that you talked to

22    about the insurance documents; why would she have had

23    knowledge of that?

24         A.   I reviewed e-mails, as I stated before, and one of

25    the e-mails I was asking Ms. Guerra to secure the documents,

**Page 27, lines 10-20: Hearsay if offered for the truth of the matters asserted**

Page 28

1    signed by Ms. Venzant so that we could process the change of

2    ownership to the assignee.

3         Q.    Why would Ms. Guerra have been the one to secure

4    those documents?

5         A.    Because she is the salesperson in the matter.

6         Q.    Did you talk to anyone else in the sales

7    department?

8         A.    I talked to Frank Paolercio.

9         Q.    Who is that?

10        A.    Head of sales.

11        Q.    What did you talk to him about?

12        A.    Asked him about his knowledge of the transaction,

13   his transactional event knowledge, and if he had any contact

14   with Sheena Venzant.

15        Q.    What did he tell you?

16        A.    He told me several things.  He basically told me

17   that Barbara was the primary contact with Sheena Venzant,

18   that he was aware of all of her conversations, but that he

19   had had no contact with her.

20        Q.    With Ms. Venzant?

21        A.    Correct.

22        Q.    And how was he aware of all of the conversations

23   that took place with Ms. Venzant?

24        A.    In his position as head of sales.

25        Q.    How do the salespeople report to him?

Page 29

```
 1       A.   I'm not in their office.  I do not know the answer

 2  to that.  I would assume that they have conferences, but I

 3  can't speculate.

 4       Q.   Do they report to him by e-mail?

 5       A.   I don't believe the sales are very big on e-mail.

 6       Q.   What's your basis for that belief?

 7       A.   My communications with sales are very limited

 8  e-mail.  They're phone people.

 9       Q.   Are salespeople required to summit written reports

10  of their activities?

11       A.   No.

12       Q.   Did you speak to anybody else in the sales

13  department to prepare for your deposition today?

14       A.   In sales, no.

15       Q.   You said you spoke to the president; I take it you

16  mean Mr. Cevallos?

17       A.   Correct.

18       Q.   Dan Cevallos?

19       A.   Correct.

20       Q.   What did you talk to him about?

21       A.   I asked him about his involvement in the matter, if

22  any, whether he had had any conversations with Eshel or

23  Mr. Garrabrants or Mr. Heffner.

24       Q.   Anything else?

25       A.   That's it.
```

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 30

1      Q.   What did Mr. Cevallos tell you about his

2   involvement in the Venzant matter?

3      A.   He had received one call from, I believe, David

4   Bavli, but was never made -- they never made contact after

5   that.  They played, I guess, phone tag.  And that his

6   conversations with Eshel were post-lawsuit.

7      Q.   What did Mr. Cevallos and Mr. Bavli discuss?

8      A.   As I stated, they played phone tag, and there was

9   no discussion.

10     Q.   They didn't actually speak on the phone?

11     A.   They did not.

12     Q.   That's Mr. Cevallos's position?

13     A.   That's what he told me.

14     Q.   What conversations did Mr. Cevallos have with

15  Mr. Bar-Adon after the filing of the lawsuit that you talked

16  about with him?

17     A.   Basically, settlement negotiations.

18     Q.   Anything else?

19     A.   Just actions in the lawsuit, things that were going

20  to happen.  I know that he warned him more than once about

21  creating bad law.

22     Q.   You believe that what the court entered is bad law?

23     A.   I do, sir.

24     Q.   Why?

25     A.   It's not good for any type of law to be created in

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                                    September 22, 2015

Page 31

1  our industry.  It's difficult enough for these transactions.

2  That one is particularly harmful.

3       Q.   Why do you think it's harmful?

4       A.   It induces poaching.

5       Q.   Does Mr. Cevallos share your belief; did he express

6  that to you?

7       A.   I don't believe he has one care either way.  It

8  won't affect anything that he does or how he does it, is how

9  he responded to me.

10      Q.   Did Mr. Cevallos state to you that he had any other

11  involvement in the Venzant matter other than trading phone

12  calls with Mr. Bavli?

13      A.   Are you asking with respect to BOFI?

14      Q.   Let's say -- no, I'm not actually.  Let me rephrase

15  that question.  Did Mr. Cevallos tell you that he had any

16  other involvement in the Venzant matter, other than his phone

17  calls with Mr. Bavli before BOFI filed this lawsuit?

18      A.   He did not indicate any type of activity.

19      Q.   Did you ask him whether he had had any other

20  involvement in the Venzant matter?

21      A.   I did not ask him if he had any other.  I had asked

22  him initially, and I received his response, which --

23      Q.   So you asked him what was your involvement in the

24  Venzant matter.  He said, David Bavli and I traded phone

25  calls, and I had some settlement discussions with Eshel?

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 32

```
 1        A.   That was his response with respect to his contact

 2   with BOFI.  He obviously was aware of the situation from

 3   Barbara Guerra and his sales manager.

 4        Q.   When you say he was aware of the situation, what do

 5   you mean by that?

 6        A.   He plays an integral part in contract negotiation.

 7        Q.   What role does he play?

 8        A.   He approves or disapproves of whatever contract

 9   term were negotiated by sales and the winner or the

10   annuitant, in this case, a winner.

11        Q.   Does he do that in every instance?

12        A.   Yes.  He also has to approve or disapprove of

13   advances requested, and, from what I understand, those were

14   requested frequently.

15        Q.   I'm sorry, I missed that.  He also has to approve

16   or disapprove of what?

17        A.   Advances.

18        Q.   Advances, okay.  Does he also approve or disapprove

19   of the terms of deals that Advance Funding offers to brokers

20   or investors?

21        A.   Absolutely.

22        Q.   And, again, in every instance?

23        A.   In every instance.

24        Q.   And so I gather from your testimony that, in the

25   Venzant matter, he would have approved the terms of the
```

Page 33

1    agreement that were offered to Ms. Venzant and then approve

2    the terms of the deal that were offered to SCS, correct?

3        A.    Yes.

4        Q.    Would he have had any other involvement in the

5    Venzant matter?

6        A.    If there were an issue or something that required

7    his involvement, he would definitely have been the person.

8    He did not recall any special issues.

9        Q.    You said you spoke with the accountant for Advance

10   Funding?

11       A.    I did.

12       Q.    Who is that?

13       A.    Julie Casal.

14       Q.    Why did you speak with her?

15       A.    I wanted to confirm advance information, funding

16   information, and anything that she might have known about the

17   Sheena Venzant matter.

18       Q.    What did you learn from her?

19       A.    She divulged the dates of advances, the date of

20   funding, and that she had no personal or direct contact with

21   Sheena Venzant.

22       Q.    Were there advances that Advance Funding gave to

23   Ms. Venzant?

24       A.    Yes.

25       Q.    How many?

Page 34

1      A.   Several.  Unfortunately, with all the details I had

2  to remember, that's just not something that I can remember.

3      Q.   More than one?

4      A.   Absolutely.

5      Q.   Do you know the amount of the advances?

6      A.   They varied.

7      Q.   What was the total; do you know?

8      A.   I do not recall.

9      Q.   Can you give me an approximate number?

10     A.   I cannot.  Those advances were reimbursed at

11  closing.

12     Q.   Do you know if Ms. Venzant had any communications

13  with Advance Funding regarding those advances?

14     A.   She had several.  Her contact would have been

15  Barbara Guerra.

16     Q.   Were those communications by phone or by e-mail or

17  by text or by some combination?

18     A.   Combination, majority phone.

19     Q.   Were there e-mails between Ms. Venzant and

20  Ms. Guerra related to the transaction for advances that

21  Ms. Venzant received?

22     A.   There were e-mails between Ms. Guerra and

23  Ms. Venzant relating to the transactions.  I believe there

24  was also at least one with regard to an advance.

25     Q.   Were those e-mail messages produced in this case?

Page 35

1       A.   Yes, sir.

2       Q.   So you saw them when you went through the documents

3  that Advance Funding had produced in discovery?

4       A.   Yes, sir.

5       Q.   Do you remember the dates of the e-mails?

6       A.   I do not.

7       Q.   They would have been, presumably, spring 2013?

8       A.   They would have been, presumably, throughout the

9  entire transaction.  Ms. Venzant, as most lottery winners,

10  request advances frequently.

11       Q.   Does the sales team at Advanced Funding keep a

12  running log of communications with lottery winners?

13       A.   No, sir.

14       Q.   You said that one of the e-mail messages exchanged

15  between Ms. Guerra and Ms. Venzant related to advances,

16  correct?

17       A.   At least one.

18       Q.   At least one, okay.  What did the other e-mail

19  messages relate to?

20       A.   Family matters.  I know I reviewed the discussion

21  about the cancelation letter.

22       Q.   What was the substance of that discussion?

23       A.   We were attempting to secure it for the closing

24  binder.  So there were some discussions back and forth about

25  getting a copy of it, what the substance of it was.  I know

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 36

1   she sent us a copy from work, which was an unsigned copy. So

2   I said I needed the actual copy that was sent. And I was

3   reading that it was at home and would be sent to us when

4   Sheena arrived at home.

5        Q.   And were these communications then in June or July,

6   when you were putting the closing binder together?

7        A.   They would have been during that time frame, yes.

8        Q.   Had you seen the letter prior to that time frame?

9        A.   We saw prior an unsigned copy of that letter, but

10   our due diligence requires that we have a signed copy.

11        Q.   Did Advance Funding produce a signed copy of the

12   letter in this case?

13        A.   Yes.

14        Q.   How about an unsigned copy of the letter?

15        A.   I do not know. I don't recall if I saw that or

16   not.

17        Q.   And these communications with Ms. Venzant about

18   this letter, these were all by e-mail?

19        A.   I don't believe all of them were by e-mail. I

20   would imagine some were definitely by phone, but I did recall

21   reading one by e-mail.

22        Q.   And these were communications between Ms. Venzant

23   and Ms. Guerra?

24        A.   Correct.

25        Q.   Did Ms. Venzant have any written communications

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                September 22, 2015

Page 37

Page 37, lines 9-21: Hearsay if offered for the truth of the matters asserted

1   with anybody else at Advance Funding?

2       A.   Not to my knowledge.

3       Q.   You mentioned that at least one of these

4   communications referenced -- and we were just talking about

5   this, to some extent -- at least one of the communications

6   referenced Ms. Venzant's assertion that she had cancelled her

7   contract with BOFI, correct?

8       A.   Correct.

9       Q.   When did she notify or when did she advise Advance

10  Funding that she had canceled her contract with BOFI?

11      A.   Early on, she advised us that she had cancelled her

12  contract with BOFI.

13      Q.   And did she advise you that she had cancelled her

14  contract -- did she advise you of that in a written

15  communication, like an e-mail or a text message?

16      A.   I believe that conversation was by phone to

17  Ms. Guerra.

18      Q.   And do you know when that conversation took place?

19      A.   That was during the initial contract signing

20  period, which was May.  So I would assume it would have been

21  in April or May, perhaps June, but I doubt it was that late.

22      Q.   But you don't know exactly when it took place?

23      A.   I don't recall the exact date.

24      Q.   You said you spoke with legal in preparing for this

25  deposition?

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 38

```
 1        A.   Correct.

 2        Q.   What do you mean by that?  I want to be careful

 3   here because I don't want to ask you about any privilege

 4   communications.  What's legal?  Does Advance Funding have an

 5   in-house legal department?

 6        A.   They have legal employees that work in the state of

 7   Florida.  They're separated from sales.

 8        Q.   So employees of Advance Funding?

 9        A.   Correct.

10        Q.   This is not outside counsel?

11        A.   Correct.

12        Q.   Are these lawyers?

13        A.   No.

14        Q.   Paralegals?

15        A.   Employees.

16        Q.   Okay.  So what makes them a legal department?

17        A.   They handle contract preparation; due diligence.

18        Q.   Who did you talk to there?

19        A.   Elyse Edwards, spelled with a "Y."

20        Q.   E-l-y-s-e?

21        A.   Correct.

22        Q.   Thank you.  Did you talk to anybody else in the

23   legal department about this case?

24        A.   No, sir.  That file was prepared by Elyse Edwards.

25        Q.   What's the file you're referring to?
```

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 39

1       A.   The file I mentioned earlier.

2       Q.   The closing binder?

3       A.   Correct.  And I forgot to mention the credit report

4    when I was listing documents that are sent.

5       Q.   What did you speak with Ms. Edwards about?

6       A.   I asked her, when she ran searches in her due

7    diligence, did she see any issues and whether she had any

8    contact with Sheena Venzant.

9       Q.   Did she say that she had seen any issues?

10      A.   None.

11      Q.   Did she have any contact with Ms. Venzant?

12      A.   No.

13      Q.   Was that all you talked about with her?

14      A.   Yes.

15      Q.   I think you mentioned that you had reviewed --

16   correct me if I'm getting this wrong -- but court searches in

17   two jurisdictions?

18      A.   Correct.

19      Q.   What sort of a court search are you talking about?

20      A.   When it is discovered that someone may or may have

21   not done a deal with a prior factoring company, we perform a

22   search to see if that deal ever went to fruition.

23      Q.   Why did you search in two jurisdictions?

24      A.   Because the law requires that you either file where

25   the lottery is located or where the winner resides.

Page 40

1      Q.   What two courts did you search then?

2      A.   The residence county and the county that the

3 lottery is located in.

4      Q.   So what due diligence did Advance Funding do before

5 it entered into the agreement with Ms. Venzant?

6      A.   Before?  Generally, they'll do UCC searches.

7      Q.   In this case --

8      A.   Yes.

9      Q.   -- Advance Funding did UCC searches?

10     A.   They did.

11     Q.   What else?

12     A.   You don't have the authority to ask for much, so,

13 unfortunately, that's about the extent of it.

14     Q.   Advance Funding didn't contact BOFI after

15 discovering that BOFI had previously entered into an

16 agreement with Ms. Venzant, correct?

17     A.   Correct, and they would not.

18     Q.   Why not?

19     A.   That would induce poaching.

20     Q.   In what way?

21     A.   BOFI would be alerted that we were doing a

22 transaction with Ms. Venzant and would attempt to secure the

23 deal themselves.

24     Q.   And you would consider that to be poaching?

25     A.   Yes, indeed, sir.

Page 41

1           Q.    Why?

2           A.    Because, without that knowledge, they would have

3    never known that we were doing a transaction or that

4    Ms. Venzant was interested in doing a transaction.   It would

5    be an unfair advantage.

6           Q.    For BOFI to know that you were talking to her?

7           A.    For BOFI or any of the factoring companies to know,

8    yes.

9           Q.    And that's true even though BOFI had previously

10   entered into a transaction with her?

11          A.    That would be true with any factoring company at

12   any time.

13          Q.    What due diligence did Advance Funding do after it

14   entered into an assignment agreement with Ms. Venzant?

15          A.    In addition to securing the documents for the

16   closing binder and reviewing each of those items, it does its

17   own court searches; lien and judgment, which includes UCC

18   searches; if available, family probate court searches;

19   searches at the county and the district levels; bankruptcy

20   searches.

21          Q.    Did Advance Funding do all those searches in this

22   case?

23          A.    They hired someone to do those searches.

24          Q.    And are the results of those searches in Advance

25   Funding's records?

Page 42

1        A.    Yes.

2        Q.    Did you review them to prepare for your deposition

3   today?

4        A.    I did.

5        Q.    Were they produced in discovery?

6        A.    I believe they were.

7        Q.    Did Advance Funding do any other due diligence

8   after it entered into the assignment agreement with

9   Ms. Venzant?

10       A.    Based on conversations with Sheena, it was

11  obviously revealed that she had done a prior transaction with

12  BOFI.  She claimed that she had cancelled it.  Of course, we

13  don't just rely on representations made by winners, so they

14  requested a copy of the cancelation letter.  They performed

15  the court searches that I referenced earlier.

16       Q.    And why don't you just rely on representations of

17  winners?

18       A.    It's not within our due diligence.

19       Q.    And why is that?

20       A.    Because it could be proven false.

21       Q.    Why didn't you contact BOFI here to determine

22  whether Ms. Venzant had cancelled her agreement with BOFI?

23       A.    I believe I answered that question.

24       Q.    Because that would induce poaching, as you put it?

25       A.    Absolutely.

Page 43

1      Q.   Why was it important to confirm that Ms. Venzant

2   had cancelled her agreement with BOFI?

3      A.   We do not want to get into a transaction that might

4   lead to litigation, for one.

5      Q.   Any other reason?

6      A.   If we were to proceed and incur fees and costs

7   related to due diligence filing, securing of an order or not

8   securing of an order, that obviously would be detrimental.

9   It would be a waste of time.

10      Q.   Why would you think that entering into an agreement

11   with a lottery winner like Ms. Venzant, who had previously

12   entered into an agreement with another company, would lead to

13   litigation, if she hadn't cancelled the agreement?

14      A.   I have been in this business since '98.  I am no

15   stranger to litigation.  It could happen whether she had

16   entered into a contract or not, but we try to limit our

17   exposure obviously.

18      Q.   If Advance Funding were to enter into an agreement

19   with a lottery winner, an assignment agreement with a lottery

20   winner, and were then to be contacted by another factoring

21   company that was in negotiation with the lottery winner

22   concerning their own assignment agreement and Advance Funding

23   hadn't yet obtained a court order, would Advance Funding take

24   the position that the agreement it had entered into was

25   enforceable and seek to obtain court approval of the

Page 44

1   agreement?

2            MR. MANVILLE:  I am going to object.  It is

3   well beyond the scope of this 30(b)(6) deposition.  This is

4   exactly the problem that we discussed yesterday with the

5   judge, and I think she admonished you that you need to stay

6   within the topics.  So point to me, please, where that is in

7   any way related to one of your designated topics.

8       Q.   You can answer the question.

9       A.   Can you repeat the question.

10           MS. FOX:  You're here today to answer

11  questions as a 30(b)(6) designated deposition on specified

12  topics and nothing more.

13           MR. MANVILLE:  Yes, and you made exactly that

14  objection to the court yesterday, and she overruled it.

15           MS. FOX:  Right, and she mentioned that you

16  needed to stay within the topics.

17           MR. MANVILLE:  Which is exactly what I'm

18  doing.

19           MR. FOX:  Then point to me the topic.

20           MR. MANVILLE:  About half of them, Susan.  I

21  am not going to get into a discussion about this.  This is

22  plainly relevant, and we already had this discussion with the

23  court yesterday.

24           MS. FOX:  It is not relevant to the --

25           MR. MANVILLE:  If you have a problem with it,

BOFI Federal Bank v. Advance Funding LLC, et al.    Monica L. Ray 30(b)(6)                September 22, 2015

Page 45

1    make a motion for protective order.  Call the court right now

2    and bring this up.

3                    MS. FOX:  I am getting a great record of it.

4                    MR. MANVILLE:  Can you read the question back,

5    please.

6                         (The previous question was

7                          read back.)

8                    MS. FOX:  Same objection.

9        A.    Advance Funding would proceed to receive court

10   approval if no prior court approval had been received.

11       Q.    So Advance Funding would seek to obtain court

12   approval of its agreement at that point?

13       A.    I would -- you're not giving me an instance of why

14   it would not, so, yes, it would.

15       Q.    Would Advance Funding take the position that the

16   contract was binding and enforceable, notwithstanding -- even

17   before it obtained court approval of the order?

18                    MR. MANVILLE:  Same objection; outside the

19   scope.

20       A.    Advance Funding is well aware that no contract is

21   enforceable, absent court approval.

22       Q.    In any circumstance, in any jurisdiction?

23       A.    In any circumstance, in any jurisdiction, for

24   lottery.

25       Q.    For lottery.

Page 46

1      A.   Can I clarify?

2           MS. FOX:   No.

3      Q.   Yeah, go ahead.

4      A.   There are some states that do not allow lottery

5  assignments; obviously, those states would not be included.

6      Q.   Okay.  How much time did you spend preparing for

7  your deposition today?

8      A.   Approximately, six hours.

9      Q.   Did you meet with Ms. Fox to prepare for your

10 deposition?  I'm not asking you what you talked about.

11     A.   This morning, we met before we came to the office.

12     Q.   When did you fly out?

13     A.   Last evening.

14     Q.   Let's get back to something we were talking about

15 earlier, and this is how Advance Funding participates in

16 factoring transactions relating to lottery installments.  Can

17 you tell me generally sort of how the process works, starting

18 from the very beginning.  How does Advance Funding identify a

19 potential lottery winner to work with?

20     A.   Advance Funding has a research department.  Lottery

21 winnings are public information.  Research will attempt to

22 locate based on the lists of lottery winners they receive

23 from each lottery state that is assignable, and those bits of

24 information are given to sales.

25     Q.   How many people are in the sales department?

Page 47

1        A.    Seven.

2        Q.    And so, at that point, the salespeople will reach

3   out to the lottery winners to inquire about whether they're

4   interested in entering into an assignment agreement?

5        A.    Yes.

6        Q.    How does Advance Funding determine what terms to

7   offer a particular lottery winner?

8        A.    They use the TValue program.

9        Q.    Tell me how that works.

10        A.    TValue is a calculatory program that allows you to

11   put terms in; determine what rate of interest that would be

12   considered.  Each of the salesmen know the parameters of

13   funding.  So they know, based on that TValue calculation,

14   what they can offer.

15        Q.    So what data would you input into the program at

16   the front end when you're trying to figure out what kind of a

17   deal to propose?

18        A.    Sales would enter the payments they would like to

19   buy, the payments that the winner might want to sell.

20   Obviously, each transaction is going to be different.

21        Q.    And what other information?

22        A.    They would calculate a rate.

23        Q.    So, for a particular lottery winner like

24   Ms. Venzant, it might be 20 payments of $50,000 a year,

25   something like that.  So that gets input into the program?

Page 48

1        A.   If that's what she wants to sell, yes.

2        Q.   Right.  Does Advance Funding -- how does Advance

3   Funding determine what -- let's strike that.  When Advance

4   Funding initially contacts a lottery winner, is it sort of an

5   open-ended inquiry, like would you be interested in entering

6   into this transaction, some sort of assignment agreement,

7   and, if so, what would you be interested in assigning, how

8   many payments?

9        A.   I would be lying if I could answer that question.

10  Each winner obviously is going to be different.  Some people

11  say expletives and hang up on them; some people talk to them.

12  Some of our salespeople are more social in nature, and

13  they'll try to get involved in their family matters, develop

14  a relationship, and then start talking about a contract.

15  Some will start talking about a contract right away.  It

16  depends on the nature of the salesperson and, obviously, the

17  lottery winner's nature, as well.

18       Q.   So, after some discussion with the lottery winner,

19  the lottery winner and the salesperson presumably reach a

20  point where they're talking about a certain number of

21  payments, a certain amount per payment, something like that?

22       A.   Correct.

23       Q.   Okay.  And then the salesperson will take that

24  information and go back and input that information into the

25  TValue program?

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 49

```
 1       A.   Yes.

 2       Q.   And then how does the program determine a rate?

 3       A.   It's a calculatory program.  I would not be able to

 4  tell you how that program was designed, but it obviously acts

 5  as sort of a reverse mortgage.

 6       Q.   Is there any other information that needs to be

 7  input into the program to determine what the applicable rate

 8  is going to be?

 9       A.   No.  The rate is what they put in with the

10  payments.

11       Q.   Okay.

12       A.   It's the purchase price that they calculate.

13       Q.   This is my question.  Okay.  So they input the

14  payments, and they input a rate?

15       A.   A rate.

16       Q.   And then that determines what the purchase price --

17  what is going to be offered to the lottery winner, what

18  amount?

19       A.   Within a certain range, but, yes, that gives them a

20  basic idea of what they know they could get out of the

21  transaction.

22       Q.   And how does Advance Funding determine what rate to

23  input into the program?

24       A.   We have developed and fostered funding

25  relationships over the years.  We know which funders will buy
```

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 50

 1   which types of deals; which funders like deals that start

 2   later; which funders like life contingent; which funders want

 3   immediate repayment; which funders like smaller deals; which

 4   funders will take crazy deals.  There is no one set, but we

 5   have a general idea what the market is paying rate-wise, so

 6   they know basically what they can get from a transaction.

 7        Q.   The rate that is offered to a lottery winner is not

 8   the same rate that the funder gets, right?

 9        A.   Correct.

10        Q.   But the rate that's offered to the lottery winner

11   is driven by what rate you think the funder is going to be

12   willing to offer?

13        A.   Correct.

14        Q.   And so that is determined -- so the rate that you

15   offer the lottery winner, the rate that Advance Funding

16   offers the lottery winner, is determined by the type of deal

17   at issue, the amount of the deal, who you think might be out

18   there in the funding community who would be willing to fund

19   that deal, and what you think they would be willing to offer

20   for it?

21        A.   I believe they basically have a set range that they

22   work with.  That's a sales thing, and that wasn't something

23   that I was prepared to testify about.

24        Q.   You testified that there's a range of rates that

25   are used to determine what rate to offer to the lottery

Page 51

1   winner.  And tell me if I'm misstating your testimony.

2   There's a range that the salespeople will pick from, correct?

3        A.   They converse with the sales manager and with Dan,

4   and they develop what it is that they're going to offer to

5   the winner.

6        Q.   But you don't know exactly how that process works,

7   how they select a particular rate for a particular

8   transaction?

9        A.   Other than they know the market rates that are

10  available out there from our funders.  That's the only answer

11  I can give you, sir.

12       Q.   And I assume the funders, the different funders,

13  are going to be willing to offer different rates, correct?

14       A.   Based on their appetite for transactions, yes.

15  Obviously, a transaction that starts later into the future is

16  going to garner a higher rate because they're going to have

17  to wait longer for their repayment.  Something that starts

18  with immediate payback is going to garner a higher purchase

19  price.

20       Q.   What determines the profit that Advance Funding

21  will earn on this transaction?  Is it, oversimplifying, the

22  difference between the rate that funder is willing to offer

23  and the rate that Advance Funding is offering the lottery

24  winner?

25                 MS. FOX:  I'm going to object to the question.

Page 52

```
 1  It's beyond the scope of the deposition notice to ask about

 2  the rate.  This witness has not been designated to testify

 3  about it.  And, to the extent that her testimony is binding

 4  on Advance Funding, unless it is part of the deposition

 5  notice, then she doesn't have to testify about it.

 6              MR. MANVILLE:  How about Advance Funding's

 7  claim for damages in this matter, including, without

 8  limitation, the amount of damages claimed by Advance Funding

 9  and the factual basis for such claim?  That is based on a

10  spreadsheet that we were provided.  And the basis for Advance

11  Funding's claim has everything to do with the rates that

12  Advance Funding --

13              MS. FOX:  Then ask her about that, and she can

14  talk about it in connection with this particular transaction.

15              MR. MANVILLE:  I will get to that, but this is

16  absolutely intimately related with Advance Funding's damages

17  claim, and there is no way that a court would see it

18  otherwise.

19       A.  Advance Funding would make the money on the spread,

20  as you have indicated.

21       Q.  And so how does Advance Funding -- for a given

22  transaction, how does Advance Funding determine what the

23  spread is going to be?

24       A.  You've already stated that, exactly that.  They

25  can't predetermine.  It isn't until a contract is reached,
```

Page 53

1    terms are agreed to, that we begin to shop that transaction.

2        Q.   But what you've told me is that Advance Funding has

3    an idea -- before it offers a rate to a lottery winner, it

4    has an idea of what the funders who are potentially going to

5    be interested in this transaction are going to be willing to

6    offer as a rate, right?

7        A.   I believe that that's accurate.

8        Q.   Now, it may not know it to the decimal point, but

9    it has a rough idea of what that number is going to be, and,

10   on that basis, it can determine what rate it might be willing

11   to offer a lottery winner, correct?

12       A.   That is a correct assumption, yes.

13       Q.   All right.  So the amount that Advance -- so what

14   would prevent Advance Funding from -- so, again, how does

15   Advance Funding determine the spread between -- in advance of

16   entering into these transactions between what it thinks it's

17   going to be able to obtain from a funder and what it's going

18   to be willing to offer a lottery winner, I mean, that spread

19   could be bigger or smaller in any given case, correct?

20       A.   The spread is not predetermined.  It's something

21   that's shopped after the transaction is done.  So it doesn't

22   know exactly within any degree of certainty what it will get.

23   There are times we've entered into contracts, and we couldn't

24   find any funder, irrespective of the fact that we thought

25   somebody might be interested in it.  We have a general

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 54

 1   knowledge of rates out there, a general knowledge of what

 2   certain funders like.  And sometimes their portfolios fill up

 3   in that respect, and something we thought they would take

 4   they won't take.  By the same respect, there are some times

 5   we think they're really going to love a transaction, and they

 6   don't even offer a bid.  There is no guarantee.  So I don't

 7   know how to answer that, other than that.

 8        Q.   In every instance where there is a similar deal

 9   that Advance Funding is contemplating with a lottery winner,

10   similar number of payments, similar amount, would Advance

11   Funding offer those lottery winners exactly the same rate?

12        A.   There's no guarantee what one salesperson will

13   propose to a sales manager and Dan for any one particular

14   lottery winner.  Each transaction is completely different.  I

15   don't believe they look at historical data whatsoever.

16        Q.   And so how does a particular salesperson then

17   determine exactly what rate to offer a lottery winner?

18        A.   Basically, when they get down to terms, they will

19   discuss that with their sales manager, and they will come to

20   some sort of number based on calculations and what they're, I

21   would assume, profit, could be.

22        Q.   But there's no grid, there's no table of rates, if

23   you have a transaction with these parameters, you offer this

24   rate, if you have a transaction with these parameters, you

25   offer this rate, it's a case-by-case basis, lottery winner by

Page 55

1    lottery winner, correct?

2         A.   Correct.

3         Q.   And so what are, generally speaking, the components

4    of an offer to a lottery winner?  So the primary components

5    are plainly going to be, we'll take "x" number of payments,

6    and we will pay you a lump some of "y" for those payments,

7    and I understand that you need to disclose the rate that

8    you're offering.  What other terms of a typical lottery

9    transaction are part of one of these deals?

10        A.   Are you asking about the contract, or are you

11   asking about negotiations?

12        Q.   Well, negotiations first.  When you're in

13   discussions with the lottery winner, what are you talking

14   about with the lottery winner other than those items?

15        A.   Everything under the sun.

16        Q.   Okay.

17        A.   Some -- as I stated, some salespeople are very

18   social in nature, and they know everything about their

19   children, about their life, about their job, about their

20   family's funerals, and such.  Some don't know as much.  It's

21   an individual basis.  We have different personalities in our

22   salespeople.

23        Q.   That question was not clear.  I don't mean just

24   sort of chitchat.  I mean what other deal terms are typically

25   discussed during the negotiation phase?

Page 56

```
 1        A.   Basically, lottery winners are only interested in

 2   one thing, what am I giving up, what am I getting.

 3        Q.   The rest of it is incidental?

 4        A.   A lot of times, they'll ask for advances, a lot.

 5        Q.   And under what conditions does Advance Funding

 6   agree to advance funds to lottery winners?

 7        A.   I don't believe there are conditions.  I do believe

 8   they look at the deal terms, the potential that it will

 9   garner "x" amount of profit or profit at all.  Obviously, it

10   does not want to extend an advance to a deal that might not

11   ever come to fruition because getting money back from a

12   lottery winner is difficult.

13        Q.   So, again, that's case by case?

14        A.   Absolutely.

15        Q.   Typically, those advances are then paid back when

16   the assignment agreement is executed, right?

17        A.   No.

18        Q.   No.  When it's approved by the court and you get a

19   letter from the lottery?

20        A.   At closing.

21        Q.   At closing, and the money is paid?

22        A.   Correct.

23        Q.   Does Advance Funding buy entire periodic

24   installments?  So, in this case, I noticed that, I believe,

25   Ms. Venzant was entitled to $52,000 a year, but, if I
```

Page 57

1 remember correctly, Advance Funding purchased a slightly

2 smaller amount.

3        A.    Each transaction will be different.  It all depends

4 on what the lottery winner is willing to sell and what we're

5 willing to buy.

6        Q.    Why would you buy $50,000 out of a $52,000

7 installment?

8        A.    Generally, because that's what the lottery winner

9 wanted to sell.  They wanted to keep 2,000 a year for

10 whatever purpose.

11        Q.    Do you negotiate with lottery winners concerning

12 the terms of the deal, of a particular deal?

13        A.    I have absolutely no contact with a lottery winner,

14 ever.

15        Q.    Right.  Not you personally, but does Advance

16 Funding, if you're in talks with a lottery winner and they

17 say I want to sell 20 payments, and Advance Funding comes

18 back and says, all right, we'll buy those payments, here's

19 what we're going to pay you, here's the rate we're offering,

20 is that presented on a take-it-or-leave-it basis, or is there

21 frequently negotiation between Advance Funding and the

22 lottery winner?

23        A.    Each transaction is different, but there's

24 frequently negotiation.  More than one option is generally

25 presented.

Page 58

1       Q.    More than one option, meaning there's some back and

2    forth?

3       A.    Yes.

4       Q.    How does Advance Funding typically close its deals

5    with lottery winners?  I don't mean at closing, but I mean

6    sort of the handshake deal.  Who does that work?  Is that

7    Mr. Cevallos?

8       A.    I don't understand the question.

9       Q.    So Advance Funding is in discussions with a lottery

10   winner concerning a possible transaction -- maybe you've

11   answered this earlier -- but are the salespeople responsible

12   for that?  So a salesperson is going to be assigned to a

13   lottery winner and makes the initial contact, does the

14   negotiations, closes the deal, and then is responsible for

15   papering it, as well?  Is that the way it works?

16      A.    The way it works is sales simply has contact with a

17   winner, and they're designed by state, not necessarily by

18   with respect of winner.  So each salesperson has a state.  So

19   anyone that has won in that state, it's within their purview,

20   and they make contact or they don't make contact.  And then,

21   when the contract terms are reached, it is sent to Elyse, and

22   Elyse will prepare the contract.

23      Q.    And the salespeople are responsible for finalizing

24   contract terms, reaching the deal with the lottery winner,

25   and so forth?

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                September 22, 2015

Page 59

1      A.    Not for finalizing, but for reaching the deal.  And

2  then they'll discuss with their sales manager, and, if the

3  sales manager and Dan approve of that transaction, then a

4  contract will be requested.

5      Q.    So, assuming you've gotten to that point, you've

6  entered into an assignment agreement with a lottery winner,

7  you've gotten to closing, what happens next in the process?

8      A.    In a lot of states and depending on the funder,

9  that's when lien searches, certified lien searches, are

10  ordered.  We garner any documents that haven't been secured

11  thus far that would be required for a closing binder.

12  Depending on the funder, sometimes there's an RPSA; sometimes

13  there's an assignment agreement; sometimes there's nothing.

14      Q.    Well, so let me back up a little bit.  At what

15  point in this process does the funder come into the picture?

16      A.    The funder is not aware of the transaction other

17  than, when a bid is presented and accepted, they will provide

18  what name and address they would like listed in the court

19  order.  Otherwise, they don't receive anything further until

20  the closing binder.

21      Q.    So at what point in the process does Advance

22  Funding contact potential funders for a lottery transaction?

23      A.    Sometimes in advance of a contract, if we're fairly

24  certain that they're going to get it signed, but, more often

25  than not, after the contract is signed.

Page 60

1       Q.    So you sign -- you execute the assignment agreement

2   with the lottery winner, and, at that point, you reach out to

3   funders?

4       A.    As I stated, sometimes it's before.

5       Q.    Okay.

6       A.    But, more often than not, it is after, yes.

7       Q.    Okay.  And then so who at Advance Funding is

8   responsible for shopping these deals to brokers and

9   investors?  Is that you?

10      A.    Advance Funding doesn't have connections with

11  brokers and investors.  Northeastern Capital has been around

12  for a very long time and has fostered several relationships

13  with funders; wealth managers; insurance companies.  It has

14  quite the resources as far as funders.

15      Q.    So here, for example, Advance Funding doesn't have

16  a contractual relationship with the Tovey trust, for example?

17      A.    I don't know of anyone that has a contractual

18  relationship with the Tovey trust.

19      Q.    And Advance Funding doesn't have a contractual

20  relationship with Settlement Collections Service?

21      A.    No, sir.

22      Q.    The way it works is Advance Funding works through

23  Northeastern, which then shops the deal to its connections in

24  the funding community?

25      A.    Correct.

Page 61

```
 1        Q.    And, again, Advance Funding and Northeastern are

 2   independently owned, right?

 3        A.    Correct.

 4        Q.    One of them is not a subsidiary of the other or an

 5   affiliate of the other?

 6        A.    No, sir.

 7        Q.    And I believe you told me there was no contractual

 8   relationship between those two companies, correct?

 9        A.    No, sir.

10        Q.    So are you the person at Northeastern then who's in

11   charge of obtaining funding for the lottery transactions that

12   Advance Funding enters into?

13        A.    I am the person that shops the bids and reviews and

14   sends closing binders, yes.

15        Q.    When you shop a bid, how do you do that?

16        A.    E-mail.

17        Q.    E-mail.  Exclusively e-mail?

18        A.    I definitely do not have conversations.

19        Q.    It's not by phone?

20        A.    No, sir.

21        Q.    Not, generally, I assume, snail mail?

22        A.    No, sir.

23        Q.    E-mail.  Text message?

24        A.    E-mail.

25        Q.    Just e-mail, okay.  For a typical lottery
```

Page 62

1    transaction, how many potential investors do you reach out

2    to?

3         A.   I send it to all of our investors, regardless of

4    whether I think they might be interested, because they're

5    appetite for certain transaction could change, and they might

6    not, obviously, alert me to that change immediately.  So I

7    don't want to miss an opportunity, so I send it to the

8    blanket basically.

9         Q.   And how many addressees comprise the blanket?

10        A.   Currently, seven.

11        Q.   Who are they?

12        A.   I consider that proprietary information, sir.  I'd

13   really rather not answer that question.

14        Q.   Okay.  We may get back to that.  One of them is

15   SCS?

16        A.   Correct.

17        Q.   Are the others all brokers, like SCS, or are they a

18   mix of brokers and funders?

19        A.   They're a mix of brokers, they're a mix of funders,

20   and an insurance company.

21        Q.   Is this a relatively static list?  In other words,

22   have the people that you send these e-mails to, of the

23   entities that you send these e-mails to, does that list

24   change over time.

25        A.   Yes.

Page 63

1      Q.   How frequently do you add or take people off of

2   your e-mail list?

3      A.   As frequently as they become available.  I have

4   never taken anyone off, that I know of, except for BOFI.

5      Q.   Was BOFI on the list for a while?

6      A.   BOFI did do transactions with Advance in the past.

7   They became a competitor, and, obviously, it would not be a

8   good idea to send potential contract information to a

9   competitor.

10      Q.   How long has Northeastern been in business?

11      A.   Northeastern started in '97, I believe.

12      Q.   The same year as Advance Funding?

13      A.   No, sir.

14      Q.   When did Advance Funding start?

15      A.   I believe 2011.

16      Q.   I believe Advance Funding website states that it

17   did it's first transaction in 1997?

18      A.   I'm unaware of Advance Funding's website.  I've

19   never actually reviewed it.

20      Q.   Does Northeastern have a website?

21      A.   It does.

22      Q.   Do you know the URL offhand?

23      A.   www.northeasterncapitalfunding.com.

24      Q.   Do you know what Mr. Cevallos did before 2011

25   work-wise?

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 64

1     A.   I do not.

2     Q.   When you started working at Northeastern -- I

3  believe in May 2007?

4     A.   Correct.

5     Q.   -- were you shopping bids the same way you do now,

6  by e-mail?

7     A.   I wasn't originally responsible for that.  John

8  Cevallos did that.

9     Q.   When did you take over that responsibility?

10    A.   The exact date, I do not recall.

11    Q.   Can you tell me approximately?

12    A.   It's only the past -- this would be a total

13  guess -- probably seven years, six years.

14    Q.   When you started shopping bids, did you do it by

15  e-mail, sort of the same way you do it now?

16    A.   The only way I've ever done it, yes.

17    Q.   How many potential investors did you send your

18  e-mails to when you started in this position six or seven

19  years ago?

20    A.   You're referring to Northeastern now, not Advance?

21    Q.   I'm referring to Northeastern, correct.

22    A.   Okay.  I didn't realize I would be testifying

23  regarding Northeastern, but I have no problem.  Can you

24  repeat the question.

25    Q.   When you started in your current position and --

Page 65

1    when you took over shopping bids from John Cevallos, how many

2    investors, potential investors, would you send your e-mails

3    to?

4        A.    I really do not recall.  I don't believe the number

5    was as high as seven, but I don't recall the exact number.

6        Q.    Do you know if anyone at Advance Funding or

7    Northeastern is responsible for developing new funding

8    sources?

9        A.    The presidents of each of those companies.

10       Q.    It's part of their jobs?

11       A.    Yes.

12       Q.    How does Northeastern go about developing new

13   funding sources?

14       A.    I did not converse with John Cevallos about

15   Northeastern's funding acquisitions.  I apologize.

16              MS. FOX:  That's okay.  It's not a topic.

17              MR. MANVILLE:  It actually is very much a

18   topic.

19       Q.    When you send out an e-mail to potential investors,

20   shopping a bid, what information do you include in your

21   e-mail?

22       A.    The first three letters of the winner or

23   annuitant's last name, the state, whether it is lottery or

24   structured or casino or any other type of prize, and then the

25   actual deal terms, sans, obviously, the purchase price.  If

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 66

1    it's a structured, I also provide the issuer and the owner.

2        Q.   What deal terms do you include in those e-mails?

3        A.   The number of payments, the frequency of the

4    payments, the amount of each payment, and, if it's a life

5    contingent deal, insurance information, proposed insurance

6    information.

7        Q.   Do you propose a rate that the investor will pay,

8    or is it up to the investor to give you a rate?

9        A.   Absolutely, the investor is giving me a rate.

10            MS. FOX:  Could we take a break at this point.

11            THE VIDEOGRAPHER:  We are going off the

12   record.  The time is 10:42 a.m.

13                      (A brief recess was taken.)

14            THE VIDEOGRAPHER:  This is the beginning of

15   Disc No. 2.  We are back on the record.  The time is 10:53.

16       Q.   So, if you shop a bid to your investors and one of

17   them is interested, how do they respond, also by e-mail?

18       A.   Yes.  Some will attempt a phone call, but I

19   generally don't pick up those phone calls.  I prefer it in

20   writing.

21       Q.   And I assume that the response could consist of

22   anywhere from, we'll take it, here's the rate, to, we have

23   some questions about it?

24       A.   Generally, it's pretty forthright.  So there's not

25   very many questions that are asked.  It's basically what rate

Page 67

1    they would propose.  Some will say, I really like this or I

2    have an investor that would really like this, can you let me

3    know what bids you end up with, and I'll see if I can beat

4    it.  Different investors have different methodology for their

5    responses, but most just give me a rate.

6         Q.   If there are multiple investors interested in a

7    single deal, does the highest rate win or the lowest rate

8    win?

9         A.   Well, the most money would come from a lower rate,

10   so obviously the lower rate.

11        Q.   That's what you're looking for, you're looking for

12   the lowest bid?

13        A.   In most deals.  Sometimes it's -- if I know

14   specifics of a transaction that might be problematic or cause

15   a delay in funding, like some funders will accept a closing

16   binder without an acknowledgment for MetLife deals, for

17   instance, because MetLife takes forever to acknowledge.  So,

18   obviously, I'm not going to select a funder who has the

19   lowest rate if that funder is going to make me wait for the

20   acknowledgment letter.  Can I expound?  I just realized --

21        Q.   Yes.

22             THE WITNESS:  I'm sorry.

23             MS. FOX:  Don't give me a heart attack.

24        A.   I'm not the one that makes that call, just so you

25   know.  I relay that information to whomever it is that is

Page 68

1   actually contracted with the winner or the annuitant.  It's

2   their decision ultimately.

3          Q.   So Advance Funding or some other factoring company?

4          A.   Right.

5          Q.   How many factoring companies does Northeastern work

6   with?

7          A.   Three.

8          Q.   What are the other two?

9          A.   I'd rather not answer.

10         Q.   Are you shopping bids from those three factoring

11  companies to the same group of potential investors?

12         A.   Yes.

13         Q.   If none of the investors are interested in the

14  deal, then what happens?

15         A.   We don't do the deal.

16         Q.   Because there's no way at that point that you

17  can -- well, what if you tell them that you'll do the deal at

18  a higher rate?  I mean, I know you don't propose a rate in

19  the first instance.  They might come back and say, we're not

20  really interested, but, what if you say in response to that,

21  I'll tell you what, we'll do this deal at 7 1/2 percent or

22  8 percent?

23         A.   I can't make those calls for any of the brokers, or

24  Northeastern, for that matter.  I would just relay the

25  information I get to the president, and the president will

Page 69

1  tell me how to proceed.

2      Q.   Right.  But is that an option?  You relay that

3  information to the president, and, in some instances, I

4  assume that could be an option, get back to them and tell

5  them we'll do this deal at a rate of "x" and see if they're

6  interested in that?

7      A.   If there are any options, yes.  If they are

8  willing, then they would presumably offer that.

9               MR. MANVILLE:  Let's make this Exhibit 2, I

10  think.

11                    (Exhibit 2 marked for

12                        identification.)

13      Q.   So can you tell me what Exhibit 2 is.

14      A.   This is an e-mail correspondence between myself and

15  the Millers, or SCS, as you will know them as, with regard to

16  the Venzant transaction.

17      Q.   I note that the first e-mail in this string is an

18  e-mail from you to the Millers with a copy to Connie Younan,

19  proposing this deal and proposing a rate of 7 1/2 percent,

20  correct?

21      A.   Correct.

22      Q.   So there are instances where, in the initial

23  communication with the investors, you might give them a

24  percentage, a rate, that you want to do the deal at?

25      A.   Not generally.  If this is one that I was told

Page  70

1    specifically to ask a certain funder because of their

2    appetite, then, yes, but that's not generally the way it

3    happens, no.

4        Q.   Aside from that, is this a fairly typical

5    communication with a funder regarding a lottery deal?

6        A.   No.

7        Q.   In what way is it not typical?

8        A.   Obviously, there's a lot of personal in here that I

9    wouldn't normally put in, but I have quite a good

10   relationship with SCS over the years.

11       Q.   So your communications with your other funders,

12   they tend to be not so colloquial?

13       A.   Correct.

14       Q.   But, other than that, in terms of the substance of

15   the correspondence here, other than that and the fact that

16   your initial e-mail communicated a specific rate, is this

17   sort of fairly typical correspondence relating to a lottery

18   deal?

19       A.   This is a fairly normal correspondence for a life

20   contingent lottery deal, yes.

21       Q.   Because you're discussing the insurance policy here

22   and who's going to own that and what's going to happen to it?

23       A.   Correct.

24       Q.   And I note that, at the end of this string, you

25   advise the Millers that you are confirmed at 7 1/2 percent

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 71

 1    with Kirk A. Tovey Irrevocable Trust as assignee.  The

 2    $1 million life policy will be A rated or better and will be

 3    owned by SCS.  Are there any other documents that memorialize

 4    this transaction between Northeastern and SCS?

 5         A.   It's not a transaction between Northeastern and

 6    SCS.  This is a transaction between Advance Funding and SCS.

 7         Q.   Sort of brokered by Northeastern?

 8         A.   I made the introduction, but the deal will be with

 9    Advance.  We will not be involved in any way in the title or

10    the stream or anything.

11         Q.   Are there any documents other than this e-mail

12    string that memorialize this transaction between Advance

13    Funding and SCS and Tovey as assignee?

14         A.   Yes.

15         Q.   What documents are there that state the terms of

16    this deal?

17         A.   There's no document that will state these specific

18    terms, but there's always an assignment of sale agreement,

19    where Advance Funding assigned to Tovey its rights and

20    obligations in the agreement for purchase.

21         Q.   And so is that a document that's executed by

22    Advance Funding and the Tovey trust?

23         A.   It's not considered a contract because it's

24    unilateral, executed by only Advance Funding.  It's only in

25    states such as Texas that require both parties sign an

Page 72

1    assignment agreement that you'll see both.  Generally, it's

2    only the one.

3         Q.   Is there any document then -- if the assignment

4    agreement is not a contract document, is there any contract

5    document that states the terms of this deal that's discussed

6    in Exhibit 2?

7         A.   No.  These things are done literally on an e-mail,

8    with this funder.  Other funders, like I said, there are

9    RPSAs, there are broker agreements, there are certain levels

10   of contractual documentation, but SCS does not.

11        Q.   All right.  What's an RPSA?

12        A.   A receivable purchase and sale agreement.

13        Q.   And what is a receivable purchase and sale

14   agreement?

15        A.   It's a transactional document between the purchaser

16   and the seller, meaning the company seller, not the annuitant

17   or winner seller.

18        Q.   Do some funders require an RPSA and others not?

19        A.   Correct.

20        Q.   SCS is one of the funders that doesn't require an

21   RPSA?

22        A.   Correct.

23        Q.   What is a broker agreement?

24        A.   A broker agreement would be where Northeastern

25   brokers the deal for another factoring company, in which case

Page 73

1    we would receive some sort of compensation for that

2    arrangement of funding.  We don't do that for Advance

3    Funding, obviously because of the relationship.  We just find

4    a funding source and then put those two together, and we're

5    out of it.

6         Q.   Was one of the documents that you reviewed in

7    preparing for your deposition today the assignment of sale

8    agreement relating to the Venzant transaction?

9         A.   Yes.

10        Q.   And so that's in the file?

11        A.   That's part of the petition, I believe.

12        Q.   Do you consider Northeastern to be an agent of

13   Advance Funding?

14             MS. FOX:  Calls for a legal conclusion.

15        Q.   You can answer that.

16        A.   I'm not sure I understand the relationship.  They

17   are companies owned by brothers, and they help each other

18   out.  I know, because I have the resources that I have

19   developed over the years, obviously Advance Funding didn't

20   start until much later, they haven't developed those same

21   resources, I literally just put people together, and then

22   they do the transaction.  I have nothing to do with any of

23   that.

24        Q.   And so, in this instance, if I understand your

25   testimony correctly, there was no contract document

Page 74

1    reflecting the terms of the agreement between Advance Funding

2    and SCS relating to the Venzant deal?

3         A.   You understand correctly.  There is the only --

4         Q.   That's it?

5         A.   -- meeting of the minds.

6                   MS. FOX:  You answered your question about the

7    $2,000.  Did you see that?

8                   MR. MANVILLE:  I did.

9                   THE WITNESS:  He had asked me generally.

10   That's why I didn't answer specifically.

11                  MR. MANVILLE:  This is exactly why I asked the

12   question.

13                  MS. FOX:  About proof of life?

14                  MR. MANVILLE:  Mm-hmm.

15        Q.   So can you explain your statement to the Millers

16   that you always purchase only partial payments so there are

17   no proof of life requirements for the assignee?

18        A.   Yes.  A life contingent deal, payments are only

19   paid if the annuitant or winner is alive.  There are certain

20   proof of life requirements, depending on the lottery or the

21   issuer, for each separate transaction.  Some can be pretty

22   egregious, like a signed, notarized card once a month.  And,

23   as I stated before, once you pay a lottery winner, getting

24   cooperation out of them is very, very difficult.  So it is

25   standard policy for Advance, Northeastern, and most

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                                September 22, 2015

Page 75

1    companies, I believe all now, or at least those who have had

2    experience in life contingent actions, is that they leave a

3    portion of each payment due to the annuitant or winner so

4    that there's a still an obligation for either the lottery or

5    the issuer to maintain that contact with that person, and

6    they do the proof of life.

7         Q.   Have you ever experienced a circumstance where

8    there was a breach by one party or the other of an informal

9    agreement of this nature, like we're looking at in Exhibit 2?

10        A.   Yes.

11        Q.   Can you tell me the circumstances of that, just

12   generally?

13        A.   Sure.  We had a transaction with wealth managers

14   where they have someone that's interested in the transaction,

15   and they either, because of documents that are required --

16   specifically, I recall an Ohio transaction.  There's a

17   document that requires them to make some sort of tax

18   statement, a tax compliant statement, and the ultimate funder

19   was uncomfortable with that statement and backed out.

20        Q.   And so was there a litigation arising out of that?

21        A.   No.  No.

22        Q.   You've never experienced a lawsuit or litigation

23   arising out of this type of informal agreement?

24        A.   No, sir.

25        Q.   Do you have any idea how a dispute like that would

75:7-25 - Relevence; calls for speculation

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                        September 22, 2015

Page 76

1    be resolved, where you essentially have an agreement

2    reflected in two sentences in an e-mail?

3         A.   Sure.

4              MS. FOX:   Objection; calls for speculation.

5         Q.   Go ahead.

6         A.   Inasmuch as I've cultivated most of these

7    relationships and spoke with these people personally, I've

8    advised all of them that there is no transaction, there is no

9    requirement for them to go through with this, unless and

10   until the closing binder meets their approval or the approval

11   of their counsel.  So there have been many transactions -- I

12   can recall one in California with a person who used to be

13   part of a corporate funder that we had that now purchases

14   these on his own directly, and he didn't like something in a

15   transaction as far as the tax lien was concerned, and we took

16   the transaction back and sold it to another funder.  So there

17   are resolutions to everything.  We work with people.  We

18   don't shove any files down anyone's throat.

19        Q.   So, in a typical factoring transaction then, let's

20   say one involving lottery payments, you get to this point

21   with your funder where you have an agreement that the funder

22   is going to buy the deal, then what happens next?

23        A.   I advise the company that is doing the actual

24   transaction that I've secured funding for them.

25        Q.   This would be Advance Funding in this instance?

76:1-25 - Relevence; calls for speculation

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 77

77:1-8 - Relevence; calls for speculation

1      A.    Correct, in this instance, Advance Funding.   Then

2  the petition is generally filed, or it may have already been

3  filed with an open-ended assignee, knowing that they could

4  present the order later.   It depends, but, generally, we wait

5  for an assignee before we even file because it's just cleaner

6  that way, and I know for a fact that we have an assignee, and

7  it's going to actually go.   So a petition will be filed with

8  local counsel.

9      Q.    How many lottery deals does Advance Funding do

10 every year?

11     A.    I know I looked at the graph, and I remember seeing

12 22, but I think that was over the course of a year and a

13 half.

14     Q.    What type of deals is the Tovey trust interested

15 in, lottery deals and also structured settlement deals?

16     A.    Yes.

17     Q.    Anything else?   That's it?

18     A.    I'm not aware of what Tovey is interested in.   I

19 just present deals to SCS, and SCS will let me know if they

20 have a bid.   I don't know who the ultimate funder is until I

21 accept that.

22     Q.    Right.   Those are the products that you make

23 available to Tovey through SCS, are lottery transaction,

24 structured settlement transactions?

25     A.    IGT deals; casino winnings; Wendy's scratch off;

Page 78

1    Coke prizes; Publisher's Clearing House; sports royalties on

2    a contract; book royalties.  There have been quite a few

3    different types of transactions, but, for the most part, it's

4    lottery and structured.

5         Q.   Wendy's scratch off, that's my favorite.

6         A.   Mm-hmm.

7         Q.   Has Tovey provided funding for any other types of

8    deals, other than lottery deals and structured settlement

9    deals?

10        A.   Not to us.

11        Q.   Not to you, okay.  What about SCS; is SCS also

12   interested primarily in lottery deals, structured settlement

13   transaction?

14        A.   No.  No.  They have several transactions -- I'm

15   sorry, I didn't mean to interrupt.  They've done several

16   transactions with IGT.  They have a direct appetite for them.

17   They've also expressed interest in other casino winnings.

18   They've entertained other things that we have presented to

19   them, but, for lack of guarantee or proper rating, they

20   declined.

21        Q.   Does Advance Funding get involved in any type of

22   transactions, other than lottery deals and structured

23   settlement deals?

24        A.   Yes.

25        Q.   Do they get involved in all of these other types of

BOFI Federal Bank v. Advance Funding LLC, et al.    Monica L. Ray 30(b)(6)                    September 22, 2015

Page  79

1    transactions that you listed or just some of them?

2        A.   I would believe they would definitely get involved.

3    Anything that involves payments in the future is something

4    that they would be interested in.

5        Q.   Is SCS still entertaining offers from Advance

6    Funding through Northeastern relating to any of these other

7    types of deals, IGT deals, casino winnings, that sort of

8    thing?

9        A.   They entertain them, and, if they have someone,

10   they will provide that information, but, for the most part,

11   Tovey was their largest funding source.

12       Q.   So, if SCS can obtain a funding source, for

13   example, for a deal involving casino winnings, as far as you

14   know, SCS would do that deal?

15       A.   I don't know why they wouldn't.  I don't know what

16   SCS would buy and what it wouldn't.  I mean, I don't see a

17   reason why.

18       Q.   And is that actually also true with regard to

19   lottery deals and structured settlement deals; if SCS could

20   find funding for those deals, to your knowledge, would SCS

21   enter into a transaction with Advance Funding related to

22   those deals?

23       A.   Routinely, they have and, I would imagine, would

24   continue.

25       Q.   So is the problem, if I understand correctly, that

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 80

1   Advance Funding has alleged here with regard to its

2   relationship with SCS, has to do solely with the fact that

3   Tovey is no longer providing funding for these transactions,

4   correct?

5        A.   No.

6        Q.   Okay.

7        A.   Since the lawsuit was filed and lots of bad things

8   were said before the lawsuit was -- or after -- I'm not

9   exactly sure -- they've had a disinterest in funding most

10  transactions from us, waiting for the resolution of this

11  lawsuit.  They anticipate they're going to speak with Tovey,

12  but they're not optimistic that he will come back on board.

13       Q.   Do you have an understanding of the cause of this

14  disinterest that you just referred to?

15       A.   Oh, definitely.  Tovey thought that lottery was

16  much more secure, and, in the normal course of business, it

17  is, but this lawsuit caused them to second-guess lottery,

18  which is unfortunate.

19       Q.   Well, let me break that out a little bit because I

20  want to make sure we're being clear.  Is the disinterest that

21  you referred to, is that a disinterest on the part of Tovey

22  in participating in lottery transactions or structured

23  settlement transactions with Advance Funding?

24       A.   I think it's both, SCS and Tovey.

25       Q.   Why do you think it's both, SCS and Tovey?

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                          September 22, 2015

Page 81

```
 1        A.    Why do I think it is?

 2        Q.    Yes.

 3        A.    Because the recent transactions I've sent over to

 4   them, they have either declined to bid or specifically told

 5   me that they're not going to bid until this is resolved.

 6        Q.    SCS has told you that?

 7        A.    That would be the only contact I have, yes.

 8        Q.    Has SCS told you that in written communications or

 9   on the phone?

10        A.    Both.

11        Q.    Both.  Okay.  The written communications are e-mail

12   messages?

13        A.    Correct.

14        Q.    And have all of those e-mail messages been produced

15   in discovery in this case?

16        A.    If they were discoverable with our searches in our

17   computer, yes.

18        Q.    Are you aware of any e-mail message from anyone at

19   SCS to you or anyone at Northeastern or Advance Funding

20   relating to SCS's willingness to enter into lottery or

21   structured settlement deals that have not been produced in

22   this litigation?

23        A.    No.

24        Q.    You mentioned that you've had some phone calls with

25   folks at SCS about this?
```

Page 82

```
 1        A.    Yes.  When the initial phone calls came in from

 2   Eshel, he incited panic, frustration.  I received a very

 3   panicked call from Scott Miller, wherein he stated Eshel had

 4   alleged some pretty malicious and definitely false things

 5   about Advance Funding.  And he explained that it was not

 6   good, that he wanted Tovey protected, and he immediately

 7   demanded that we buy back the Venzant transaction.

 8        Q.    How many other phone calls have you had with

 9   Mr. Miller about this issue?

10        A.    How many?

11        Q.    Yes.

12        A.    I would say probably a total of five.

13        Q.    Five.  What's the next one that you can recall?

14   Was there anything else that you talked about with him during

15   that first phone conversation?

16        A.    I asked him the specific things that were said to

17   him.

18        Q.    And what did he say?

19        A.    He said that BOFI said that we had hired an

20   ex-employee of theirs, who had stolen a database, and we were

21   purposely taking their transaction and that we have bad

22   files, do bad things.  It was just a generally very nasty

23   conversation.  He alleged that BOFI had a legal right to the

24   payments, that they were going to sue, and that they were

25   going to bring Tovey into the lawsuit, even though they know
```

Page 83

```
 1    the funders have nothing to do with contractual rights and

 2    obligations and the contracting of such.  And he basically,

 3    in no uncertain terms, told me to throw money at the matter

 4    to make it go away.

 5         Q.   Were those the terms that you think he used?

 6         A.   Those were not his exact words, but he basically

 7    said make it go away.

 8         Q.   Mr. Bar-Adon said that to Mr. Miller?

 9         A.   No, Mr. Miller told me to make it go away.

10         Q.   Okay.  Did Advance Funding agree to buy back the

11    file?

12         A.   We definitely said that we would, but we said,

13    nothing has been done, this is posturing.  After I

14    investigated and spoke with Advance Funding, I realized that

15    Eshel's comments were completely false and defamatory, and so

16    I spoke with Scott and told him all that I had found out,

17    that Advance Funding had not hired any ex-employee who had

18    stolen the database.  I told him that a UCC is nothing more

19    than notice to the world that you have a potential interest.

20    I told him that we had done court searches and that neither

21    location revealed any filing by BOFI and reminded him that,

22    under law, you do not have contract rights, absent a court

23    approval.  I told him that we would not likely pay BOFI to go

24    away, but that we would indemnify them.  Advance stands

25    behind its deals 100 percent, I believe was exactly the
```

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 84

1    wording I used.  And he responded with, "Well, we'll talk

2    about it, but keep Tovey out of it."

3        Q.   Was this a phone conversation that you had with

4    him?

5        A.   Yes, definitely.

6        Q.   So this was the follow-up to the initial

7    conversation?

8        A.   There were phone conversations and e-mails, but

9    most was phone, some was definitely e-mail, because I was

10   communicating with their counsel.

11       Q.   And that's Ms. Schwartz?

12       A.   Yes, and she agreed.

13       Q.   She agreed to what?

14       A.   Everything that I had said about the UCCs not being

15   any type of lien, that they had never filed, therefore, they

16   had no contract rights.  Their interference was improper.

17       Q.   When Mr. Miller said we'll talk about it, what did

18   he mean, we'll talk about it internally at SCS?

19       A.   Yes.

20       Q.   The Millers would talk about it?

21       A.   Yes.  Because he had initially asked me to buy back

22   the file, and my attempts were to calm him down, there is no

23   real threat here, don't worry, and he eventually came back

24   and coalesced.

25       Q.   What do you mean by that, did he call you back?

Page 85

1      A.   Yes.

2      Q.   What did he say?

3      A.   He agreed that we would handle the defense, if any

4  was required.  And I told him I find it curious that Eshel

5  hasn't contacted us yet.

6      Q.   Do you remember when that phone call took place?

7      A.   I don't, but I believe there is definitely an

8  e-mail to that respect that was in discovery, and I recall

9  reading that.  Many times, I think I told him that Eshel had

10 never contacted us, by any method, and that is very much

11 ordinary in our industry.

12     Q.   So Mr. Miller called back, and he agreed that

13 Advance Funding would handle the defense, if there was any

14 defense required?

15     A.   Correct.

16     Q.   Did you discuss his earlier request that Advance

17 Funding keep Tovey out of it?

18     A.   Did we discuss keeping Tovey out of it?  Not at

19 that time.

20     Q.   If he had gotten back to you and said, we talked

21 about it, and we still want Advance Funding to buy back the

22 file, would Advance Funding have bought back the file?

23     A.   Absolutely.  He actually went so far as to say, not

24 only do we want you to buy that one back, we want you to buy

25 14 others back, he doesn't want any lottery deals now, which

Page 86

1    caused us a little bit of concern at the time obviously.

2        Q.   Why didn't Advance Funding -- did Advance Funding

3    see some possibility that BOFI would actually file a lawsuit

4    and bring in SCS and Tovey as defendants?

5        A.   I'll be very honest with you.  I believe I even

6    stated in an e-mail definitely, possibly by phone, that there

7    was no way that they would do that.  It didn't make any sense

8    whatsoever.  It just -- BOFI knows better.  I hate to say it,

9    but Eshel has been around for a very long time.  He has been

10   in this business, I believe, longer than I have.  And, when

11   you have a dispute with a company, the normal thing, what

12   every other factoring company has ever done is you call that

13   factoring company and you say, hey, did you not know we had

14   this deal, blah, blah, blah, blah, whatever the circumstances

15   are.  And then sometimes there is an exchange of money,

16   sometimes there's not, sometimes there's an explanation of,

17   well, this is what happened, and this is why we proceeded.

18   We never had that opportunity.

19       Q.   David Bavli did call you, right?

20       A.   He called me, and, because I'm not Advance, I was

21   not able to talk to him.  I suggested he call Dan.

22       Q.   And then he did call Dan?

23       A.   I believe he called Dan, but there was never a

24   conversation.  I know I relayed him to Dan.

25       Q.   Did you all reach out to Mr. Bar-Adon or Mr. Bavli,

Page 87

1    affirmatively reach out to try to resolve the matter?

2         A.    We reached out via a tortious interference letter,

3    a cease and desist.

4         Q.    You just said custom in the industry is essentially

5    to pick up the phone and call and see if you can work it out.

6         A.    Absolutely.

7         Q.    Did you try do that?

8         A.    That wasn't our position.  We were the company that

9    secured the appropriate judicial order.  It would have been

10   their position to call us if they had a dispute.  We saw no

11   dispute.  They never even filed a petition for approval.  So

12   how they asserted they had contract rights is beyond me.  I

13   just -- I thought it was their continued practice of

14   interfering with our funder relationships, as they had done

15   with WMS.  This is just a history of practice that they have.

16        Q.    Tell me about WMS.

17        A.    They did the same exact thing.  They called WMS and

18   said nasty things about Advance Funding and ruined that

19   funding source.

20        Q.    And when did that happen?

21        A.    Years, years earlier.

22        Q.    How many years earlier?

23        A.    Probably 2012, maybe 2011.

24        Q.    What were the circumstances?  What caused -- was

25   this Mr. Bar-Adon again?

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 88

1        A.    No.   I don't believe Mr. Bar-Adon was with BOFI at

2    the time.

3        Q.    Who was it?

4        A.    Maybe Daniel Heffner.   I'm not exactly sure who

5    made the call.

6        Q.    What were the circumstances that prompted whoever

7    it was to make this call?

8        A.    I actually can't state to their circumstances or

9    what may have led them to make such a call.   It was so

10   unbelievable that it's hard to believe.   The same with this

11   circumstance.   I really, really did not believe that a

12   lawsuit would ever be filed under the fact circumstances of

13   this matter.

14       Q.    What were the facts and circumstances of the --

15   what was it the WMS matter?

16       A.    I would have to review those notes.   I wasn't

17   prepared for that.   I just prepared for the subject matter

18   that you presented, but I can certainly -- if you want to

19   call me later, I would have no problem looking into that and

20   getting back to you.   I don't think you'll like the results

21   of that one.

22       Q.    But you do have an opinion about their conduct,

23   even though you can remember the facts that support that

24   opinion, correct?

25       A.    I have an opinion, and my opinion, which really

Page 89

1   isn't relevant because I'm not Advance Funding, but my

2   opinion is they get involved when they shouldn't get

3   involved.  I know that there were two instances where they

4   filed, over a year after, to have Advance Funding's orders,

5   judicially approved orders, overturned using a best interest

6   standard, which is not a standard in lottery, it's a

7   structured standard.  So I don't know if it's lack of

8   experience or what or some personal vendetta.  It's hard for

9   me to understand why BOFI is continuing to interfere in

10  Advance Funding deals.  I just don't understand it.  Are you

11  aware of these transactions, that they attempted to vacate --

12       Q.   I'm asking you about them.

13       A.   Okay.  They attempted to vacate a Georgia and a New

14  York order that Advance Funding had secured via the

15  appropriate judicial approvals, did everything correct, but,

16  because they said they wanted to offer more money, it would

17  be in the best interests of the winner, that the court should

18  vacate Advance Funding's year or so old order and let them

19  buy the payments.  That's not done in this industry, sir.

20  That's just malicious.

21       Q.   Offering the annuitant more money is malicious?

22       A.   That's not what I said.  I said filing a court

23  petition, asking that someone -- a factoring company's prior

24  court order, judicially approved order, be vacated so that

25  they could then offer more money, knowing that they would be

Page 90

1  interrupting another funding source.  That's the malicious

2  part.

3      Q.   So, here, if I understand your testimony, you're

4  telling me that, although Mr. Bar-Adon had spoken with

5  Mr. Miller and indicated an intention to file a lawsuit and

6  indicated that he believed that Advance Funding had

7  tortiously interfered with BOFI's contractural relationship

8  with Ms. Venzant, you concluded that that was unlikely to

9  happen, and so, therefore, did not take steps to protect your

10 broker or investor in this case; is that right?

11     A.   No.

12     Q.   What's wrong about what I just said?

13     A.   Well, the steps we took were to offer

14 indemnification, should any legal action be filed.  My belief

15 that one wouldn't be filed did not stop me from preparing.

16     Q.   And did you believe that offering indemnification

17 to SCS and Tovey would be sufficient to maintain the

18 relationships with those two entities?

19     A.   I had no idea if that would be sufficient.  I was

20 trying whatever I could to maintain that relationship.  It

21 was valuable.

22     Q.   But trying whatever you could didn't include

23 actually offering to buy back the file, like Mr. Miller

24 requested?

25     A.   We agreed that we would.  We didn't feel it would

Page 91

1    be necessary because nothing had actually happened at that

2    point.

3         Q.   After the lawsuit was filed, did you offer to buy

4    back the file?

5         A.   After the lawsuit was filed, it was too late.

6         Q.   Why?

7         A.   Because they didn't want Tovey named in a lawsuit,

8    so obviously that had already happened, the damage was done.

9         Q.   Did you have a conversation with Mr. Miller after

10   the lawsuit was filed about whether, if Advance Funding

11   bought back the file, the relationship could be maintained,

12   or did you just assume that the damage was irreparable?

13        A.   I don't think there were any assumptions.  There

14   were lots of conversations.  Basically, at that point, they

15   had calmed down.  Eshel hadn't made any further contact at

16   that point, so they had basically calmed down, listened to

17   reason, consulted with their counsel, and understood the

18   legal ramifications and that the unlikelihood that BOFI would

19   succeed.

20        Q.   And so, as far as you know, does SCS currently

21   blame this lawsuit on BOFI and not Advance Funding?

22        A.   I can't answer to what they think.  We haven't had

23   any substantive conversation in that regard.  Basically, all

24   I've done is alert them as to the motions for summary

25   judgment and that BOFI still wanted to pull them into a

Page 92

1  deposition and Mr. Tovey, as well, and we would do our best

2  to protect Tovey to not have to be deposed.

3        Q.   Have you ever had a conversation with Mr. Tovey?

4        A.   Never.

5        Q.   Has SCS asked Advance Funding to take any specific

6  steps to get the lawsuit resolved promptly?

7        A.   Other than the initial conversation, where I told

8  you he intimated to me to throw money at it to make it go

9  away.

10       Q.   Right.

11       A.   I believe he's comfortable with the defense that

12  we've paid for.

13       Q.   I assume that, after Mr. Miller asked you to throw

14  money at the matter to make it go away, Advance Funding did

15  not do that, correct?

16       A.   There was nothing to throw money at.  Eshel never

17  made contact with us.

18       Q.   But you never --

19       A.   We didn't know until the lawsuit, and then it was

20  too late.

21       Q.   Why do you think it was too late after the lawsuit

22  was filed?

23       A.   Because their intention, their desire, was to keep

24  Tovey from being named in a lawsuit.  They specifically

25  stated that.  I believe that's in the e-mails.

Page 93

1      Q.   Do you believe there was a risk between

2  Mr. Bar-Adon's initial communications with Mr. Miller and the

3  filing of the lawsuit that BOFI would file a lawsuit

4  involving SCS and Tovey?

5      A.   I really believed that there was no way Eshel would

6  ever do that.  There's no legal standing for that.  And Eshel

7  knows.  Eshel is a lawyer.  Eshel has been in this business.

8  I just don't understand how this happened.

9      Q.   Have you read the legal briefs that have been filed

10 in this case?

11     A.   I have.

12     Q.   Do you understand the arguments that have been made

13 on both sides?

14     A.   I understand that they have made arguments.  I

15 don't understand their legal arguments.  They're not valid.

16     Q.   You don't understand the arguments that BOFI has

17 made?

18     A.   I understand them to not be valid.

19     Q.   You believe they are invalid?

20     A.   I believe, by law, they are invalid, and I believe

21 the judge has agreed.

22     Q.   Do you believe reasonable minds could differ on

23 that issue?

24          MS. FOX:  Objection to the form of the

25 question.  It's beyond the scope of what we're talking about

Page 94

1    here today.

2         A.   I don't know what you mean by reasonable minds,

3    but, specifically, Eshel, I don't think his was reasonable.

4         Q.   I mean reasonable minds.  Do you think it's

5    possible to see it the way BOFI sees it?  Do you think that

6    would be at all reasonable, or you just don't see it that way

7    at all?

8         A.   I don't see it the way BOFI has put it forward, and

9    I don't think BOFI sees it that way either.

10        Q.   Why do you think BOFI doesn't see it that way?

11        A.   Because it's just not legally factual.  It's

12   well-known in the industry.  Basically, it's a race to the

13   court house, whoever gets the order first wins.  The fact

14   that they are asserting some sort of contract rights, knowing

15   that they never even filed for approval of those rights, it's

16   kind of ludicrous.

17        Q.   Do you have an understanding of why BOFI waited to

18   file?

19        A.   I understand why they said they would wait to file,

20   but no one has ever done that.  You don't wait for a

21   contestability period.  You might wait to pay for the

22   contestability period, but we don't even do that.

23        Q.   So Advance Funding doesn't wait for the

24   contestability period to expire?

25        A.   No.  And this case is proof of that.

Page 95

1       Q.   Right.   How many deals has Advance Funding done

2   involving life contingent payments and a life insurance

3   policy?

4       A.   Several.

5       Q.   How many?

6       A.   I can't state with specificity how many.   I don't

7   recall that term.

8       Q.   More than two?

9       A.   Oh, absolutely.

10       Q.   More than five?

11       A.   I'm most certain it's more than five.

12       Q.   And, in every instance, Advance Funding has not

13   waited for expiration of the contestability period in order

14   to obtain court approval and obtain -- and make the payment

15   to the lottery winner, correct?

16       A.   Correct.   Not only would we not wait, that would

17   just open yourself up to exposure and poaching for that

18   length of time.   Of course, get your court approval, make it

19   a condition precedent that you may want to hold payment back,

20   but to not file, to not even receive approval for a deal

21   you're so sure you want to do, it just doesn't make sense to

22   me.   It's just not done.

23       Q.   So getting back -- I've gotten a little off track

24   here -- getting back to a question I was asking earlier, you

25   said Advance Funding might do somewhere in the neighborhood

Page 96

1   of 22 or so lottery deals a year?

2       A.   I remember seeing that on the spreadsheet, and I

3   believe I said that was probably over the course of a year

4   and a half.

5       Q.   A year and a half.  Okay.  Fair enough.  And are

6   those deals all over the country?

7       A.   Yes.

8       Q.   How many lottery deals -- do you know how many

9   lottery deals Advance Funding did in 2014?

10      A.   I think the number was 18.

11      Q.   How about 2013?

12      A.   I would be lying if I tried to speculate.  I think

13  they average around 21 deals a year.

14      Q.   Has the number of deals that Advance Funding --

15  lottery deals that Advance Funding has done -- decreased

16  since the filing of this lawsuit?

17      A.   I think the number of potential deals that they

18  could have done has decreased since the filing of this

19  lawsuit because there were several deals we couldn't obtain

20  funding for.  The ones that we did do, obviously we had to

21  pay a little bit higher, but such is -- that's the result

22  unfortunately.  I don't think the number is any guaranteed

23  amount each year.  It's, if we reach the lottery winners,

24  they want to do a transaction, they do a transaction.  We

25  still have a lottery funding source, it's just not as

Page 97

1   advantageous.

2        Q.   Before the filing of this lawsuit, were there

3   lottery deals that Advance Funding did that it was unable to

4   obtain funding for?

5        A.   There may have been one that it was unable to

6   obtain funding for, but we had a really good relationship

7   with SCS, in that Tovey apparently liked lottery deals, so he

8   basically took everything that we proposed.

9        Q.   How many brokers like SCS are there in the

10  industry?

11       A.   I wouldn't be aware of all of them because that's

12  not my job to develop the source.  Mine is just to cultivate

13  it and make it a comfortable source.

14       Q.   Do you have any idea how many there might be?

15       A.   I really don't.

16       Q.   Ten?  100?  1,000?

17       A.   I really do not.  I don't do any research in that

18  regard.  It's just not in my purview.

19       Q.   About how many funding sources do you know are

20  there in the industry; do you have any idea?

21       A.   I do not.

22       Q.   With regard to the brokers that Advance Funding

23  works with, do you know how many funding sources those

24  brokers have?

25       A.   I do not.

Page 98

```
 1        Q.    Do you know if SCS has funding sources other than

 2   Tovey?

 3        A.    Yes.

 4        Q.    How many; do you know?

 5        A.    I don't.

 6        Q.    Do you know who they are?  I'm not going to ask you

 7   who they are.

 8        A.    I do know of a couple only because they've

 9   purchased deals from us.

10        Q.    Lottery deals?

11        A.    Lottery and structured, yes.

12        Q.    And was that before the filing of the lawsuit,

13   since the filing of the lawsuit, or both?

14        A.    Mostly before.

15        Q.    Do you have any idea why those funders -- not

16   Tovey, but those other funders -- are not buying lottery

17   deals now?

18        A.    Oh, I haven't been told that they're not.  They

19   might still be.  They certainly aren't buying lottery deals

20   from us.

21        Q.    Why not; do you know?

22        A.    SCS has made it clear, until this is done, they're

23   not buying anything lottery related to us -- excuse me --

24   from Advance or anyone until this is done.  So I think

25   they've just shut down lottery altogether.
```

Page 99

1    Q.    So you're telling me there has been a communication

2  from SCS to you saying, until this lawsuit is over, we will

3  not buy any more deals, any more lottery deals, from Advance

4  Funding, regardless -- even if we have a potential funding

5  source for it?

6    A.    There's no such communication, no.

7    Q.    That's what I heard you just telling me.

8    A.    No.  I said we've presented bids to them.  They've

9  either declined or just not presented a bid.  I can't

10  speculate as to why they did or did not.

11    Q.    Okay.  Do you know what types of funders there are

12  in the industry?  What's the range?

13    A.    I really don't know anything about that.  I'm

14  sorry.  It's just not something I ever had to pay attention

15  to.  The funding source is brought to me by either one of the

16  presidents, and then they develop the entire relationship.

17  It's only my job to ask them what documents they're going to

18  require in the closing binder, what's their turnaround time

19  for review, that sort of thing.  The actual rates and

20  discussions were held before my involvement.  And then, of

21  course, I'm the one that presents the closing binders, so I

22  have most of the contact from that point forward.  And then I

23  will be the one presenting the streams to see if they are

24  interested in bidding.

25    Q.    But I gather that, at Advance Funding and

Page 100

 1   Northeastern, the responsibility for researching and

 2   identifying possible funding sources and then cultivating

 3   relationships with those funding sources, that's up to the

 4   Cevallos brothers, correct?

 5        A.    Correct.

 6        Q.    And you have no insight into that process, correct?

 7        A.    Sometimes I am brought in on conversations,

 8   sometimes I'm not.  How they found those people, that was

 9   what I was relating to you, I have no idea what their source

10   of information is.

11        Q.    And are they also the ones who are responsible for

12   managing and cultivating a funder?  I recall a discovery

13   response where Advance Funding says that it takes years to

14   develop a funding source.  Who does that work?  Is that a

15   Cevallos brothers who develop those sources?

16        A.    They develop the source; I cultivate it.  I'm the

17   one that develops the trust, the clean files, the reputation.

18   The fact that our files are so clean, and I've actually been

19   told this by SCS and other funders, they have a level of

20   comfort with our transactions.  That takes a lot of time to

21   get to that point.  Some of the other factoring companies,

22   I'll be very honest with you, because I know, where

23   Northeastern broker deals for these companies, as well,

24   they're sloppy; their documents aren't reliable; they're

25   outdated; they're not signed; it's just a mess.  I guess my

Page 101

1   experience in this industry has proven to me at least that,

2   if you present a clean file consistently, that you're going

3   to develop a better relationship between yourself and your

4   funders.

5       Q.   But this aspect of your job, maintaining clean

6   files and so forth, this is what happens after the funder is

7   brought in, I gather, right?

8       A.   After the introduction, yes.

9       Q.   So John Cevallos will bring in potentially a new

10  broker or a new funding source, and presumably he's been

11  talking to that person about doing a lottery deal or doing

12  lottery deals, and then you're the one who actually kind of

13  works the process, and, over time working with that funder,

14  cements the relationship, let's say?

15      A.   Right.   Except for, more often than not, it's Dan.

16  Dan is more active in the business.   John, he's accomplished,

17  he's a traveler, so he's not as active hands-on.   Dan is very

18  hands-on, still building his business.   So he will be the one

19  providing those leads to me and the information putting me on

20  the phone calls.   But, yes, I am the one, from that point

21  forward, asking, what do you require in your closing binder,

22  what is your review time, basically developing the parameters

23  of the relationship.   I will take the documents and review

24  them if there's an RPSA.   I will take the documents and

25  review if there's a broker agreement.   If there's anything

Page 102

1    beyond the introduction and saying, do you want lottery

2    deals, do you want structured deals, what kind of rates,

3    that's them.  Everything beyond that is me.

4         Q.   Okay.  Does Advance Funding want to work with as

5    many brokers and funders as responsible?

6         A.   Absolutely.

7         Q.   So you'd rather be sending an e-mail, not to 7

8    people, but 70 people?

9         A.   Absolutely.  Competition is healthy.

10        Q.   What does Advance Funding look for in a broker like

11   SCS that Advance Funding might want to enter into a business

12   relationship with?

13        A.   Inasmuch as I'm not the one to develop that lead, I

14   have no idea how they got the source, what they actually were

15   looking for to get that source.  All I'm told is, this

16   company is going to start buying deals from us, you know,

17   figure it out.

18        Q.   And is that also true of funders or investors?

19        A.   I thought that's what we were talking about.

20        Q.   I specifically asked about brokers.

21        A.   Oh, I'm sorry.  Oh, I'm sorry.  The broker -- I

22   apologize then.  I have to back up.  I don't have anything to

23   do with the brokers.  That is still Dan and John.

24   Northeastern, before my starting there, already had

25   relationships with brokers or other factoring companies that

Page  103

1   we broker the deal for, so to speak.  And, depending on

2   those, sometimes we're in the chain of title, sometimes we're

3   not, and there's a side deal, sometimes it's a handshake,

4   sometimes it's an agreement.  It just depends on what their

5   level of comfort is with one another.  For instance, Stone

6   Street -- and I'm not giving up any proprietary information

7   by saying that, so we're good -- Stone Street is one such

8   company that has its own funding sources; however, it doesn't

9   have a funding source for a particular type of transaction,

10  so they'll bring that to us, and vice versa.

11       Q.   Is it Dan Cevallos who mostly brings in new leads

12  for Northeastern to work with in terms of funders and

13  brokers?

14       A.   They bring in new leads as a funding source, but,

15  because they're brothers, they share information.  There is

16  no competitive nature between the two of them.

17       Q.   I gather that Northeastern works -- I think you

18  testified to this earlier, that some of your funding sources

19  are brokers like SCS, and some of them are sources that

20  self-fund; is that correct?

21       A.   That's true.  By self-funding they have -- they're

22  wealth managers, and their clients are the purchasers, so

23  they actually either have the funds in some sort of account,

24  trust account or such, that they have access to it.  So the

25  funds actually come from SCS.  We never get funds directly

Page 104

1    from, say, Tovey.

2         Q.   Are there impediments that you're aware of to

3    Advance Funding or Northeastern developing business

4    relationships with particular funders or brokers?

5         A.   Yes.

6         Q.   So tell me about some of those.

7         A.   Northeastern has a relationship with Great West,

8    which is a very big industrial funder.  So, again, I'm not

9    giving out any proprietary information.  There are certain

10   parameters that you have to attain before you can become a

11   Great West broker.  And Advance Funding has not, up until

12   now, qualified, and because Northeastern has that

13   relationship already, there's no need for them to continue to

14   try.  So they just, whenever it's a Great West funding, then

15   Northeastern will be in the chain of title, and sometimes

16   there's compensation, sometimes there's not.  It all depends.

17   I know, at least for purposes of states that have a

18   withholding, Great West -- excuse me -- Northeastern handles

19   that.

20        Q.   Are there any other types of impediments to Advance

21   Funding or Northeastern developing relationships with

22   particular brokers or funders?

23        A.   I'm not sure what impediment there would be.  I

24   believe they're both independent, they're out there, but,

25   like I said, John is, for lack of a better word, semiretired.

Page 105

1    So I think the more proactive is going to be Dan.

2          Q.   Let's talk for just a little bit about the Venzant

3    transaction.  Can you sort of summarize what happened?  We've

4    talked a little bit about it already.

5          A.   Sure.

6          Q.   I know, for instance, we've talked about the

7    initial contact between Advance Funding and Ms. Venzant in

8    spring 2013 and whether that was Advance Funding reaching out

9    to her or whether it was her reaching out to Advance Funding.

10   So we can sort of gloss over some of the stuff we've covered.

11         A.   Okay.

12         Q.   But, if you could give me a summary of what

13   happened, I would appreciate it.

14         A.   Sure.  Obviously, contact was made.  One of them

15   believes it's one, one believes it's the other, but, however,

16   they did obviously make contact, had several discussions, and

17   came to contract terms.  Those contract terms were presented

18   to Elyse, Elyse prepared a contract, and then the petition

19   was filed.

20              THE WITNESS:  I believe, Susan, you filed

21   that.

22         A.   The order was secured about a month after that,

23   and, in the meantime, due diligence was done by Elyse, and

24   then we funded.

25         Q.    I do want to ask you a specific question about what

Page 106

1   I just told you I didn't need to ask you about.  So this is

2   Advance Funding's answer to Interrogatory No. 5, which asked,

3   "State with specificity how Sheena Venzant first became a

4   client of AF."  AF answered, "To the best of my knowledge, a

5   salesperson at AF left a detailed voicemail message for

6   Ms. Venzant on April 29, 2013."  Where did that information

7   come from?

8        A.   Barbara Guerra.

9        Q.   When you spoke with Ms. Guerra, was she that

10  specific?  Did she remember leaving a voicemail for

11  Ms. Venzant on April 29, 2013?

12       A.   She didn't remember that specific date.  As a

13  matter of fact, when I spoke with her, she was unclear.  She

14  said that was the first time she had reached out to

15  Ms. Venzant, and I believe she had looked at her phone

16  records back when this initially happened.  I'm not exactly

17  sure, but she said that was the first time she reached out to

18  her beyond when she had reached out to her the first time

19  after the initial win.

20       Q.   That was going to be my next question.  How did she

21  come up with that specific date?  What did she look at?  You

22  suggested that she might have looked at her phone records.

23  Do you know what she looked at?

24       A.   I didn't I ask her that.  I asked her, because I

25  had read Sheena's affidavit, I said, "Are you sure?"  And she

Page 107

1    said, "I'm not 100 percent sure."  She said, "I just remember

2    that that's the first time I contacted her."

3         Q.   Do you know who spoke with Ms. Guerra in preparing

4    these answers to interrogatories?

5         A.   I spoke with Ms. Guerra.

6         Q.   In connection with the drafting of these

7    interrogatory answers?

8         A.   I spoke with her; Dan spoke with her.  It's

9    possible Suzanne -- Susan spoke with her, I'm not sure.

10        Q.   The answer to Interrogatory No. 1 says that, "Dan

11   Cevallos, as president of AF, is answering these

12   interrogatories."  So is it your understanding then that he

13   had a conversation with Ms. Guerra about the date on which

14   she left Ms. Venzant a voicemail message?

15        A.   Sure.  I believe I just answered that, saying that

16   Dan and possibly Susan.

17        Q.   Did you have any phone conversations with

18   Ms. Venzant in the spring of 2013?

19        A.   I've never had any conversation with a winner or an

20   annuitant, ever.

21        Q.   E-mail communications with her?

22        A.   Never.

23        Q.   Not you, okay.

24        A.   No.

25                  MR. MANVILLE:  Let's make this No. 3.

Page 108

```
 1                  (Exhibit 3 marked for

 2                   identification.)

 3       Q.   I am handing you what's been marked Exhibit 3.

 4  This is a long e-mail string, beginning on June 24, 2013, and

 5  ending on March 13, 2014, between you -- I think you are

 6  certainly the common thread -- and a number of people,

 7  including the Millers, Amy Schwartz, and a few other folks.

 8  I want to ask you a few questions about this.  So, if you

 9  look at your message -- and, first of all, I guess, did I

10  describe this accurately?  Is this what we're looking at

11  here?

12       A.   That's what it appears to be, yes.

13       Q.   Take a look at an e-mail from you to Amy Schwartz

14  and the Millers, copying a few other folks, dated June 28,

15  2013.  So part of this e-mail -- is this a list of the

16  materials that are going to be in the closing binder?

17       A.   The specific e-mail that you're referring to, no.

18       Q.   Well, maybe we're not looking at the same one.

19       A.   Oh, sorry, I'm looking at the one from Amy.  Hold

20  on one second.  Oh, yes.  I apologize.

21       Q.   So this is actually the e-mail from you to

22  Ms. Schwartz and the Millers, transmitting the documents

23  constituting the closing binder?

24       A.   It is.

25       Q.   And then, looking at the next e-mail in this
```

Page 109

1    string, this is an e-mail from Ms. Schwartz to you of the

2    same date, and then a response from you to her of the same

3    date.  I take it that the text here, the larger text, is your

4    response to her e-mail; is that right?

5          A.    That is correct.

6          Q.    If you see in paragraph 1 there, you said, "They

7    attempted to do a deal with Ms. Venzant, but were unable to

8    secure court approval."  What was your basis for making that

9    statement?

10         A.    Court searches.

11         Q.    Why did you say they were unable to secure court

12   approval?

13         A.    Because you can't receive court approval if you

14   don't even apply.  You have to petition the court.

15         Q.    So you were not intending to suggest that they had

16   applied for court approval, but been denied?

17         A.    No, I wasn't intending to imply anything.

18         Q.    You also say, "She advised that she intended to

19   send a formal cancelation letter."  Is this what Ms. Venzant

20   told Advance Funding in the spring of 2013, that she intended

21   to send a formal cancelation letter to BOFI?

22         A.    Right.  And I had to state it that way because I

23   didn't have a copy of it.

24         Q.    But what you're stating here is what she told you.

25   Is that what she told Advance Funding, that she intended to

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                September 22, 2015

Page 110

1  send a formal cancelation letter to BOFI?

2       A.   You're using what she told you, and you're saying

3  what she told Advance Funding.   This would be what she told

4  Advance Funding.   I don't have any contact with Ms. Venzant.

5       Q.   I understand.   That's why I asked.

6       A.   Oh, okay.

7       Q.   Is it your position, as Advance Funding's 30(b)(6)

8  representative, that Ms. Venzant advised Advance Funding that

9  she intended to send a formal cancelation letter to BOFI?

10       A.   She advised Barbara Guerra that she had sent one.

11  I just did not have a copy of it.

12       Q.   Why didn't you say here that she advised that she

13  had sent a formal cancelation letter to BOFI, I will secure a

14  copy?

15       A.   I can't say why I used one word over the other, but

16  I clearly said next, I will secure a copy of said letter if

17  you'd like.

18       Q.   Right.   So, by June 28, you didn't have a copy of

19  the letter, correct?

20       A.   I did not.   I had received an unsigned copy, which

21  I told you is not verification of anything, to me.

22       Q.   Do you recall when you received the unsigned copy?

23       A.   I do not.

24       Q.   The very last e-mail in the string is an e-mail

25  from you to Scott Miller and Amy Schwartz, copied to the

Page 110, lines 7-11:
Hearsay if offered for
the truth of the matters
asserted

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 111

1   other Millers.   And you state, "Well, we spoke to Venzant and

2   have gotten to the bottom of the problem."   Who spoke with

3   Venzant?

4         A.    The only person that I know of that had contact

5   with her was her sales rep, Barbara Guerra.

6         Q.    "And, according to you, Ms. Venzant wanted to pay

7   them back the 15 K, but they said, 'No, they want 21 percent

8   interest in addition.'"   That's what Ms. Venzant told

9   Ms. Guerra?

10        A.    That's what Ms. Guerra told me.

11        Q.    That Ms. Venzant had told her.

12        A.    That's what she gathered from their conversation.

13        Q.    And then you say, "Obviously, that has caused a

14   problem, as she does not feel she should pay them back

15   interest when they jerked her around for over a year."

16   What's your basis for stating that BOFI, quote, "jerked her

17   around for over a year," end quote?

18        A.    I'm just relaying what was told to me.

19        Q.    Your testimony is that Ms. Guerra told you that

20   Ms. Venzant had told her that BOFI jerked her around for over

21   a year?

22        A.    That's what Ms. Guerra told me, that, following her

23   conversation with Ms. Venzant, this is what she told me.

24        Q.    But did she say that Ms. Venzant had told her that;

25   do you recall?

**Page 111, lines 19-23: Hearsay if offered for the truth of the matters asserted**

Page 112

1        A.    Absolutely no recollection of what she may have

2   told me, but, this is what I wrote.

3        Q.    You don't have any independent recollection of the

4   conversation on which this e-mail was based?  I realize this

5   was a year and a half ago.

6        A.    Right, several years ago, but what you're asking

7   from me is exactly what she told me.  I don't have that type

8   of recall.  I'm sorry.  I do recall a conversation.

9   Generally, that's what she said.  So I wouldn't have dreamed

10  up the language myself.  I didn't have the conversation with

11  Ms. Venzant.  So I'm probably paraphrasing what she said

12  because Barbara is quite verbose.

13                        (Exhibit 4 marked for

14                         identification.)

15        Q.    Handing you Exhibit 4, is this a copy of the signed

16  letter that you received or that Advance Funding received

17  sometime after June 28th, 2013, from Ms. Venzant?

18        A.    Yes.

19        Q.    Because, frankly, I don't think I've ever seen the

20  unsigned version, is the unsigned version identical to this,

21  but without the signature line?

22        A.    From my recollection, I don't recall exactly what

23  it looked like.  It wasn't something we maintained a copy of

24  because I didn't find it to be of value, so it was discarded.

25        Q.    I thought you reviewed it as part of your

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 113

1    preparation for today's deposition?

2         A.   I reviewed this as part of my deposition.

3         Q.   So I want to clarify, because I think you did tell

4    me that you had reviewed the unsigned letter, but, in fact,

5    Advance Funding does not have that letter in its file?

6         A.   I don't believe we do.  I believe your question was

7    whether we presented that as part of our discovery response.

8         Q.   I asked you that, as well.

9         A.   Okay.  I don't recall whether that's in there or

10   not.  I definitely have seen this letter.  I was referring to

11   the letter I was first given, but she was at work, so she

12   didn't have the one that she had actually sent.  This is a

13   copy of the one she actually sent.

14        Q.   So your testimony -- going back to Exhibit 3 --

15   your testimony is that, as of June 28, 2013, you had an

16   unsigned copy of the letter, but you did not yet have a

17   signed copy of the letter, correct?

18        A.   I had seen a copy of the unsigned letter, but I had

19   not seen a copy of the signed letter.

20        Q.   And, sometime subsequent to June 28, 2013, Advance

21   Funding obtained a signed copy of the letter, correct?

22        A.   I believe there's an e-mail in here somewhere where

23   we actually provided it to counsel.  So, instead of me

24   saying, I'd rather rely on that.  But I can say that they

25   wouldn't have funded without it.

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 114

1      Q.    They wouldn't have funded without the signed

2   letter?

3      A.    Generally.  So we made every attempt to get it

4   then.  I believe, that day she presented it, as soon as she

5   got home.

6      Q.    And the difference in your mind between an unsigned

7   letter and a signed letter that the lottery winner says she's

8   sent to the company that previously entered into a deal with

9   her is that this is more likely to be --

10     A.    The one she actually sent.

11     Q.    -- accurate?

12     A.    No, the one she actually sent.

13     Q.    She's more likely to be telling the truth about all

14  this?

15     A.    No.  She was more likely not to send one that she

16  hadn't signed.  From what I understood, she was communicating

17  with what we now know as an ex-employee of BOFI, who gave her

18  the wording for it.  Now, whether she sent it, from where, I

19  don't know that.  I do know that I did finally get a copy

20  that was the one that she sent.

21     Q.    And so it wouldn't have been enough to tell your

22  funder, she has advised us that she sent a letter to BOFI

23  cancelling the contract; you would have wanted to send this

24  to the funder and say, here is a copy of the letter that she

25  says she sent to BOFI cancelling the contract?

Page 115

1        A.    Right, here is a copy of the letter she actually

2   sent, not one that she intended to send or -- because, if a

3   letter isn't signed, obviously, you're going to infer that it

4   wasn't the one that was sent.  So I don't need a copy of

5   something that was not signed in my file because it doesn't

6   mean anything.

7        Q.    How do you know this --

8        A.    I want a copy of the one that was sent.

9        Q.    How do you know this was sent?

10        A.    Because Barbara Guerra had that conversation with

11   her while she was at work, and she apparently went home and

12   got us a copy of the one that was sent.

13        Q.    Because Ms. Venzant told you she sent this?

14        A.    We would have no other way of knowing.  Actually, I

15   take that back.  We do have a way of knowing because I

16   believe there was also a subsequent letter in February of

17   2014 where BOFI acknowledged receipt of the cancelation and

18   asked for return of the advances.

19        Q.    I know what letter you're talking about.  How do

20   you know that that correspondence was referring to this

21   letter, as opposed to some other communication from

22   Ms. Venzant?

23        A.    I don't.

24        Q.    Okay.  I believe you testified earlier that -- so I

25   just want to clarify something here -- I think you testified

Page 116

1   earlier that the UCC reports were provided to SCS in 2013 as

2   part of the closing binder, correct?

3       A.   There are lien and judgment searches, which do

4   include UCC searches.

5       Q.   That was my question.  So the UCC searches aren't

6   specifically referenced in this list on page 6 of Exhibit 3,

7   but they would have been included in the lien and judgment

8   searches?

9       A.   Correct.

10      Q.   Okay.  So, when Scott Miller asked on March 13,

11  2014, was there a UCC search done, the answer was really,

12  yes, and we gave it to you a year ago?

13      A.   I mean, those are facts, what you're stating, but,

14  no, my answer was, yes, they attempted to do a deal, but were

15  unable to secure court approval, and then she came to us to

16  complete a transaction.  She advised that she intended to

17  send a formal cancelation letter.  I will secure a copy of

18  said letter if you would like.

19      Q.   Why didn't you respond to Mr. Miller's e-mail that

20  the UCC searches had previously been provided?

21      A.   I can't speculate as to why I did something two

22  years ago.

23      Q.   Looking at Exhibit 4, again, this is the

24  handwritten letter?

25      A.   Yes.

Page 117

1      Q.   Nobody at Advance Funding drafted this, did they?

2      A.   No.  If you look at the date, we hadn't had contact

3  with her at this time.

4      Q.   Right.  I mean, I could copy this out today and put

5  that date on it, right?  I mean, nobody at Advance Funding

6  drafted this, right?

7      A.   That would be very fraudulent sir.  No, nobody at

8  Advance Funding drafted that.

9      Q.   Would you agree that the deal that Advance Funding

10  offered Ms. Venzant wasn't as favorable as the deal that BOFI

11  had offered her?

12      A.   I would not.

13      Q.   Why?

14      A.   I don't believe it was the same transaction.

15      Q.   Right, it wasn't the same transaction.  Was it more

16  or less favorable than the deal that BOFI had offered?

17      A.   I don't really deal with numbers.  That's not

18  something that I would even look at.

19      Q.   Other than transmitting the UCC searches to SCS,

20  did Advance Funding advise SCS that Ms. Venzant had

21  previously -- let's start over.  Other than transmitting the

22  UCC searches to SCS in the spring of 2013, at that time, did

23  Advance Funding advise SCS that Ms. Venzant had previously

24  entered into an assignment agreement with BOFI?

25      A.   That's not a typical conversation.  Basically,

Page 118

 1    after we strike a transaction deal with a funder, there's no

 2    further conversation, other than, do you have a court date,

 3    did it get approved, and then we send the binder.

 4         Q.   So no is the answer, correct?

 5         A.   I believe that's the answer, yes.

 6              MR. MANVILLE:  Let's mark this five.

 7                        (Exhibit 5 marked for

 8                         identification.)

 9         Q.   Ms. Ray, handing you Exhibit 5, this is another

10    e-mail string that's long, in terms of amount of time that it

11    covers, starting on July 2, 2013, and ending on March 12,

12    2014.  Its a string between you and Ms. Schwartz and the

13    Millers and so forth; is that correct?

14         A.   Correct.

15         Q.   Now, in Mr. Miller's e-mail, the last e-mail in the

16    string, March 12, 2014, he says -- he asks if Advance Funding

17    did a UCC search, and he says, "It is my understanding,

18    having been in this business for 20-plus years, that, if

19    there was a UCC filed, Advance would have seen that there was

20    a lien and would have settled that issue before selling that

21    file to the Tovey trust or before advising SCS that the file

22    was clean."  Do you disagree with that statement, that that's

23    what Advance Funding should have done?

24         A.   No, that's not what Advance Funding should have

25    done.  I think you're taking it out of context.  And there's

Page 119

1   a later e-mail that addresses this specific thing from Amy

2   Schwartz.

3        Q.   What do you think he's saying here?

4        A.   I'm not saying he's saying anything.  You just

5   said, do I agree with this statement?

6        Q.   You don't agree with this statement?

7        A.   No.  A UCC is not lien.

8        Q.   Well, I don't see -- he didn't say, and I didn't

9   suggest that a UCC -- oh, I see, that there was a lien.  But

10  what about -- what I'm really asking about is his statement

11  that you would have settled the issue before selling the file

12  to the trust or advising SCS that the file was clean.

13       A.   If there was a lien, yes, we would have settled it.

14       Q.   But your view is, if there's no lien, then you

15  have, not only no obligation to contact BOFI, but, as you put

16  it, contacting BOFI would invite poaching, in your view?

17       A.   No, my opinion is there was no issue, there was no

18  reason to contact BOFI.  There was no lien.

19       Q.   And the response that you're referring to that came

20  later from you and Ms. Schwartz, that was a response to

21  Mr. Miller's view that a UCC filing in this instance

22  constituted a lien that needed to have been resolved?  You

23  responded and said it's not a lien?

24       A.   I responded and Amy Schwartz, both, responded,

25  legal counsel, responded to him, directly on point.

Page 120

1      Q.   And what was his response to that message, a UCC

2    filing is not a lien in this instance?  Did he accept that?

3      A.   I would have to look at his e-mail again.  I would

4    assume he did, from his legal counsel's e-mail, yeah.  It was

5    pretty strong language.

6      Q.   How frequently does Advance Funding enter into a

7    deal with a lottery winner where another factoring company

8    had previously entered into a deal with that winner regarding

9    the same lottery installment payments?

10     A.   It's common both ways.

11     Q.   What do you mean by that?

12     A.   Advance Funding will enter into contracts with an

13   annuitant or a winner who had either previously entered into

14   a contract with another factoring company and for whatever

15   reason isn't pursuing that contract anymore.  And the same

16   happens to us, we'll have a signed contract, and we'll lose

17   that winner to someone else.  Until you get a court order,

18   you really have nothing.

19     Q.   Does Advance Funding ever advise its investors when

20   it enters into a lottery assignment agreement with a lottery

21   winner that had previously entered into an agreement with

22   another factoring company?

23     A.   No.

24     Q.   You don't bring that to the attention of your

25   investors?

Page 121

1       A.   There's no need.

2       Q.   Was SCS made the beneficiary under Ms. Venzant's

3   life insurance policy?

4       A.   I believe the contract -- excuse me -- the

5   insurance documents that I reviewed today did indicate that

6   SCS was the new owner and beneficiary of that policy.

7       Q.   Why was that done?

8       A.   Apparently, they protect the wealth of these

9   individuals that they manage the wealth of, and that made

10  financial sense to them.  I can't speculate as to why SCS

11  chose to do that.

12      Q.   That was part of the deal I assume, that Advance

13  Funding, I guess, didn't care about one way or the other?

14      A.   I don't understand your question.

15      Q.   Well, if I remember correctly, I believe it was SCS

16  that asked to be made the beneficiary under the policy; is

17  that right?

18      A.   Generally, I will ask the funder, or in this case

19  broker, who is going to be the owner and beneficiary of the

20  policy.

21      Q.   Right.  As far as Advance Funding is concerned, you

22  have no skin in that game, it just needs to get assigned to

23  whoever it's going to get assigned to?

24      A.   We ask the funder's representative who they wanted

25  the policy in.  So I'm not sure what you mean by that.  I

Page 122

1    mean, obviously, we're not a benefit -- we don't benefit from

2    that policy.

3         Q.   Right.  I'm not suggesting that.

4         A.   So that's a general question we ask always.  I

5    don't know --

6         Q.   And then you'll generally do what the funder asks?

7         A.   We didn't do anything.  Sheena Venzant requested

8    these documents from her insurance company, and then we sent

9    them to the funder's representative to fill in.  We didn't

10   submit it, we didn't do anything.

11        Q.   Your confirming e-mail -- this is Exhibit 2 -- your

12   confirming e-mail to Richard Miller said, "The $1 million

13   life policy will be A rated or better and will be owned by

14   SCS."  So did Advance Funding have some role in transferring

15   the policy to SCS?

16        A.   Other than providing the forms, no.  This

17   speculates a policy that we were going to have her secure.

18   We were unaware at the time that she had already secured a

19   policy.

20        Q.   I see.  Okay.  And then you learned later that she

21   had already secured a policy?

22        A.   Yes, because, obviously, if I say it will be

23   A rated or better, obviously I don't have a policy already.

24        Q.   Is it Advance Funding's position that

25   Mr. Bar-Adon's conversation with Mr. Miller in March 2014,

Page 123

1    that that conversation, in and of itself, impaired Advance

2    Funding's business relationship with SCS or Tovey?

3         A.   It certainly was the initiation of such.

4         Q.   I understand that, but did that conversation, in

5    and of itself, have a material impact on the business

6    relationship between Advance Funding and Tovey, let's say?

7         A.   Well, there is no relationship between Advance

8    Funding and Tovey.  There's only a relationship between

9    Advance Funding and SCS, and I believe it was very damaging.

10        Q.   Okay.  So your testimony today is that, to your

11   knowledge, the phone conversation that Mr. Bar-Adon and

12   Mr. Miller had on March 18, 2014, that conversation damaged

13   the business relationship between SCS and Tovey?

14             MS. FOX:  Between SCS and Tovey?

15        A.   Between SCS and Tovey?

16        Q.   Yes.  That's what you just said.

17             MS. FOX:  No.  Misstates the testimony.

18        A.   No, I said between Advance and SCS.

19        Q.   Okay.  Well, if the answer is no, then -- or if you

20   don't know --

21        A.   But you've asked the question two different ways.

22        Q.   Well, let me ask it again.

23        A.   Okay, please.

24        Q.   Is it your view that the conversation that

25   Mr. Bar-Adon had with Mr. Miller on March 18, 2014, damaged

Page  124

1    the business relationship between SCS and Tovey?

2        A.   I know for a fact it did because I received e-mails

3    in that regard, yes.

4        Q.   That conversation damaged the business relationship

5    between SCS and Tovey.  In what way?

6        A.   That conversation damaged the business relationship

7    between them and Tovey because they had bought files from us

8    that Eshel was saying were -- what was it he said we had

9    done?  I can't recall exactly, but it was basically that we

10   had done bad documents, bad files, that we're stealing their

11   deals, that we didn't have a right to those payments.  So,

12   basically, that alarmed them that they had purchased for

13   their investor a deal that supposedly we had no contract

14   rights in and were now subject to attack by some other

15   entity.  So it brought fear to them.  Then -- and I believe I

16   testified that that was the initiation of such, and then,

17   obviously, the lawsuit was the nail in the coffin.

18       Q.   Do you know if Mr. Miller has ever spoken to

19   Mr. Tovey about his conversation with Mr. Bar-Adon?

20       A.   I do not.

21       Q.   So how do you know that the conversation affected

22   their business relationship, if you don't even know if

23   they've talked about the conversation?

24       A.   I can only assume they have, but, besides that, I

25   can -- you asked me if that was my belief, and I said yes.

Page 125

1      Q.   All right.  Fair enough.  Do you have any

2   evidence -- other than your belief, do you have any evidence

3   that the conversation between Mr. Bar-Adon and Mr. Miller

4   damaged the relationship between SCS and Tovey?

5      A.   The only evidence I have would be their asking me

6   to immediately buy back the file.

7      Q.   Which occurred after the lawsuit was filed,

8   correct?

9      A.   I believe it was before we knew about the lawsuit.

10      Q.   Before?

11      A.   It may have been filed, but we didn't have notice

12   of it for some period of time.

13      Q.   Do you know -- right now I'm looking at a March 12,

14   2014, e-mail from Mr. Miller to Ms. Schwartz with a copy to

15   you.  This is Exhibit 5, where Mr. Miller states that he

16   expects the file to be repurchased from the Tovey trust or

17   for Advance to reach an immediate resolution with BOFI.  So

18   do you know if this e-mail was sent before or after

19   Mr. Miller talked to Mr. Bar-Adon?

20      A.   This was after Mr. Miller had talked to

21   Mr. Bar-Adon.

22      Q.   Do you know when Mr. Miller and Mr. Bar-Adon spoke

23   for the first time?

24      A.   I don't know the date of that, no.

25      Q.   So how do you know this was after they talked?

Page 126

1      A.   Because there would have been no issues.  There's

2   no independent bringing up of anything after a deal closes.

3      Q.   Do you know if Mr. Miller's request that Advance

4   Funding repurchase the file was based on a request that

5   Mr. Miller had received from Mr. Tovey?

6      A.   I think I answered that.  I have no way of knowing

7   that.

8      Q.   You don't know.  I mean, it could have just been

9   Mr. Miller trying to protect his investor, correct?

10     A.   It could be any -- I can't speculate as to why he

11  would ask that.

12     Q.   All right.  And you have no knowledge -- as of the

13  date that he sent this e-mail on March 12, 2014, you don't

14  know whether Mr. Miller had spoken with Mr. Tovey about this

15  issue at all, correct?

16     A.   I do not know for sure.  I can only assume.

17     Q.   So other than -- I asked you earlier if you had any

18  evidence that Mr. Bar-Adon's conversation with Mr. Miller had

19  damaged the business relationship between SCS and Tovey, and

20  you pointed me to this request that Advance Funding

21  repurchase the file, correct?  Do you have any other evidence

22  that that conversation damaged the business relationship?

23     A.   That that one conversation specifically?  I have no

24  absolute evidence.  I can certainly ask.  I believe there's

25  another party that you could be asking that question to.

Page 127

1    That's not me.

2        Q.    Right.  Well, I'm asking you because Advance

3    Funding has made certain allegations relating to that

4    communication and the impacts of that communication on its

5    relationship with SCS and on SCS's relationship with Tovey.

6    And now I'm asking you for the basis for these allegations

7    that Advance Funding has made in this lawsuit.  That's why

8    I'm asking you these questions.

9        A.    Okay, I understand.

10       Q.    Yeah.

11       A.    To me, in my conversations with Scott Miller, it's

12   very clear that, not Scott, but Rick III, may have had a

13   conversation with Mr. Tovey and probably did.

14       Q.    Do you know when he spoke with Mr. Tovey about

15   this?

16       A.    I don't know specifics.  I spoke with Scott.  I did

17   not speak with Rick.  Rick apparently is the person who

18   handles Mr. Tovey specifically.

19       Q.    Do you know if Mr. -- if Rick Miller spoke with

20   Mr. Tovey specifically about the conversation that Scott

21   Miller had had with Mr. Bar-Adon?

22       A.    I believe there have been inferences in

23   conversations that lead me to believe that, yes.  Is there a

24   paper?  Do I have evidence?  No.  Other than conversations.

25       Q.    Give me an examples of an inference in a

Page 128

1    conversation that would lead you to conclude that Rick Miller

2    had talked to Mr. Tovey about Mr. Bar-Adon's conversation

3    with Scott Miller.

4         A.   The fact that he would ask me to buy back the file.

5         Q.   Right, but we've just talked about that, and you've

6    told me that that request could be simply Scott Miller's

7    request independent of any communications with Mr. Tovey.  So

8    what else do you have?

9         A.   It could be him wanting me to buy back the file

10   because he wants to buy it.  I can't speculate, but I can

11   assume.  It happened in proximity to all this conversation,

12   so it's a logical conclusion.

13        Q.   Did Mr. Bar-Adon's conversation with Mr. Miller in

14   March 2014, did that conversation, in and of itself, damage

15   the business relationship between Advance Funding and SCS?

16        A.   Yes.

17        Q.   How?

18        A.   They didn't buy lottery files from us any further.

19        Q.   From that date forward?

20        A.   Other than those that they had already committed

21   to.  There was actually several e-mails where they said they

22   wouldn't buy anything.

23        Q.   And were those e-mails sent before or after the

24   filing of the lawsuit?

25        A.   Well, I think -- you keep using the filing of a

Page 129

1    lawsuit as a date.  We weren't aware of it.  They waited I

2    think over three months to even try and serve the lawsuit.

3    So for you to use the date of the lawsuit, that's not

4    relative for me.

5         Q.   Okay.  Fair enough.  Were those communications, to

6    your knowledge, where Mr. Miller indicated, Scott Miller

7    indicated, that he SCS wouldn't buy any more deals from

8    Advance Funding, did those communications occur before or

9    after Advance Funding and SCS had notice of the lawsuit?

10        A.   It started with the conversation, and there were --

11   there was definitely decline in the deals, that they would

12   even bid on, much less take.  So, to me, it clearly affected

13   their decision.

14        Q.   Was it the conversation that affected their

15   decision, or was it the possibility of litigation that

16   affected their decision?  Do you know one way or the other?

17        A.   Well, initially, it was probably the possibility of

18   litigation, because that's what he threatened in the

19   conversation.  So the conversation and the threat of

20   litigation are one and the same.  So, yes, if I understand

21   your question correctly.

22             THE VIDEOGRAPHER:  Counsel, just to let you

23   know, there's about ten minutes left on this disc.

24             MR. MANVILLE:  Okay.  Why don't we take a

25   break.

Page 130

1                    THE VIDEOGRAPHER:  We are going off the

2      record.  The time is 12:42.

3                              (The noon recess was taken

4                               at 12:42 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 131

1                SEATTLE, WASHINGTON; TUESDAY, SEPTEMBER 22, 2015

2                              1:42 P.M.

3                              --oOo--

4                THE VIDEOGRAPHER:  This is the beginning of

5      Disc No. 3.  The time is 1:42, and we're going on the record.

6

7                E X A M I N A T I O N   C O N T I N U E D

8      BY MR. MANVILLE:

9           Q.   Ms. Ray, following up on two things, when Advance

10     Funding enters into an assignment agreement with a lottery

11     winner, before the agreement is approved by the court, does

12     Advance Funding typically file a UCC statement?

13          A.   Not any longer.

14          Q.   You used to?

15          A.   They used to.

16          Q.   When did you stop doing that?

17          A.   They stopped several years ago, I think it's been

18     at least three.

19          Q.   Why did Advance Funding stop doing that?

20          A.   Because we found our deals were being poached based

21     off of our UCCs.

22          Q.   I see.  So you file a UCC before the court order.

23     If somebody comes and in and offers the lottery winner a

24     better deal --

25          A.   More.  It happens very frequently unfortunately.

131:9-25 - Relevence

Page 132

```
 1        Q.    Does Advance Funding file UCC statements with

 2   regard to rights of first refusal?

 3        A.    Not any longer.

 4        Q.    The same thing, did you stop a few years ago?

 5        A.    No UCCs.  Yes.  All UCCs were stopped at one time.

 6                            (Exhibit 6 marked for

 7                             identification.)

 8        Q.    Ms. Ray, handing you what's been marked Exhibit 6,

 9   can you tell me what this is.

10        A.    This is a lottery prize assignment agreement

11   between Sheena Venzant and Advance Funding, LLC.

12        Q.    Go down to paragraph 3, "Court approval of

13   assignment."  Do you see the last sentence in that paragraph?

14   It reads, "Both parties recognize that this agreement is

15   enforceable upon execution, but that the court approval of

16   this agreement is required by the lottery, and such approval

17   is a condition precedent to the payment obligation of either

18   party under this agreement."  Do you see that?

19        A.    Yes.

20        Q.    But your testimony today is that an agreement like

21   this assignment agreement is not enforceable upon execution,

22   correct?

23        A.    I said that they don't have valid, legal contract

24   rights.

25        Q.    What's the difference between not having valid,
```

Page 133

1    legal contract rights and not being enforceable?

2        A.   I'm not exactly sure.

3        Q.   Well, you just drew a distinction; what do you

4    think the distinction is?

5        A.   I think this sentence is meant to say that they

6    want an acknowledgment letter from the lottery before they'll

7    fund.

8        Q.   The sentence, "Both parties recognize that this

9    agreement is enforceable upon execution," that's what that

10   means?

11       A.   No, the rest of that sentence.

12       Q.   What does the first part of the sentence mean,

13   "Both parties recognize that this agreement is enforceable

14   upon execution"?

15       A.   I have no knowledge.  I did not draft this

16   agreement.

17       Q.   Your testimony is that this agreement is, in fact,

18   not enforceable upon execution until it's approved by the

19   court, correct?

20       A.   No, that's not my testimony.  My testimony is that

21   no entity has legal contract rights until approval by the

22   court.  That was my testimony.

23       Q.   And you see a distinction between those two things,

24   having legal contract rights and having an enforceable

25   contract?  Those for you are two different things?

BOFI Federal Bank v. Advance Funding LLC, et al.    Monica L. Ray 30(b)(6)                September 22, 2015

Page 134

1       A.    I would imagine, depending on what you're trying to

2   enforce.  If you're trying to enforce a contract rate, then,

3   yes, that's not.  If you're trying to enforce their

4   obligation to continue to cooperate, yes, I think that is.

5       Q.    So some aspects of this agreement you would agree

6   are enforceable immediately upon execution, like the

7   obligation to cooperate, for instance?

8       A.    I would think that that would be definitely

9   enforceable, but that's contract rights.  That has nothing to

10  do with the rights of the lottery prize payments.

11      Q.    Are there any other contract rights embodied in

12  this document that you would say are enforceable immediately

13  upon execution prior to the entry of a court order?

14      A.    Contract rights?  I mean, considering this is a

15  contract, yes.  I just don't think that you own the lottery

16  prize payments.  You have no rights to the lottery rights

17  payments until you are approved by court order.

18      Q.    What I think I understand what you're saying -- and

19  correct me if I'm wrong -- is that, here, the lottery winner

20  doesn't have -- the lottery winner doesn't have a right to

21  the payment, the lump-sum payment, and the factoring company

22  doesn't have a right to the installment payments until the

23  agreement is approved by the court, correct?

24      A.    Correct, and we've received an acknowledgment

25  letter.

*Page 134, lines 18-25: Irrelevant, legal conclusion*

Page 135

1      Q.   And you've received an acknowledgment.  But there
2  are aspects of this agreement, this lottery prize assignment
3  agreement, that are enforceable as between the parties prior
4  to entry of a court order, correct?
5      A.   I'm not a lawyer; I did not draft this document; I
6  don't know what this means.  I'm sorry.
7      Q.   You don't know what it means?
8      A.   No.
9      Q.   You did testify that, in your view, the duty to
10 cooperate would be enforceable immediately, correct?
11     A.   It seems like something that's in the contract, so
12 I would say yes.
13     Q.   Are there any other duties that you can identify in
14 this contract that would be immediately enforceable?
15     A.   Again, I'm not an attorney, so I really can't say.
16 I didn't draft this.  I really don't know what the intent of
17 this was.
18     Q.   Do you think a right of first refusal is
19 enforceable immediately upon execution of an assignment
20 agreement?
21     A.   No.
22     Q.   You don't think it is.  Does Advance Funding ever
23 file lawsuits based on the right of first refusal prior to
24 entry of a court order?
25     A.   I think they've learned that way, yes, I believe

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 136

1    they have.

2         Q.   So they do, Advance does do that on occasion?

3         A.   Has.

4              MS. FOX:   Let her answer the question.

5         Q.   Has.

6         A.   Has.

7         Q.   When is the most recent instance?

8         A.   I don't recall.  That wasn't something I researched

9    for this deposition.  I'm sorry.

10        Q.   Would you agree that, if a lottery winner enters

11   into an assignment agreement like this one, like Exhibit 6,

12   and signs an affidavit meant to be presented to the court,

13   along with a petition approving the agreement and the lottery

14   winner subsequently decides that she's made a bad deal, that

15   she could go into court and she could tell the court that she

16   disavows the affidavit that she signed?

17        A.   Absolutely.  Until a deal is consummated through a

18   court order, a lottery winner can do anything they'd like,

19   and they do.

20        Q.   Why didn't you contact -- why didn't Advance

21   Funding contact BOFI after it obtained the court order, but

22   before it funded the deal, the Venzant deal?

23        A.   There was no reason to contact BOFI.

24        Q.   When did you learn that Ms. Venzant already had an

25   insurance policy in place?

Page 136, lines 10-19: Irrelevant, legal conclusion

Page 137

 1        A.   At some point during the transaction, we had

 2   attempted to have her get a policy.  That was denied, and she

 3   said to Barbara, "I have a policy already."  So we were

 4   shocked, but it worked, so --

 5        Q.   And was that -- do you remember if that was before

 6   or after Advance Funding obtained court approval with the

 7   Venzant assignment agreement?

 8        A.   I don't recall exactly.

 9        Q.   Has Advance Funding ever done any deals where it

10   obtained court approval for a lottery assignment agreement,

11   but then didn't promptly fund the deal?

12        A.   Yes.

13        Q.   How often does that happen?

14        A.   Infrequent, but it has happened.

15        Q.   Can you give me some examples of when that's

16   happened?

17        A.   Specific names, no, I wouldn't recall, but I can

18   give you some instances that it would happen.

19        Q.   Okay.

20        A.   As I said, in some instances, with certain funders,

21   our lien and judgment searches have to be certified through a

22   certain date; therefore, we don't even order them until the

23   order has been entered, not because of cost, but because they

24   have to be through the date that the lottery prize payments

25   change ownership.  So we'll learn of a tax lien or perhaps

Page 138

1    something that wasn't disclosed to us prior, and it has to be

2    satisfied.

3         I have a New York lottery winner, as a matter of

4    fact Tovey had originally agreed to be the funders, and

5    there's a tax lien that's larger than the purchase price.

6    Clearly, we can't do that, so we're in negotiations with --

7    it's not a federal tax lien, it's a state tax lien.  We've

8    been in negotiations with the DTF to get that lowered so that

9    we could actually consummate the transaction, because, until

10   then, we're underwater, and it doesn't make sense for us to

11   pay.

12        Q.   Is that one of the deals that's referenced in one

13   of the charts that were produced in discovery?

14        A.   I believe it probably is.

15        Q.   Do you know which chart it would be on?

16        A.   It should be on both because the charts are SCS and

17   then those from SCS that are Tovey.  I'm next to positive it

18   was a Tovey transaction.

19        Q.   I'll just hand you that for now.  Is it one of

20   those?

21        A.   Aren't these deals that have closed?  If it hasn't

22   closed, it won't be on this.  If you want to show me the one

23   that's lost profit, it might be on there.  I'm sorry, I'm not

24   trying to -- is this supposed to be marked?

25        Q.   No.

Page 139

1      A.   I can look at it?

2      Q.   Yeah.  We'll mark it later.

3      A.   It does not appear to be on here, likely because it

4   hasn't closed.

5      Q.   Why didn't Advance Funding provide funding in the

6   Marge Brian matter in New York?

7      A.   Why did Advance Funding not provide --

8      Q.   Why was Advance Funding unable to fund that deal?

9      A.   We are actually getting ready to fund that deal.

10      Q.   When was the order entered in that case?

11      A.   Oh, it hasn't.

12      Q.   There hasn't been any order entered?

13      A.   Not yet, no.  The parties have settled.

14      Q.   When did Advance Funding originally enter into an

15   assignment agreement with the lottery winner in that case?

16      A.   Without seeing the documents, I couldn't answer

17   that question.

18      Q.   Months ago?  Years ago?

19      A.   I believe that's years ago.

20      Q.   And did Advance Funding get a court order approving

21   the assignment a couple years ago?

22      A.   I don't think it had a funder.  We weren't able to

23   secure funding.

24      Q.   Did you get a court order?

25      A.   You can't get a court order until you have a

Page 140

1    funder.  You file the petition when you get the assignee

2    information.

3         Q.   All right.  So the answer is, no, there was no

4    court order obtained two years ago?

5         A.   Right.  We had no one to sell it to.

6         Q.   You mentioned the WMS matter earlier?

7         A.   Yes.

8         Q.   Was Advance Funding unable to fund that

9    transaction?

10        A.   That's not a transaction.  WMS is a funder.

11        Q.   Right.  Was there a specific transaction relating

12   to a particular lottery winner?  You mentioned an incident

13   where Mr. Bar-Adon supposedly called somebody at WMS and

14   spoke to them about Advance Funding, correct?

15        A.   Right.

16        Q.   That was a matter relating to a specific lottery

17   winner?

18        A.   I believe I said I could definitely look into that.

19   I did not research that for these topics.

20        Q.   Okay, you don't know, okay.

21        A.   But I would definitely be willing to testify in the

22   future on that.  I do know that we no longer use WMS as a

23   funder as a result of that.

24        Q.   What's the legal significance of a cancelation

25   letter, like the one that Ms. Venzant says she sent to BOFI,

Page 141

```
 1   in a state where a lottery winner can cancel an assignment

 2   agreement at will whenever they want?

 3              MS. FOX:  Object to the form of the question;

 4   calls for a legal opinion.

 5        A.   I am not a lawyer.  I would assume, if there is no

 6   restriction on the time limit that you have to cancel, you

 7   can cancel at any time.

 8        Q.   So why was it -- just to clarify, this letter that

 9   you obtained from Ms. Venzant --

10        A.   Yes.

11        Q.   -- you needed to obtain this solely because your

12   funder wanted it, correct?

13        A.   No, actually, I wanted it.  I wanted to have a copy

14   of it.

15        Q.   Right.

16        A.   I send my files off, and they're very clean.  I

17   want a clean file.  That's all.

18        Q.   Why did you need a copy of this letter?  If your

19   testimony is that she could essentially walk into court

20   anytime and say, I don't want to do that transaction anymore,

21   why would you need this?

22        A.   I only specifically asked for that copy when it

23   became an issue raised by Amy Schwartz.  She wanted a copy

24   for her file.

25        Q.   Okay.  That was my question.  That's why you
```

Page 142

```
 1   obtained this copy from Ms. Venzant?

 2        A.   That's why I obtained that copy from sales.

 3        Q.   From sales, okay.  I'm going to pick up the thread

 4   of the conversation that we were having before lunch.  Do you

 5   know when Advance Funding was served with BOFI's lawsuit in

 6   this matter?

 7        A.   I believe it was in late July.

 8        Q.   Of 2014?

 9        A.   Correct.

10        Q.   If BOFI had not filed its lawsuit, do you know if

11   Tovey would be funding Advance Funding transactions right

12   now?

13        A.   I don't think that he would.

14        Q.   What's your basis for saying that?

15        A.   Because, between the time that the conversation was

16   held and the time that the lawsuit was actually served, there

17   were no further transactions committed to by Tovey.

18        Q.   But do you know that that would have continued if

19   the lawsuit hadn't been filed?

20        A.   I believe the lawsuit was a continuation of what

21   started with a phone call.  If you're trying to separate the

22   two instances, the lawsuit definitely would have been enough.

23        Q.   But you've never had a conversation with Mr. Tovey,

24   correct?

25        A.   Correct.
```

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 143

```
 1        Q.   So you don't if, if BOFI had never filed suit, if

 2   that phone call between Mr. Bar-Adon and Mr. Miller would

 3   have just blown over?  I mean, you've never asked Mr. Tovey

 4   that, correct?

 5        A.   I have no contact with Mr. Tovey.

 6        Q.   Right.  So you don't know one way or the other.

 7   That may have just kind of fizzled out; he may have continued

 8   to refuse to fund deals?  Do you know one way or the other

 9   what would have happened if BOFI hadn't filed suit?

10        A.   He could have also offered us a $9 million line.

11   There's nothing that you can say, other than the fact that he

12   stopped buying deals from us.  It was pretty clear to us that

13   he wasn't going to buy deals.

14        Q.   And the same question with regard to SCS.  If

15   BOFI -- if Mr. Miller had had his communication with

16   Mr. Bar-Adon on the phone, but BOFI had not filed the lawsuit

17   after that, would you -- would Advance Funding continue to

18   experience disruption in its business relationship with SCS

19   today or not?  Do you know one way or the other?

20        A.   I believe it's clear from the history, yes.  From

21   the period that the phone conversation to the period that

22   they filed suit, there were no new deals given to us.

23        Q.   But, again, would that have continued for the next

24   14 months, or would that have just blown over; do you know?

25        A.   I don't know that I would know that.  I do know
```

Page 144

1    Mr. Miller, Rick Miller III, indicated that he would try and

2    talk to Tovey once this was done.

3         Q.   The lawsuit was done?

4         A.   The whole issue, yes.

5              MR. MANVILLE:  Let's take a one-minute break.

6              THE VIDEOGRAPHER:  We are going off the record

7    the time is 2:02 p.m.

8                        (A brief recess was taken.)

9              THE VIDEOGRAPHER:  We are back on the record.

10   The time is 2:04 p.m.

11        Q.   Did BOFI's pre-suit communications with SCS result

12   in SCS not doing any particular deal with Advance Funding

13   that it otherwise would have done?

14        A.   It stopped all deals.

15        Q.   Right.  Can you identify a deal that it would have

16   done if Mr. Bar-Adon -- that SCS would have done if

17   Mr. Bar-Adon had not spoken to Mr. Miller?

18        A.   I think, if you look at the lost profit

19   spreadsheet, it identifies all the lottery deals.  I sent

20   those to the Millers and asked them, if these were given to

21   you at the dates appropriate, would you have bid on them, and

22   he gave me bids.  So I would assume that means he would have

23   bought them.  Yes, sir.

24              MR. MANVILLE:  Let's make this No. 7.  I don't

25   want to keep coming back to it without marking it.

Page 145

1                    (Exhibit 7 marked for

2                     identification.)

3        Q.   Ms. Ray, tell me what Exhibit 7 is.

4        A.   This is a spreadsheet that I originally sent to

5    Mr. Millers, Messrs. Miller, and indicated these are the

6    lottery deals that we either submitted to you and you

7    declined because of the Tovey lawsuit or that we just stopped

8    submitting to you because you obviously weren't going to bid.

9    Can you please tell me, if these were presented applicable to

10   the date of the contract, would you have bid on them, and

11   what would your rate have been?  And he provided me with

12   those rates, and then I did the calculation of lost profit.

13       Q.   When did you provide this spreadsheet to the

14   Millers?

15       A.   Last week.

16       Q.   When did they get back to you?

17       A.   Literally, the next day, I believe.

18       Q.   So last week you sent this to them on what day?

19       A.   I don't recall exactly what day, but it was

20   definitely last week.

21       Q.   Which of the transactions listed in Exhibit 7 are

22   transactions that Advance Funding submitted to SCS and SCS

23   declined to fund?

24       A.   I can't state with specificity which ones.  At some

25   point, as I said, we just stopped submitting them because

Page 146

1    they weren't -- they were not giving us bids and made it very

2    clear that, until this went away, they weren't going to.

3         Q.   So can you identify in Exhibit 7 which transactions

4    you didn't submit to SCS because you assumed they wouldn't

5    fund it?

6         A.   I can't state with any specificity which ones I

7    stopped and what point I stopped, but definitely after

8    several were responded to that they would not or they didn't

9    respond at all.

10        Q.   So after -- so what am I looking at, K date?

11        A.   K date, that's the contract date.

12        Q.   Contract date.  So, if I'm looking at the dates

13   indicated in K date, at some point -- and I'm looking at them

14   chronologically -- at some point you went from submitting

15   proposed deals to them to not even including them on your

16   e-mails?

17        A.   Correct.

18        Q.   And you don't know when that was?

19        A.   I don't know exactly, no, sir.

20        Q.   Do you remember if it was this year or last year?

21        A.   I don't recall when that exactly happened.  It was

22   after I received at least two to three e-mails stating that

23   they just weren't going to buy any lottery deals.

24        Q.   Can you identify any deal on Exhibit 7 that SCS

25   didn't do because of Advance Funding's pre-suit

Page 147

1    communications with SCS?

2        A.   If you're trying to differentiate one to the other,

3    I can't say specifically which ones their reasoning would

4    have been that, but I can pretty much say that none of them,

5    because, from the point of the conversation even through the

6    point and to the point of the lawsuit, they weren't buying

7    anything.  So, if all of these were presented to them within

8    that period of time, they wouldn't have bought them; if all

9    of these were presented after that period of time, they

10   wouldn't have bought them.

11       Q.   Well, okay.  Out of curiosity, let's look at our

12   sample size.  So, between Mr. Bar-Adon's telephone

13   conversation with Mr. Miller and service of the lawsuit, of

14   the Complaint, in late July, we're talking about mid-March to

15   late July, that is how many deals?  I see one, two, three.

16   So three deals you presented to SCS, and SCS declined to bid

17   on those?

18       A.   Correct.  Keep in mind, sometimes the bids are sent

19   prior to actual contract because they are fairly certain that

20   it's going to come in, and they want me to shop it to make

21   sure that we can even sign the contract, because, if we can't

22   get interest -- depending on the parameters of the deal, we

23   pre-shop.  So I can't specifically say it was only three, but

24   I know it was at least three.

25       Q.   Well, how many more could it have been?

Page 148

1       A.   Well, there's one that's dated in 2012; there's one

2   that's dated in 2010.  So, clearly, those dates don't mean

3   anything to you, but they do to us.  So basically that means

4   Advance owns those payments, and they were trying to sell

5   them, so -- and we did.

6       Q.   And do you know, for the deal with a contract date

7   of October 11, 2012, when you shopped that to your funders?

8       A.   I can't state with specificity, no.

9       Q.   You don't know if it was in that window from

10  mid-March to the end of July 2014?

11      A.   No, but all of these were on the current tab, so

12  they are definitely deals that were done in that time frame,

13  beyond that time frame.  These are obviously deals that went

14  well past when the actual lawsuit was filed, but these are

15  deals that would have been presented from the point that they

16  no longer -- that they did business with us to now.

17      Q.   Right.  I understand that.

18      A.   All right.

19      Q.   Yeah.

20      A.   For more specifics beyond that, I can't tell.

21      Q.   Unless those deals with dates earlier than

22  March 2014 happened to have been shopped to SCS between

23  mid-March and the end of July 2014, the three deals we're

24  talking about here that, presumably, based on the dates, were

25  shopped to SCS during that window are the DAM deal, the TS

Page 149

1    deal, and the WFR deal, correct?

2        A.   That's an assumption you're making, sir.  I can't

3    make that assumption.

4        Q.   Well, I am asking you.

5        A.   I'm telling you, I cannot make that assumption.

6    Basically, I can tell you is sometimes we pre-shop a deal.

7    So just because the date of the contract falls outside of the

8    date that you're asking me about doesn't mean that it wasn't

9    pre-shopped.  I have no way to determine that.

10       Q.   So, for example, so we understand each other, so HA

11   with a contract date of 8/29/14 could have been pre-shopped

12   in July 2014?

13       A.   Absolutely.

14       Q.   But you just know, for any of these deals, when --

15   and, for that matter, a contract with a date 7/1/2014 could

16   have been pre-shopped a few months before that?

17       A.   It could have been, yes.

18       Q.   So you don't know which of these deals were

19   actually shopped to SCS between mid-March and the end of

20   July 2014?

21       A.   With specificity, no.

22       Q.   I mean, at all.  I'm not asking for specificity.  I

23   mean, you don't know which of these deals were shopped to SCS

24   during that window, correct?

25       A.   No, sir.

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 150

1      Q.   Do you know how many deals you shopped to SCS

2  during that window?

3      A.   I think I answered, at least three times I was

4  declined, at least three.

5      Q.   At least three, okay.

6      A.   Yes.

7      Q.   Was that unusual?  What percentage of deals did SCS

8  previously bid on?

9      A.   A large portion of our lottery.  As I said, that

10  was apparently what Mr. Tovey was most interested in at the

11  time, until this lawsuit.

12      Q.   Right.  But that wasn't really exactly my question.

13  So what percentage of deals that you would send out to your

14  funders would, before mid-March 2014, did SCS typically bid

15  on?  Did they bid on everything?

16      A.   For the most part, yes.

17      Q.   Every single deal that you put out there, SCS bid

18  on?

19      A.   For the most part.  There were some that were too

20  far in advance, what have you, but they had an extreme

21  appetite for lottery.

22      Q.   So about 20 deals a year is your testimony?

23      A.   I think I said 22, but, yes.

24      Q.   Yeah, something like that.  And were they

25  frequently outbid by other investors, or, if they bid on a

Page 151

1   deal, did they usually get it?

2       A.   I don't know if I can answer that question.

3   Without seeing the specifics of everyone's bids and trying to

4   remind myself of each and every transaction we did, that

5   would be almost impossible for me to answer.

6       Q.   Okay.  But going back historically then for the

7   period -- when's the first deal that Advance did with SCS?

8       A.   I believe 2011.

9       Q.   So, from the period 2011 through March 2014, I

10  should expect to see in Advance Funding's records something

11  like 20 lottery deals a year funded by SCS, correct?

12      A.   No.

13      Q.   Why not?

14      A.   Because 2011 was the first year of Advance's

15  existence.  So I don't think they had attained quite the

16  comfort level.

17      Q.   When did they attain that comfort level?

18      A.   You would have to ask them.

19      Q.   Do you recall -- I don't want to put you -- this

20  isn't a trick question.  Let's find some records, because

21  you've given them to us.

22              MR. MANVILLE:  Let's mark this is eight.

23                      (Exhibit 8 marked for

24                       identification.)

25      Q.   Handing you Exhibit 8, can you tell us what this

Page 152

 1   is.

 2        A.   This appears to be Tovey deals.

 3        Q.   Is it just Tovey deals?

 4        A.   Without any identifying tab, I can't say for sure,

 5   but this looks like -- I recognize a lot of these as being

 6   Tovey deals.  Yes.  At the very least, it's at least SCS

 7   deals, but I believe most of these are Tovey deals.

 8        Q.   Are these only Tovey deals?

 9        A.   I think I just answered.

10             MR. MANVILLE:  Let's take a break for a

11   second.  I'm going to get the discovery responses that go

12   with this.

13             THE VIDEOGRAPHER:  We are going off record.

14   The time is 2:17.

15                  (A brief recess was taken.)

16             THE VIDEOGRAPHER:  We are back on record.  The

17   time is 2:19.

18             MR. MANVILLE:  Just trying to keep you awake

19   over there.

20             Let's mark this as nine.

21                  (Exhibits 9-10 marked for

22                   identification.)

23        Q.   Now, if you take a look at Exhibit 8, I will tell

24   you that Advance Funding stated in its supplemental answer to

25   Interrogatory No. 17 that this is a chart showing the SCS

Page 153

1    transactions with the rate and the profit earned by AF on

2    each transaction.  And, if you could compare that to

3    Exhibits 9 and 10 and then tell me what we're looking at with

4    eight.  Is eight just Tovey transactions through SCS, or is

5    eight all SCS transactions with Advance Funding?

6          A.    Eight is all SCS transactions.

7          Q.    Okay.  So, if I'm looking at this spreadsheet,

8    Exhibit 8, I see one transaction from 2011.  This is the one

9    you referenced.  This is the first transaction that Advance

10   Funding did through SCS, correct?  It's the Shea transaction?

11         A.    According to the date, it would be.

12         Q.    And then I see one, two, three, four, five, six,

13   seven, eight transactions for 2012, correct?

14         A.    One, two, three, four, five, six, seven, eight,

15   eight with a contract date of 2012.

16         Q.    All right.  And then I see one, two, three, four,

17   five, six with a contract date in 2013, correct?

18         A.    One, two, three, four, five, six with a contract

19   date of 2013.

20         Q.    All right.  So, if I'm following you and Advance

21   Funding is doing about, you said 22 lottery deals a year, and

22   Tovey is funding somewhere -- sorry -- SCS is participating

23   in six to eight of those deals per year, we're talking about

24   somewhere between a quarter and a third of the deals,

25   correct?

Page 154

1      A.   Well, I think you're using the amount of deals that

2   we're doing now, as opposed to the amount of deals that we

3   did with SCS when Advance Funding was new.  So I think you're

4   comparing apples and oranges, but, if you want to say is that

5   a correct percentage math-wise, yes.

6      Q.   Okay.  So are you telling me now that, today, in

7   this year, in 2015, Advance Funding is on pace to do

8   something like 22 lottery deals?

9      A.   I would say yes.

10      Q.   And 2014 was similar?

11      A.   I would say probably a little bit less, but, yes.

12      Q.   And what about 2013?

13      A.   A lot less.

14      Q.   Okay.  Maybe that's the disconnect.  How many

15   lottery deals did Advance Funding do in 2013?

16      A.   2013?  I don't think I have a spreadsheet that

17   shows all lottery deals in 2013.  Based on what I have in

18   front of me, I can count up what you've already done with the

19   2013 and tell you that, but that doesn't necessarily -- I

20   believe these are all SCS deals.

21      Q.   Right.  And you don't know how many other deals

22   there were?

23      A.   Not from memory.

24      Q.   The same with 2012, you don't know how many lottery

25   deals there were in total?

Page 155

 1      A.   Three years ago, no.

 2      Q.   Do you know what percentage of those deals SCS

 3  funded in 2012?

 4      A.   Considering that was their second year in

 5  existence, I would imagine a lot of them.

 6      Q.   How about 2013?

 7      A.   I wish I could answer you, sir.  I can't remember

 8  definite details like that.  I'm sorry.

 9      Q.   That's fine.  Before March 2014, was there ever an

10  instance where SCS passed on three straight lottery deals?

11      A.   Never.

12      Q.   Two straight lottery deals?

13      A.   It's possible, but I'm not sure what you mean by

14  straight.  Are you saying asked in the same e-mail; asked in

15  the same week; in the same month?

16      Q.   I don't know.  One after the other.  I mean, it

17  doesn't matter how much time is between them.

18      A.   We don't keep records such as that, but they

19  usually bid on pretty much everything lottery.

20      Q.   Okay.

21      A.   Whether we ultimately accepted their bid or not is

22  another story.

23      Q.   Do you have any sense of what percentage of SCS

24  bids Advance Funding typically accepts?

25      A.   I could go off of these spreadsheets and do the

Page 156

1    math like you did.

2        Q.   If you put a deal out there and SCS bids on it, how

3    often do they get the deal; is it 90 percent of the time;

4    50 percent of the time, roughly?

5        A.   I just -- I didn't look at it in a mathematical way

6    like that.  I'm sorry.

7                           (Exhibit 11 marked for

8                             identification.)

9        Q.   Ms. Ray, handing you Exhibit 11, is this an e-mail

10   from you to David Bavli dated March 18, 2014?

11       A.   Yes.

12       Q.   And you sent him this e-mail in response to a phone

13   call that you received from him; is that correct?

14       A.   Correct.

15       Q.   Did he leave you a voicemail message?

16       A.   Yes.

17       Q.   Do you remember what he said in the message?

18       A.   I do not.

19       Q.   Did he ask you to call him back?

20       A.   Yes.

21            MR. MANVILLE:  What happens here in the

22   afternoon on days like this is that the sunlight bounces off

23   the building across the street.

24                           (Exhibit 12 marked for

25                             identification.)

Page 157

1          Q.   Ms. Ray, handing you Exhibit 12, this is another

2    one of these long e-mail strings, including some e-mails that

3    we've previously talked about.  The last e-mail in the string

4    is an e-mail from you to Richard Miller copying various

5    folks; is that right?

6          A.   Correct.

7          Q.   And you state in this e-mail sent on March 19,

8    2014, quote, "Dan did speak with David Bavli last evening.

9    Eshel still has not called us."  Does that refresh your

10   recollection that Mr. Cevallos, in fact, did speak with

11   Mr. Bavli?

12         A.   It definitely does.

13         Q.   Did Mr. Cevallos tell you, when you talked to him

14   in preparation for your deposition, that he hadn't spoken to

15   Mr. Bavli?

16         A.   I thought that's what he told me.

17         Q.   Going a little further back, there's an e-mail here

18   from Richard Miller on March 18, 2014, sent at 3:49 p.m., and

19   that's to you and, again, copying various other individuals.

20   Do you see that one?  It's at the bottom of page 2, going

21   over onto page 3.

22         A.   Okay.  Yes.

23         Q.   And Mr. Miller says, "A wait and see if our client

24   is named in an issue stance makes me uncomfortable.  I need

25   you and Dan to help me understand why I should be okay with

Page 158

 1    this approach, and I would prefer to do it by phone."  That's

 2    what he told you?

 3         A.   That's an e-mail that you just read.

 4         Q.   Did I read it correctly?

 5         A.   Yes.

 6         Q.   Did he send you that e-mail?

 7         A.   Yes.

 8         Q.   Did you receive it?

 9         A.   Yes.

10         Q.   Did you then -- it looks like you then had a call

11    with Scott Miller about this issue; is that correct?

12         A.   Correct.

13         Q.   What did you tell Mr. Miller during that call?  Was

14    this the call that you referenced where you -- we discussed

15    earlier, where --

16         A.   I don't know if it's the specific call, but he

17    definitely called me upset.

18         Q.   So do you remember this call?

19         A.   This specific call?

20         Q.   Mm-hmm.

21         A.   I can't say if this was the first, the second, or

22    the third, but I definitely recall my conversations with

23    Scott.

24         Q.   Okay.  Do you remember if this was the call that

25    you previously had testified about, where you told Mr. Miller

Page 159

 1    what you had found out and agreed to indemnify SCS and Tovey?

 2         A.   I don't recall if that's the exact one.  Like I

 3    said, I had three conversations with them.  Whether this was

 4    the first, second, or third, I do not know.

 5                        (Exhibit 13 marked for

 6                         identification.)

 7         Q.   Handing you Exhibit 13, this is an e-mail exchange

 8    between you and Scott Miller, copying various individuals,

 9    correct?

10         A.   Correct.

11         Q.   And you sent an e-mail to Scott Miller on

12    April 3rd, 2014, stating, "To date, they still have not

13    contacted us, if that tells you anything," correct?

14         A.   Correct.

15         Q.   Why did you tell him that, when Mr. Bavli had

16    called you and had actually spoken with Mr. Cevallos a couple

17    of weeks earlier?

18         A.   We were expecting contact by Eshel.

19         Q.   Oh.  So, by they here, you meant Eshel, not --

20         A.   The person who called the Millers, yes.

21         Q.   Was there a reason why you weren't more specific in

22    that e-mail?

23         A.   About what?

24         Q.   About the fact that you were referring to a single

25    individual when you used the word "they"?

Page 160

```
 1        A.   I'm not exactly sure.  He was copied on the e-mail

 2   where he knew that David had spoken with Dan.

 3        Q.   I understand that.

 4        A.   So, to me, it was clear, to me.  I had multiple

 5   conversations with them.  We were expecting a call from

 6   Eshel.

 7        Q.   Had you mentioned in those conversations that

 8   Mr. Bavli had reached out to you?

 9        A.   No.

10        Q.   So did you ever tell the Millers that Mr. Bavli had

11   had -- well, in that e-mail -- was this in this e-mail?

12        A.   David Bavli.  Dan did speak with David Bavli last

13   evening.

14        Q.   Okay.  All right.

15        A.   That was March 19th.

16        Q.   Right, yeah.

17        A.   Fairly early on.

18        Q.   Yeah.  Do you know why Mr. Bavli was calling you?

19        A.   I didn't take his call, so, no.

20        Q.   He didn't leave you a substantive message?

21        A.   No.

22        Q.   Assuming he did talk to Mr. Cevallos, you don't

23   know what they talked about?

24        A.   Dan didn't recall that conversation either, so I

25   can't make any assumption based on that.
```

Page 161

 1        Q.    Were there any other communications between BOFI

 2    and Advance Funding before BOFI filed suit?

 3        A.    Not to my knowledge.  If by communications, do you

 4    mean correspondence from us to them or contact directly from

 5    them to us?

 6        Q.    Either way.  I mean, I know there was a cease and

 7    desist letter that went out.

 8        A.    Okay.

 9        Q.    Is it Advance Funding's position that BOFI's

10    pre-suit communications with SCS and BOFI's filing of this

11    lawsuit have damaged Advance Funding's business relationship

12    with Northeast Capital?

13        A.    No.  They're brothers.  I don't think there's

14    anything that could damage that.

15        Q.    If Advance Funding were to recover damages in this

16    lawsuit, does it have an agreement with SCS to share any

17    portion of those damages with SCS?

18        A.    It does not.

19        Q.    Does it have such an agreement with Tovey?

20        A.    It does not.

21        Q.    Let's go back to Exhibits 7 through 10, these

22    charts.  So let's talk first about Exhibits 9 and 10.  Do you

23    recall when these were prepared?

24        A.    These were prepared in response to the

25    interrogatories.

Page 162

1     Q.   Did you participate in preparing these?

2     A.   I did.

3     Q.   What role did you play in preparing them?

4     A.   I created these.

5     Q.   Did anybody else help you prepare these, prepare

6   Exhibits 9 and 10?

7     A.   No.

8     Q.   Did you assemble the information that you

9   incorporated into these spreadsheets?

10    A.   With the help of Advance's assistant, yes.

11    Q.   Who is Advance's assistant?

12    A.   Elyse Edwards.  She's now Elyse Mary.

13    Q.   Did anyone else assist you in assembling

14  information to include in these spreadsheets?

15    A.   I don't believe so, no.

16    Q.   Let's talk about Exhibits 7 and 8 now.  The same

17  questions, did you -- well, did you prepare Exhibit 8?

18    A.   I prepared a spreadsheet which had a header.  The

19  header is not on here.  So, to the extent that the

20  information is in this, I did.

21    Q.   And then I believe you testified earlier that you

22  prepared Exhibit 7 and you transmitted it to SCS so SCS could

23  insert what I gather is in the column "Miller Rate"?

24    A.   Correct.

25    Q.   But everything else in Exhibit 7 you put together?

Page 163

1      A.   Correct.

2      Q.   So let's look at Exhibit 8 again.  And I believe

3  you testified that this was -- that this is all -- these are

4  all the transactions that Advance Funding has done through

5  SCS.  Now, are those lottery transactions, or are those

6  lottery and structured settlement transactions?

7      A.   Just lottery.

8      Q.   Just lottery, okay.  So, in addition to these,

9  there would have been a number of structured settlement

10  transactions, as well?

11      A.   Yes.

12      Q.   Do you have any of idea how many structured

13  settlement deals Advance Funding does every year?

14      A.   I don't.  Advance Funding just opened its

15  structured settlement department in 2014.

16      Q.   How many deals did Advance Funding do with SCS in

17  2014 that involved structured settlement payments?

18      A.   I didn't research that, sir.  I'm sorry.

19      Q.   Do you know how the relationship between Advance

20  Funding and SCS came about?

21      A.   I do not recall; however, it was definitely before

22  Advance Funding.  I don't recall the specifics.

23      Q.   I'm sorry, you said it was before Advance Funding?

24      A.   Yes, Advance Funding was organized in 2011.

25      Q.   So the relationship predated the organization of

Page 164

1   Advance Funding?

2        A.   My personal relationship, yes.

3        Q.   Did SCS previously have a relationship with

4   Northeastern?

5        A.   It did.

6        Q.   How long had SCS been in that business relationship

7   with Northeastern?

8        A.   I focused my concentration on Advance Funding, sir,

9   so I can't answer you.  If I had access to my computer, I

10  could definitely look and tell you, but I really don't know.

11       Q.   Okay.

12       A.   If it helps, Northeastern doesn't initiate, doesn't

13  originate any deals any longer.  He's been retired, so

14  basically the only thing we will do is organize funding for

15  different factoring companies.

16       Q.   By originate deals, you mean operate as a factoring

17  company, like Advance Funding?

18       A.   Correct.  It has no salespeople.  It does not enter

19  into any contracts with winners or structured settlement.

20       Q.   Was that a part of its business for a long time?

21       A.   Yes.

22       Q.   When did that stop, recently?

23       A.   It's been several years that Northeastern hasn't

24  done a transaction, I believe since 2010.

25       Q.   2010, okay.  Why did Northeastern get out of the

Page 165

1   origination business?

2        A.   He just didn't want to be as hands-on.  He was

3   done, wanted to enjoy his life.  He figured that he could

4   still profit from relationships when other factoring

5   companies try to get funding.

6        Q.   Why do you consider the identity of Northeastern's

7   funders to be proprietary information?

8        A.   Because it's a very cutthroat business, and rates

9   are very important.  While one brokering company or factoring

10  company might use the same funder, they might not get the

11  same rates.  So, whereas SCS buys from several different

12  companies, we get a very nice rate because of the value and

13  the condition of our files that we send.

14       Q.   The transactions that Northeastern places for

15  Advance Funding and for the other factoring companies that

16  work with it, when court approval is obtained for those

17  deals, isn't the identity of the assignee a matter of public

18  record, for instance, the Tovey trust?

19       A.   It does go into a court, yes.

20       Q.   Okay.

21       A.   But the actual -- is not the funder, per se, the

22  person you would actually speak to.  So reaching out to Tovey

23  would do you no good; reaching out to SCS, on the other hand,

24  would.

25       Q.   And the middleman, if you will, in those

Page 166

 1   transactions, the broker, SCS, the identity of the broker is

 2   never included in a public filing?

 3        A.    Correct.

 4        Q.    What is your concern about what a competitor would

 5   do with knowledge that Northeastern used SCS or another

 6   similar company as a broker?

 7        A.    Circumvent us.

 8        Q.    How?

 9        A.    Go directly to the funding source.

10        Q.    To SCS's funding sources?

11        A.    To SCS and obtain their funding, yes.

12        Q.    I guess I'm still having a little trouble

13   understanding.  SCS is in this business, correct?

14        A.    They're wealth managers.  They're not in this

15   business, no.

16        Q.    So the fact that SCS facilitates these lottery

17   deals is not a matter of common knowledge then?

18        A.    I don't believe it's common knowledge, no, or else

19   a lot more factoring companies would be using them.

20        Q.    Is it possible that there are reasons other than

21   this lawsuit that SCS is not currently doing business with

22   Advance Funding?

23        A.    I do not believe that.

24        Q.    Why do you say that?

25        A.    Because I still talk to them on occasion, trying to

Page 167

1    continue whatever hopes that I might -- they turn around.

2                        (Exhibit 14 marked for

3                          identification.)

4        Q.   Handing you Exhibit 14, this is an e-mail exchange

5    between -- well, I take it that the first e-mail is an e-mail

6    to your list of prospects, correct?

7        A.   Yes.

8        Q.   You cc them, that's your practice?

9        A.   Exactly.

10       Q.   And then the second e-mail is a response from

11   Richard Miller to your e-mail, and it says, "Mo, your sold

12   rates have been so far from what I can and am buying at that

13   I'm reluctant to waste your time with an offer."  What was

14   your understanding of what he meant by that?

15       A.   The second sentence made it clear.

16       Q.   Well, I'm asking you about the first sentence

17   though.  What do you understand him to mean by his reference

18   to sold rates?  What's a sold rate?

19       A.   I really don't know.

20       Q.   You don't know?

21       A.   I don't know what a sold rate is.

22       Q.   I mean, this suggests to me that he can't meet your

23   terms.

24       A.   On this deal, probably not.

25       Q.   And what this e-mail also suggests is that's been

Page 168

1    the case with other recent deals.  He says, "They have been

2    so far from what I can and am buying that I'm reluctant to

3    waste your time with an offer."

4         A.    I don't know what he's referring to.  I'm sorry.

5         Q.    Did you ask him about it?

6         A.    No.

7         Q.    Did you have any communication with him about his

8    comment concerning the rates?

9         A.    No.  The second sentence sealed it up for me.

10        Q.    So you skipped over the first sentence and went

11   straight to the second one, right?

12        A.    The first one means nothing based on the second

13   one.  Even if there was a rate, he wasn't going to buy it.

14        Q.    Is the converse also true, even if his buyer hadn't

15   shut down, he still wouldn't buy it because the sold rates

16   are so far from what he's buying?

17        A.    I think I've told you what I interpret this as,

18   but, if you would like to ask him to interpret what he meant,

19   you certainly can.  I just looked on top of that and went, my

20   buyer is shut down, thanks to this transaction.

21        Q.    Have you ever had any communication with Scott

22   Miller, any of the Millers, anyone at SCS, about whether they

23   can meet your rates?

24        A.    I'm not sure I follow.

25        Q.    Have you ever had any -- so here Richard Miller is

Page 169

1    saying that your sold rates are too far from what he's

2    buying, right?  Have you had any communication with anyone at

3    SCS about that concern that he raised here?

4         A.   On certain individual deals, he's certainly asked

5    to speak with me, and I spoke with him.  Sometimes we'll move

6    our rates for him.  It all depends.

7         Q.   Did you respond to this e-mail, Exhibit 14?

8         A.   No.

9         Q.   Why not?

10        A.   The second sentence said it all.

11        Q.   Are you aware -- do you know if Richard Miller had

12   other buyers who might be interested in this deal?

13        A.   It's possible, but he wasn't selling any lottery to

14   us.  That he definitely has communicated to me in more than

15   one way.

16                  MR. MANVILLE:  This is 15.

17                      (Exhibit 15 marked for

18                       identification.)

19        Q.   Ms. Ray, is this an e-mail string between you and

20   Mr. Miller from December 2014?

21        A.   Correct.

22        Q.   This is, again, an e-mail string related to a

23   potential lottery deal, correct?

24        A.   Correct.

25        Q.   And the last e-mail in the string is Richard

Page 170

```
 1   Miller, and he says that his lottery buyer for files like

 2   this, that's Tovey, "has informed me again that he will not

 3   be buying any additional lotteries until this lawsuit with

 4   Venzant is completed, and he may not buy any then," correct?

 5        A.   Correct.

 6        Q.   So your understanding, based on this e-mail, is

 7   that the Tovey trust is not going to be buying additional

 8   lotteries until the end of the lawsuit, at a minimum, right?

 9        A.   Correct.

10        Q.   And then, after that, he may or may not buy them?

11        A.   Correct.

12        Q.   And do you have any contrary understanding, it's

13   possible that, after, the lawsuit is completed, the Tovey

14   trust will start buying lottery deals again; he may or may

15   not, that's up in the air; is that your understanding?

16        A.   Right.   It says that he will not buy any now, and

17   he may not buy any then.

18        Q.   And you have no contrary information, he may not

19   buy any after the conclusion of the lawsuit, but he might?

20        A.   We're hoping.   We're hoping.

21        Q.   And then Mr. Miller says, "I am working on several

22   other clients that may buy lotteries, but this one is too far

23   out for them."   This suggests to me that Mr. Miller is still

24   open to the idea of buying lotteries from Advance Funding.

25   Did you read it differently?
```

Page 171

```
 1       A.    No.   He said, "I'm working on several other

 2   clients," meaning he doesn't have them, "but this particular

 3   deal is too far out for them."

 4       Q.    What did he mean by that?  What's your

 5   understanding of what he meant by this one is too far out for

 6   them?

 7       A.    I believe -- let me look at the deal -- it starts

 8   in 2031.  Most people like immediate payback.  That's what I

 9   read into it.

10       Q.    How did Advance Funding respond to Mr. Miller's

11   request in July 2014 for help in liquidating all or most of

12   the Tovey trust lottery files?

13       A.    We agreed to do it if he wanted to.

14       Q.    And then what happened after that?

15       A.    He never gave us the files or said go for it.

16                              (Exhibit 16 marked for

17                                identification.)

18       Q.    Handing you Exhibit 16, is this the e-mail from

19   Mr. Miller dated July 17, 2014, where he raised the

20   possibility that he might need to liquidate the lottery

21   files?

22       A.    That's what it appears to say, yes.

23       Q.    And you responded to this by telling him, we'll do

24   it if you want to?

25       A.    In those exact words, I don't know, but I had a
```

Page 172

1    conversation with our president, and, by the time these deals

2    had been done at the current rates, it actually would have

3    been advantageous for us.

4         Q.   Oh, I see.

5         A.   We were definitely willing to, but he never asked

6    us to.

7         Q.   And this was John Cevallos, you had a conversation

8    with John Cevallos about this?

9         A.   No, I believe these files were Advance Funding

10   files.

11        Q.   So you talked with Dan Cevallos?

12        A.   Yeah.

13        Q.   And so how did you get back to Mr. Miller on this

14   issue, by e-mail or by phone?

15        A.   I don't recall the exact, but we've had multiple

16   conversations and multiple e-mails.

17        Q.   Somehow you got back to him and said, we'll do it,

18   and then that was the end of it, he didn't bring it up again?

19        A.   He never asked us to do it.

20        Q.   Okay.

21        A.   There was a lot of conversations going back and

22   forth when he first asked, that we said, look, this is a

23   knee-jerk reaction; this is going to go away; they don't have

24   anything; they have no contract rights; you're getting scared

25   for nothing; calm down; let's see how this one plays out.  So

Page 173

1    there were several conversations.  I'm telling you that

2    initial conversation from Eshel caused a huge uproar.  Their

3    blood pressure was up to here.  It took several conversations

4    to calm them down.

5         Q.   Let's look at Exhibit 8 again.  This, again, I

6    think is all of the lottery deals that Advance Funding placed

7    with SCS, correct?

8         A.   Correct.

9         Q.   Which of these deals were not funded by Tovey?

10        A.   Romilda Rivera-Diaz has not been funded by Tovey.

11   I believe Tawanda Almendino Brown, but I'd have to check.

12   She's done multiple deals.  Nope, she is on the list.  I know

13   I looked at the spreadsheet earlier today, and I marked down

14   which ones were Tovey, and I just cannot remember how many of

15   these were not.  Clearly, if they're on Exhibit 8 and not on

16   Exhibit 9, those are the deals that Tovey did not buy.

17        Q.   Should you be comparing Exhibit 8 to Exhibit 9 or

18   Exhibit 8 to Exhibit 10?

19        A.   I'm confused.  These don't have headings on them,

20   so --

21        Q.   My understanding is that Exhibit 9 is Tovey

22   transactions; Exhibit 10 is all SCS transactions, including

23   Tovey, but mostly Tovey.

24        A.   So why are we looking at Exhibit 8?

25        Q.   Well, because it's the most recent version of what

Page 174

 1    I believe to be the complete list of SCS transactions.  But,

 2    right at the top -- that's how it was presented to us, but,

 3    right at the top, I'm not sure why Laura Haber on Exhibit 10

 4    is not also listed on Exhibit 8.

 5         A.   I just don't recall.  The names are blurring.

 6         Q.   And then there are some names, some other names on

 7    ten, that don't seem to be on eight.  Vargus.

 8         A.   These are deals going in '14.  You're saying that

 9    Exhibit 10 was given to you as all SCS deals?

10         Q.   Correct.  And then Exhibit 9 supposedly was all SCS

11    deals funded by Tovey.  Exhibit 8, I believe, was, again, all

12    SCS deals.  I just need a little clarity.

13         A.   I just find it hard to believe this is an SCS deal,

14    and it's dated 4/1/14.

15              MS. FOX:  Well, let's just -- is there a

16    question before the witness?

17         Q.   Yes.  What are all the SCS deals?  What are all the

18    deals that Advance Funding has placed with SCS?  Two of these

19    charts purport to show that, yet they don't agree with each

20    other.  So I'm just trying to figure out what all the deals

21    are.

22         A.   All right.  So nine is Tovey, so we're really

23    looking at eight and ten.

24         Q.   I think that's right.  And I think the question

25    that I have is:  Why are there some names on ten that are not

Page 175

 1    on eight and some names on eight that are not on ten?

 2         A.   I only presented one table, so I don't know where a

 3    second table came from, unless it's --

 4         Q.   What do you mean you only presented one table?

 5         A.   For SCS deals.  "Current deal that Tovey refused to

 6    buy . . . been unable to assign."  Without looking at my

 7    records, I cannot answer your question.

 8         Q.   Okay.

 9         A.   Sorry.

10         Q.   Okay.

11         A.   I don't want to give you a false answer.

12         Q.   Okay.  Well, let's take a look at Exhibit 8.  Let's

13    just start with the first deal here D&G McGee Enterprises,

14    LLC.

15         A.   Okay.

16         Q.   This was in Texas, correct?

17         A.   Correct.

18         Q.   Contract date of May 18, 2012?

19         A.   Correct.

20         Q.   And the number of payments, that's the number of

21    payments that were assigned to whoever the investor was on

22    this deal?

23         A.   Correct.

24         Q.   And it appears that the investor was Tovey because

25    this winner is listed in Exhibit 9, the Tovey list?

Page 176

```
 1        A.    Okay.

 2        Q.    And then first payment and last payment, these

 3   are -- so I take it these are annual payments?

 4        A.    Yes.

 5        Q.    All right.  The next column is, "Payment Amount."

 6   What does 60 K and 120 K refer to there?

 7        A.    Some of the payments were in the amount of 60,000

 8   and some were in the amount of 120,000.

 9        Q.    I see.  Is that a common occurrence?

10        A.    I'm sorry?

11        Q.    Is that a common occurrence?

12        A.    Like I said, there's several instances where a

13   lottery winner will only want to sell a certain portion, or

14   maybe they've already done a prior assignment with another

15   funding company or with us.

16        Q.    So is this -- so in the payment amount column,

17   these aren't payments that the lottery winner is suppose to

18   receive from the lottery, these are the payments that are

19   being assigned?

20        A.    Correct.  These are deal terms.

21        Q.    What is the PP column?

22        A.    Purchase price.

23        Q.    And then the docket number, that is the case in

24   which an order was obtained approving the assignment

25   agreement?
```

Page 177

1        A.    Correct.

2        Q.    Tell me what the rate is here.

3        A.    7.17.

4        Q.    How is that derived?

5        A.    That's the rate --

6        Q.    Was this the rate that was offered to the lottery

7    winner?

8        A.    I doubt that.  This rate looks like a rate to

9    determine profit.

10       Q.    So is this the rate that the buyer would pay?

11       A.    That is the rate that the buyer paid for that

12   transaction at that time.

13       Q.    I see.  So do you know what rate, in this D&G McGee

14   Enterprises matter, was offered to the lottery winner?

15       A.    The rate offered to the lottery winner would be on

16   the disclosure statement, which I do not have in front of me.

17       Q.    Presumably, you would need that rate to calculate

18   the profit, wouldn't you?

19       A.    No.

20       Q.    Okay.  Can you tell me how you calculated the

21   profit in this instance.

22       A.    You calculate the purchase price using the rate

23   from the funder and deduct the purchase price that you paid

24   to the winner.

25       Q.    So can you walk me through it here?

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                                      September 22, 2015

Page 178

1      A.    Sure.  You would take those deal terms and put them

2   into TValue.

3      Q.    Sorry.  Slow down, because math was never my strong

4   suit.  So what am I putting into TValue here, purchase price?

5      A.    No, sir.

6      Q.    No?  Okay.

7      A.    The deal terms.

8      Q.    All right.  So number of payments, payment amounts?

9      A.    Correct.  The rate.  And then you would put unknown

10  for purchase price.

11     Q.    And the rate is what rate, the rate that was

12  offered to the lottery winner?

13     A.    You're trying to calculate profit.  So it's the

14  rate that was paid by the funder.

15     Q.    But isn't profit -- isn't profit calculated by

16  reference to the spread between the rate paid by the funder

17  and the rate offered to the lottery winner?

18     A.    That's what I explained, yes.

19     Q.    So how do I calculate profit without knowing the

20  rate that was offered to the lottery winner?

21     A.    It has nothing to do with the rate offered to the

22  lottery winner.  The only thing you have to focus on is the

23  purchase price.

24     Q.    Okay.

25     A.    So the profit, you take the rate that is being

Page 179

1    offered by the funder on the date of funding, put in the deal

2    terms and the date of funding, leave unknown for what would

3    be a purchase price, and calculate the purchase price that

4    you're going to get from the funder.  Then you deduct the

5    purchase price you owe to the winner out of that, and that

6    leaves you profit.

7         Q.   Okay.  What's the difference between a rate

8    expressed as a percentage and a rate expressed as a

9    percentage net?

10        A.   That means that the funder has asked to buy the

11   payments net of state tax, meaning we have to eat that.

12        Q.   Okay.  Does the question of whether the funder is

13   buying payments net of state tax impact the rate that is

14   being offered typically?

15        A.   I have no idea what goes into the rate offerings.

16   I'm sorry.

17        Q.   In your experience, do you see that, when a rate is

18   offered net of state tax, it tends to be lower?

19        A.   I don't pay attention to numbers, unfortunately.

20   That's the president's job.

21        Q.   Okay.  And so, comparing Exhibit 8 to Exhibit 9 --

22   so Exhibit 8 we think is SCS deals.  Whether it's all SCS

23   deals is maybe somewhat unclear.  Exhibit 9 is SCS deals

24   funded by Tovey.  So, if we go down the list here, we see D&G

25   McGee Enterprises.  So, in that instance, Tovey bought that

Page 180

1    deal at a rate of 7.17 percent, correct?

2         A.   Correct.

3         Q.   And then, with Jessica Lopez, it was 7 percent net,

4    and that was another Tovey transaction, right?

5         A.   Yes.

6         Q.   With Roneaka Woods, it was eight and a quarter

7    percent, correct, another Tovey transaction?

8         A.   Correct, starting in 2030.

9         Q.   And then so on down the table.  The rate with

10   Forchetti was seven and a quarter percent net, another Tovey

11   transaction, correct?

12              MS. FOX:  I think we need clarification.

13        A.   Starting in 2021, yes.

14              MS. FOX:  Because you're referring to the

15   Tovey transaction, and he was the ultimate assignee, but I

16   don't know that you can assume that that is the rate that

17   Tovey paid, since the transaction is actually between Advance

18   Funding and SCS.  So, just so that the record is clear, these

19   are all deals where Tovey was the ultimate assignee.

20              THE WITNESS:  We don't get paid by Tovey; we

21   get paid by SCS.  So whatever percentage.

22        Q.   Fair enough.  So you don't know what the deal may

23   have been between SCS and Tovey?

24        A.   Right.  That's our purchase price rate.

25        Q.   Fair enough.  All right.  So these are the rates

Page 181

1    that you're getting from SCS with Tovey as the funder?

2          A.    Correct.

3          Q.    And, going on down the list, Nehemiah Bellamy, a

4    rate of 7 1/2 percent net; Sheena Venzant, 7.5 percent, and

5    so forth, correct?

6          A.    Sure.

7          Q.    And the most recent of the deals shown in Exhibit 8

8    is Tawanda Brown, June 2014, with a rate of 7.9 percent,

9    correct?

10         A.    Correct.

11         Q.    And then Romilda Rivera-Diaz, also in April 2014,

12   that was a rate of 8 percent, correct?

13         A.    Correct.

14         Q.    I guess one thing I am curious about, there are

15   three deals listed here, two of which appear on, also appear

16   on Exhibit 9, so they're Tovey deals, and these deals all

17   have a contract date of April 2014 or later.  And I thought

18   that you testified earlier that, beginning with the phone

19   conversation between Mr. Bar-Adon and Scott Miller back in

20   March 2014, SCS stopped buying Advance Funding deals.

21         A.    They did.

22         Q.    So why are these deals listed on this spreadsheet?

23         A.    The 2014 deals?

24         Q.    Yes.

25         A.    I can tell you that William Jay Cox was in contract

Page 182

1    prior to that date.

2        Q.   Okay.

3        A.   Renegotiated his deal, and, because Tovey had

4    committed to it, we kept him on that list.

5        Q.   What about the others?  What about Tawanda Brown?

6        A.   Tawanda Brown, she was definitely an earlier

7    transaction.  She was -- I'm seeming to recall she might have

8    been life contingent, but I'm not 100 percent sure because

9    there were a lot of issues with her, but -- they definitely

10   did not commit to any deals beyond those that they had

11   already committed to.  So I can answer that distinctly.

12       Q.   Romilda Rivera-Diaz, was that a Tovey transaction?

13   I see in the margin here a note that says, "Current deal that

14   Tovey refused to buy, which to date we have been unable to

15   reassign."

16       A.   Correct.  That was the one that was originally

17   done, and we found out that she had the tax lien.  This is

18   the exact deal that that I was referencing.  We've tried to

19   rewrite it, and then we still -- the tax lien grew, and we

20   still can't -- we can't get rid of this deal.

21       Q.   So let's take a look now at Exhibit 7.  And, on

22   this spreadsheet, what's represented by the rate column?

23   What are the numbers in the rate column showing?

24       A.   That's the rate we secured from an alternate

25   funder.

Page 183

1      Q.   And then you have state; contract date; again,

2  number of payments; first date; last date; assigned payments.

3  Is that the total amount of assigned payments, or is that --

4      A.   That's each payment.

5      Q.   Each payment, okay.  And what is the Miller rate on

6  this spreadsheet?

7      A.   This -- I told you earlier -- this is when I sent

8  him a list of the deals that we had done subsequent, sent it

9  to him, and said, if you would be interested in either of

10 these deals at the time that they were presented or would

11 have been presented, would you please provide a rate that the

12 Millers or SCS would have purchased this from us, and so he

13 provided rates.

14     Q.   And so, the lower the rate, the better for Advance

15 Funding, correct?

16     A.   Absolutely.

17     Q.   Why are the rates in Exhibit 7 generally so far off

18 from the historical rates that SCS paid for these deals?

19     A.   Well, I'm glad you asked that.  That would be a

20 number of reasons.  One, the initial couple of years that

21 Advance was in business, I would imagine they weren't as

22 comfortable with them, and then they became a little more

23 comfortable.  Case in point, if we look at the first Nehemiah

24 Bellamy, and then the second Nehemiah Bellamy, it went down

25 by a half a percentage.  It was gradual.  This is what I say,

Page 184

1    I foster these relationships, and so I had to do that for

2    Advance, as well.  And then, of course, the market tanked

3    obviously.  If BOFI is your client, they've told you what

4    rates are now.  As a matter of fact, speaking of Brian, BOFI

5    offered 5 percent on that.

6         Q.   Do you know if BOFI would have taken a loss on that

7    deal?

8         A.   No, they would not.

9         Q.   How do you know that?

10        A.   Because that's what the market rates are.  I mean,

11   you can look right here.

12        Q.   And so did you ask -- with regard to Exhibit 7, did

13   you ask the Millers what rate they would have quoted as of

14   the contract date?

15        A.   I asked just what I said before:  If these were

16   presented to you in the times that they were contracted, what

17   rate would you have given me?

18        Q.   And so, for example, the fourth deal on Exhibit 7

19   MPR, with a contract date of the October 11, 2012, the

20   Millers are telling you they would have given you a contract

21   rate of 4.75 percent as of that date?

22        A.   I don't think that they could have said as of that

23   date.  I think all of this was -- basically, these were all

24   presented after, so we're talking about the time period after

25   all of this happened.  So it wouldn't have been presented in

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 185

1    October of 2012.  It would have been presented at some point

2    after the lawsuit until now.  These are our current

3    transactions.

4         Q.   Right.  But when after the lawsuit?

5         A.   Most of these --

6         Q.   For that one.

7         A.   Most of these may not have even been presented

8    because we knew they weren't buying them.  I can't answer you

9    on each one.  I don't keep track of when I send out deal

10   terms to every prospective funder.

11        Q.   Let's look at the first transaction listed in

12   Exhibit 7, the DAM transaction.  So, on this one, does this

13   table tell me that, according to SCS, it would have offered a

14   rate of 5.5 percent for that deal as of July 1, 2014?

15        A.   I would really prefer that you asked him these

16   questions.  I sent him this exact table and asked him:  What

17   rate, keeping in mind the time, would you have given me?  His

18   idea of time was from the point that Tovey stopped buying

19   until now.

20        Q.   This is what I'm trying to pin down.  What exactly

21   did you tell him?

22        A.   That's exactly what I told him.

23        Q.   So run that by me again.

24        A.   Here's a list of deals we've done.

25        Q.   Right.

Page 186

1      A.   Some were presented to you, some weren't, but, if

2   you were going to bid on them, please tell me what your bid

3   would have been, keeping in mind the time.

4      Q.   That's what I'm having trouble understanding.   What

5   did you mean, keeping in mind the time?

6      A.   He knew that this was a damages thing.   So he knew

7   that it was -- these were deals that were done, that they did

8   not buy or would not buy, could not buy, whatever.   So I

9   asked him, if you were to be interested in these deals, give

10  me the rate.   Obviously, he can't go back and determine what

11  his rate would have been in 2012.   The deal wasn't presented

12  in 2012.   It was contracted in 2012.   This might be one where

13  we owned the payments, or it might be a reassignment, someone

14  who no longer wants to own the payments.   That date is not

15  indicative of when it would have been presented.   All of

16  these were done post this lawsuit.

17     Q.   Right, and I understand that, and I'm trying to

18  figure out what post this lawsuit means, because that is a --

19  the lawsuit was filed in April 2014, and we're now in

20  September 2015, so that's a year and a half time window,

21  during which interest rates have fluctuated.   What time

22  period is he using?   Do you have any idea?   Did you give him

23  any guidance?

24     A.   That's why I said, no, I would like for you to ask

25  that question of him.   I can't.   I can't answer.   I asked him

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 187

1  for what rate he would give me; he did.

2      Q.   And you don't have any idea how -- sorry, was this

3  Richard Miller or Scott Miller?

4      A.   This was Rick Miller.

5      Q.   Rick Miller.  Which one's -- there are two Richard

6  Millers.

7      A.   There's two Richards.

8      Q.   Junior and The Third?

9      A.   Correct.

10     Q.   Does one of them go by Rick?

11     A.   Yes.

12     Q.   And the other one goes by --

13     A.   Rick or Ricky is The Third.  He's the one with

14  Tovey as the client.

15     Q.   So is he the son of Richard, Jr.?

16     A.   Yes.  Yes.  He's basically the only one that's

17  really operating right now.  Both of those gentlemen, they'll

18  pick and choose cherry files that they want to keep for their

19  own personal portfolio, but they've basically turned their

20  business over to their son and nephew.

21     Q.   So this is Miller III providing these Miller rates?

22     A.   Correct.

23     Q.   And you don't know where these rates came from?

24  You asked him just -- you sent him this spreadsheet with the

25  instructions that you've testified to, and then he sent it

Page 188

1    back to you with the numbers in it?

2         A.   Correct.

3         Q.   And then this was presented to us to support

4    Advance Funding's damages claim?

5         A.   I added the lost profit column, because he would

6    obviously have no knowledge of that.

7         Q.   Okay.  And, after you got this table, this

8    spreadsheet back from him, did you discuss with him the

9    Miller rates?  Where did he come up with 5 1/2 percent for

10   lottery winner DAM, for instance?

11        A.   I did not.

12        Q.   You didn't ask him for clarification of these

13   rates?

14        A.   I would never ask anyone for a clarification of a

15   rate.  I accept their rates.

16        Q.   You understand that you are here today to testify

17   regarding Advance Funding's damages claim and all the facts

18   supporting Advance Funding's claim, correct?

19        A.   Correct.

20        Q.   And you're telling me that a key element of Advance

21   Funding's damages claim is essentially a black box, that you

22   don't know where the numbers came from, correct?

23             MS. FOX:  Misstates the testimony.  I think

24   she said she knows where the number came from.

25        Q.   How they were derived.  You don't know how they

Page 189

1    were derived?

2         A.   I don't know how any of our funder's numbers are

3    derived.   I know how the lost profit was derived.

4         Q.   But the Miller rate, you don't know how that was

5    derived?

6         A.   That was derived from Mr. Miller.

7         Q.   Right.   You didn't talk to him about where these

8    numbers came from in preparation to testify today, correct?

9         A.   I don't ever talk to a funder about their rates.   I

10   asked him what rate he would offer; I accept his rate.   I

11   would never question a rate.

12        Q.   Well, I'm not asking whether you would question it.

13   I'm asking if you --

14        A.   You are.   You're asking me where it came from.   I

15   would never ask anyone -- it came from him.

16        Q.   Right.   You have testified that you don't know the

17   exact time frame that he used to come up with these rates,

18   for instance, so you didn't seek to clarify that with him?

19        A.   Is there a question?

20        Q.   Correct?

21        A.   Correct.

22        Q.   Was it your experience in dealing with SCS over the

23   years that they were consistently offering you rates that

24   were 2 to 3 percentage points lower than what anybody else

25   would be offering?

Page 190

1      A.   Not always, but, when we got to the point of having

2   only one lottery funder, it did.

3      Q.   I'm sorry, I'm not tracking that.  I just didn't

4   understand your answer.

5      A.   Okay.  Generally, I have several funders, and I can

6   play one off the other.  Case in point, the e-mail that you

7   brought into evidence with the 7 1/2 rate, that was a rate I

8   had.  Obviously, that was not the rate that Rick had given to

9   me.  So I said, "Well, I have 7 1/2.  If you want it" --

10  blah, blah, blah.  So there's a negotiation sometimes.  I

11  give them the opportunity to buy, and I try and lower our

12  rate.  That's what I do.

13     Q.   Do you know if there are other funders out there

14  who would be willing to offer rates similar to the Miller

15  rates shown in Exhibit 7?

16     A.   None that I've known of.  If you have them, please

17  let me know.  I would love to develop another funder for

18  lottery.

19     Q.   Do you know one way or other whether there are

20  funders out there or perhaps many funders out there who would

21  be able to match these rates?

22     A.   That's not in my purview.

23     Q.   You don't know one way or the other?

24     A.   That would be the presidents.  Yeah, they're the

25  ones that develop the leads.

Page 191

1      Q.   So, again, walk me through the math on Exhibit 7.

2  So, for the first transaction listed there, how do you

3  calculate the lost profit?

4      A.   I take the deal term, put them into the TValue, put

5  in the rate for Miller, calculate what that purchase price

6  would be, then I calculated the purchase price that we got

7  based on the rate of 6.676, and the difference is the profit

8  that was lost.

9      Q.   Do you anticipate that Advance Funding will lose

10  additional profits in the future similar to the ones listed

11  in Exhibit 7?

12      A.   Unless and until we find some sort of alternate

13  funding source, I would imagine we will continue to lose more

14  profit.

15      Q.   Is Advance Funding making a claim in this lawsuit

16  for loss of those additional profits?

17      A.   We're making a claim for all damages.  It's just

18  hard to quantify exactly how much will be lost in the future,

19  because it's speculative, and we understand that.

20           MR. MANVILLE:  Why don't we take a break for

21  just a few minutes.  Let me see how much I have left, maybe

22  not very much.

23           THE VIDEOGRAPHER:  We are going off the

24  record.  The time is 3:32 p.m.

25                    (A brief recess was taken.)

Page 192

```
 1              THE VIDEOGRAPHER:  We are back on the record.

 2   This is the beginning of Disc No. 4, and the time is 3:42.

 3        Q.   Ms. Ray, when SCS quotes a rate, does the rate that

 4   it quotes to you always account for state tax withholding one

 5   way or another?

 6        A.   Unless they ask for it to be not.  They will

 7   specifically ask for it to be net of state tax.

 8        Q.   So, if they don't ask for that -- the way they

 9   operate, if they don't ask for that, then the rate they're

10   quoting is not net of state tax, and, if it's net of state

11   tax, they specifically include that in their quote?

12        A.   Or they'll say, I'm not interested, and I'll say,

13   why aren't you interested, because I don't have very many

14   lottery people.  So they'll say, well, they don't want to

15   file a state return in that state.  And I'll say, okay, well,

16   what if we do it net of state tax?  It's not always their

17   asking, sometimes it's my suggestion, because I don't have a

18   lot of possibilities for funders.

19        Q.   Right, but I guess my question is, that issue of

20   whether a quote is going to be net of state taxes, is an

21   open -- it's discussed openly, I guess, right?

22        A.   If it becomes an issue, it is discussed.

23        Q.   I mean, it's either part of the quote or not

24   part -- it's not buried anywhere?

25        A.   No, it's not a surprise.
```

Page 193

```
 1        Q.   That's what I mean.

 2        A.   Unless someone miraculously forgets something that

 3   they said.

 4        Q.   Okay.  And that's your relationship with SCS,

 5   that's the way they quote their deals?

 6        A.   That's the way everyone quotes their deals.

 7        Q.   That's the way everybody does it?

 8        A.   Yeah.  If anybody has an issue about a rate or a

 9   question about a rate, they'll ask it.  A lot of that comes

10   with the insurance policies on life contingent deals.

11   They'll say, are the premium my responsibility or your

12   responsibility?  And it's a different answer for different

13   people, depending on the rate that we get and what we need

14   and rates at that time.

15        Q.   Looking again at Exhibit 7, the rates quoted here

16   in the second column, has it been your experience that the

17   rates that have been quoted by other brokers since March 2014

18   have been elevated because SCS is not bidding on these deals?

19        A.   I think they know that we -- they are our only

20   source.  We only have one funding source for lottery now,

21   so --

22        Q.   So, if SCS had been bidding on the DAM deal, what

23   rate would you have been able to get from the broker that

24   actually funded that deal?

25        A.   I might have been able to get them lower than 5.5.
```

Page 194

1      Q.   Do you know one way or another?

2      A.   I would have no way of knowing that without having

3  that rate at the time.

4      Q.   And is that true of all these deals, you might have

5  been able to get them a lower rate if SCS had been

6  participating, but you don't know, and you don't know how

7  much?

8      A.   I would have no way -- I mean, that's pure

9  speculation.

10      Q.   And so now, assuming SCS is not participating in

11  these transactions, Northeastern has six funding sources that

12  it works with?

13      A.   No -- well, yes, if you take SCS off, there are six

14  others that do, but that's -- not all of them do lottery.

15  Obviously, you know that, yes.

16      Q.   How many of them do lottery?

17      A.   Only one.

18      Q.   One, other than SCS?

19      A.   We used to have two others, but, for whatever

20  reason, they're not buying lottery right now either.  They're

21  stating -- their specific response to that was state tax

22  issues.  There are two states that are apparently not

23  allowing them to file state tax returns and recapture the

24  tax, which makes it not as lucrative an investment for them.

25  They just don't want to deal with it.

Page 195

1      Q.   Do you know if that issue is also an issue for SCS?

2      A.   If it is, we offer to sell it net of state tax.

3   There are several states that they buy from that they expect

4   that they're going to file a return, but the problem states

5   are still the problem states for anyone.  So they would

6   probably buy them net of state tax, but I would have to send

7   them the rate quote -- excuse me -- the stream, and they

8   would bid, or they wouldn't bid.

9      Q.   The other two funders that are no longer doing

10  lottery deals because of these state tax issues, you're not

11  willing to do deals with them net of state tax?

12     A.   Oh, I'm willing to do deals.  If we're still going

13  to make a profit, I'm willing to do it, absolutely.  They

14  don't come back and say that.  Sometimes that's something I

15  find out perhaps -- I can tell you, case in point, at an ASP

16  conference, which is not a social engagement, but it's not

17  related to lottery whatsoever; however, a lot of the same

18  players for lottery are in structured and vice-versa.  So I

19  took advantage of that meeting time in a more casual

20  atmosphere and asked, hey, why aren't you bidding on my

21  lottery deals?  Because, like I said, these people come back

22  and forth.  Sometimes they just don't want any more because

23  of saturation limits.  Sometimes they don't have wealth --

24  they're handling wealth management for people who just don't

25  want lottery right now.  Sometimes they get a new client, and

Page 196

1    that person has an appetite for lottery because they've been

2    experienced with it.  There's lots of ifs, so it's hard to

3    say.  And that's why this has been so hard to quantify,

4    because I don't know what the future holds.  I don't think

5    anybody knows what the future holds.  But I can state

6    succinctly that these are the deals that we've done, these

7    are rates that we got, and these are the rates that

8    Mr. Miller gave me.

9                    THE VIDEOGRAPHER:  Monica, can you put your

10   mic back on your jacket.

11       Q.   Prior to March 2014, can you identify a particular

12   deal that Northeastern presented to SCS and that SCS turned

13   down?

14       A.   Northeastern does not present deals; Advance

15   Funding has deals.

16       Q.   Sorry, through Northeastern.

17       A.   Oh, okay.  Well, through me, I'm actually speaking

18   on behalf of Advance.

19       Q.   Right.

20       A.   Not Northeastern.  Now, say again.  I'm sorry.

21   Deals that have been presented?

22       Q.   Did Advance Funding ever propose a deal to SCS that

23   SCS turned down before March 2014?

24       A.   They would never turn down a deal, instead they

25   would just not bid.

Page 197

```
 1        Q.    Participate.  Can you think of an example of a deal
 2   they didn't bid on?
 3        A.    We don't keep track of nonparticipation, so it
 4   would be hard.  It's not something that would be like, hey,
 5   Rick never responded.  The only way that would come to light
 6   would be if the other rate that we got from the other funder
 7   was so high that I was like, we need a comparative, we need
 8   something.  Then I would go back, hey, why didn't you bid on
 9   this?  Or sometimes if a certain amount of time goes by and
10   I've sent a couple e-mails and he doesn't respond, I'll say,
11   hey, did you get my e-mails, or something, because,
12   obviously, competition is healthy.  So I want a second rate.
13   Even if it isn't the highest rate or the lowest rate, it's
14   something to compare to.  Plus I have to give these rates to
15   the applicable president, which is Advance right now.  Like I
16   said, Northeastern hasn't done a deal since 2010.  And I have
17   to say, these are the rates I got.  It's a reflection on my
18   ability to get him the best deal.  So, of course, I'm going
19   to try and get it as low as I can.  I'm going to do whatever
20   is in my power.
21        Q.    Where do you work?  Do you work from home?
22        A.    It's a home office.  It's not technically in my
23   home, but it is on my property.
24        Q.    So it's a separate building?
25        A.    It's a separate building, yes.  I actually have to
```

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 198

 1    walk outside to go to work.

 2         Q.   That's not too bad.

 3         A.   No, it's still great.

 4         Q.   And are most of Advance Funding's employees in New

 5    York?

 6         A.   Oh, yes.

 7         Q.   Are the rest of them headquartered in New York?

 8         A.   They used to have, in addition, a research

 9    department in Pennsylvania.  That's been closed down.

10    They've incorporated all those people into the New York

11    office.  So they had to get a bigger office.  And the legal

12    has always been separate.

13         Q.   Right.  You mentioned that.

14         A.   Right.  And that's down in Florida.

15         Q.   And so, except for legal, all of Advance Funding's

16    employees are in New York?

17         A.   Now, yes.

18         Q.   Is that also true of -- are all of Northeastern's

19    employees in New York, except for you?

20         A.   Northeastern doesn't really have employees right

21    now.  Like I said, John is pretty much retired.

22         Q.   Okay.  Wait.  Now, you're an employee of

23    Northeastern?

24         A.   I was always an employee of Northeastern.

25         Q.   Are there any others?

Page 199

 1        A.    That still remain?  I don't think there are.  I

 2   really don't.  Everyone else basically went over to Advance.

 3        Q.    Advance.

 4        A.    Yeah.  And I'm only still Northeastern I think

 5   because John doesn't want to let it go completely; otherwise,

 6   I would be an Advance employee, because I do most of my work

 7   for Advance.

 8        Q.    If BOFI had not communicated with SCS about the

 9   Venzant matter and then filed this lawsuit, how many deals

10   would Advance Funding expect to place with SCS in 2015?

11        A.    I think that's what this is.  Actually, a lot of

12   this was 2014.  Obviously, this is an ongoing, you know,

13   however many that we do for the rest of the year.  We would

14   expect a large portion of that to be them.  There are some

15   deals that that other funder, which is an insurance company,

16   they have an appetite for, and they will bid lower than SCS.

17   But, more often than not, SCS because they don't have high

18   overhead, they'll bid lower.  Whereas, the insurance company

19   has servicing issues, different costs that make their rates a

20   little bit higher.  So I think that's a large reason why the

21   rates are a little bit higher, or, in some cases, a lot

22   higher.  Particularly, if it's monthly payments, you'll

23   notice 240 monthly, that got a 14 percent rate.  Well, that's

24   a servicing issue.  They have to pay a servicer, and then

25   they have to pay a fee, and then there's auditing and all

Page 200

1    that good stuff.  So it goes into their rates.  And SCS

2    doesn't have that, so --

3         Q.   So is it your assumption that all of the deals

4    referenced in Exhibit 7, all of those deals SCS would have

5    done, except for the ones indicated by couldn't sell in the

6    Miller rate column?

7         A.   It's -- from what he provided, I would definitely

8    have picked this rate over that rate, in a heartbeat.

9         Q.   Right.  But your understanding is that, not only

10   would he have quoted you the rates listed in the Miller rate

11   column, they would have agreed to do these deals, all of

12   them?

13        A.   I think, by the time of 2014, I think we had

14   established a very good history of deals going through, no

15   problems, no issues, no lawsuits, no nothing.  So I think

16   they had gotten to that comfort level.  I have no doubt

17   that -- can I say 100 percent?  No, but, I mean, these rates

18   look awfully attractive to me.  I would have taken them.

19   They have never backed out of a transaction, if that's what

20   you're saying.

21        Q.   Well, I'm just asking, if you know, if Mr. Miller

22   presented you these Miller rates as kind of a hypothetical or

23   if he was also telling you that he would have bought all

24   these deals?

25        A.   I asked him specifically --

Page 201

```
 1        Q.   And he said he would have bought them?

 2        A.   -- what is the rate that you would have given us at

 3   the time for these deals?

 4        Q.   Okay.

 5        A.   So there was no hypothetical involved.

 6             MS. FOX:  Be sure and let him get all his

 7   question out before you start answering him.

 8             THE WITNESS:  I'm sorry.

 9             MR. MANVILLE:  I think I interpreted that

10   time.

11             THE WITNESS:  I did notice something else.

12   This letter -- or excuse me -- e-mail.

13        Q.   What exhibit?

14        A.   Exhibit 16.  I'm looking at the date of it.  It's

15   dated July 17th.  That's before the Millers were served with

16   the lawsuit.  This is where he is has asked me --

17             MS. FOX:  What number are you?

18             THE WITNESS:  Exhibit 16, I'm sorry.

19        A.   -- about buying back the files.  So, in answer to

20   your question before, when I said I wasn't sure about the

21   timing, now I'm absolutely positive.

22        Q.   Do you shop every lottery deal to SCS?

23        A.   I shop every deal to every funder regardless of

24   what type of deal it is.  I explain to them that they're on a

25   distribution list, you know, don't respond if -- because the
```

Page 202

1    insurance company can't take any structureds, period, it's

2    just because they're an insurance company.  So I know they're

3    not going to bid on those.  So it doesn't alarm me, it

4    doesn't send off any red flags, but I'm not going to take

5    them off the list just for that one deal because I send

6    multiple deals sometimes at a time.  So they might be

7    interested in some or -- I don't want the hassle of trying to

8    remember what everybody wants every single time, because

9    things change, too.

10        Q.   Am I correct that you have, however, taken SCS off

11   your distribution list?

12        A.   No.  I just don't ask them why they're not

13   presenting bids.

14        Q.   I see.  So they're still getting all the e-mails

15   from you, they're just not responding?

16        A.   Not responding or responding saying that, you know

17   we can't buy any.  So I finally had a conversation, look, if

18   you're -- the same conversation -- you're on a distribution

19   list, you don't need to keep responding.  I get it.  It's

20   just more of a hassle for me to take you off than for you to

21   just not respond.

22        Q.   Now, just to confirm, with regard to these Miller

23   rates in Exhibit 7, there is no agreement or commitment by

24   Mr. Miller setting forth any of these rates, right?  This is

25   you asked him to fill in the table, and he responded and

Page 203

```
 1    filled in the table, and that's the extent of the

 2    documentation that you have from him relating to these rates,

 3    correct?

 4         A.   Correct.  And, just to be clear, even if he did

 5    commit to that and I sent him a committal letter -- excuse

 6    me -- e-mail, there's still no commitment that he has to sell

 7    us at this rate.  He could receive the closing binder and

 8    say, I don't like this deal, this has an issue, or he could

 9    say anything.  We never, ever, ever force the funder to buy

10    because that's not good business.

11         Q.   For each of the deals referenced in Exhibit 6 --

12              MS. FOX:  Exhibit 6?

13              MR. MANVILLE:  Eight, sorry.

14         Q.   -- Exhibit 8, can you tell me what rate was offered

15    to the lottery winner?

16         A.   No.

17         Q.   And that's also true with regard to Exhibit 7,

18    correct?

19         A.   Right.  I would not be putting rates to lottery

20    winners.  It doesn't pertain.

21         Q.   Deals listed in Exhibit 7, have they all been

22    funded by the same investor or by different investors?

23         A.   I did not write the funder down.  I do know that we

24    have predominantly one funder, and it's an insurance company.

25    Select deals will be purchased by two other wealth management
```

Page 204

1    people that we deal with, but I did not write down who

2    actually funded.  I only wrote down the rate I got.

3         Q.   Does Advance Funding expect to do business with SCS

4    in the future?

5         A.   We are doing business with SCS on structureds.

6         Q.   On structureds?

7         A.   Yes.

8         Q.   Okay.  What is the nature of -- tell me about that.

9    Has the business that Advance Funding has done with SCS with

10   structured settlements since March 2014, has that changed

11   since the filing of the lawsuit?

12        A.   I don't believe that it has.  I haven't heard any

13   blowback on structured.  Structured is a completely different

14   animal.

15        Q.   Does the Tovey trust also buy structured settlement

16   payments?

17        A.   I don't recall that he has.

18        Q.   He's lottery only?

19        A.   If he has bought structured, I either don't recall

20   it or -- I really don't recall him ever being on the

21   structured file.  I'm going off of memory, and I've seen

22   15,000 names, so -- but I'm fairly certain.

23        Q.   How many structured settlement deals has Advance

24   Funding done with SCS in 2015?

25        A.   I didn't focus on structured; I only focused on

Page 205

 1    lottery.

 2         Q.    Can you give me an approximate number?

 3         A.    I really can't.

 4         Q.    Do you know how many --

 5         A.    I know they just started.  They didn't have a

 6    structured department.

 7         Q.    This is Advance Funding?

 8         A.    Correct.

 9         Q.    And I think you might have said this earlier:  When

10    did they start the structured department?

11         A.    2014, we had a full year, and this is our second

12    year of doing structureds.

13         Q.    So did you have a full year in 2014?

14         A.    Yes.  Absolutely.  Literally, from January --

15         Q.    January 1?

16         A.    Yeah.  We hired --

17         Q.    Is that when you started?

18         A.    Yes.  We hired a paralegal, and we had a structured

19    department.  And it was a debacle, but we won't go into that.

20    Trying to get back into a field that you haven't been in in

21    seven years, everything that we had was outdated.  It was

22    horrible, but --

23         Q.    And so did you do structured settlement deals with

24    SCS in 2014?

25         A.    I would say yeah, yeah.  As a matter of fact, they

Page 206

1    like structured.  The Millers themselves have purchased

2    structureds for their own personal retirement portfolio.

3    They can't do the lotteries, just so you know.  I'll answer

4    that question for you right now.  They can't do lottery

5    because of state tax and retirement -- the retirement vehicle

6    that purchases structureds because structureds are tax

7    exempt.  They can't contemplate filing a return for a

8    pension, a retirement pension, so that's why.

9        Q.   Do you know approximately how many structured

10   settlement deals Advance Funding did with SCS in 2014?

11       A.   I really don't.  I didn't look at the numbers at

12   all.

13       Q.   Do you know if the number of structured settlement

14   deals that Advance Funding has done with SCS has increased

15   over time?

16       A.   If I had paid attention, I would be able to answer

17   that.  I would be guessing if I tried to answer that.

18       Q.   As you sit here, you can't think of a way in which

19   the structured settlement business between Advance Funding

20   and SCS has been impacted by the lawsuit?

21       A.   I can honestly tell you it hasn't.

22       Q.   Has not, okay.

23       A.   The only -- it's only lottery, and lottery is just

24   difficult, again, because of state tax.  That's the only

25   thing that makes lottery less desirable than structured,

BOFI Federal Bank v. Advance Funding LLC, et al.      Monica L. Ray 30(b)(6)                    September 22, 2015

Page 207

1    taxes.  Sorry.

2         Q.   So does Advance Funding expect to go do business

3    with SCS in the future relating to lottery transactions?

4         A.   We certainly are hoping.

5         Q.   What do you think will have to happen first before

6    that business relationship can pick up again?

7         A.   Time and trust again, you know, rebuilding what

8    we've built over the past several years.  I don't see -- and

9    it might not even.  I don't know.  Rick apparently has tried

10   several times to get Tovey to even bid on something that

11   we've presented, and he's adamant.  And lawsuits do that.

12   He's never been sued on any of his other investments.  So now

13   he gets sued on these lotteries.  So he's lost a taste for

14   it, I think.  I don't think we'll get him back, but I can't

15   say never.

16              MR. MANVILLE:  Let's take about a three-minute

17   break, because there's one document that for some reason is

18   not in my stack here.

19              THE VIDEOGRAPHER:  We are going off of the

20   record.  The time is 4:08.

21                        (A brief recess was taken.)

22              THE VIDEOGRAPHER:  We are back on the record.

23   The time is 4:13.

24         Q.   Ms. Ray, I want to ask you a few questions about

25   Advance Funding's supplemental responses to BOFI's

Page 208

1    Interrogatories 17 and 18.  So there are a number of

2    statements in here that I want to ask questions about.

3    Advance Funding states that it has had to seek more costly

4    and less available funding elsewhere and in some instances

5    was not able to secure funding at all.  I want to know if,

6    the instances that you're referring to are shown on

7    Exhibit 7, are these the two deals where there's a couldn't

8    sell note in the Miller rate?

9         A.   Those are two of probably more than two.  If we

10   knew for whatever reason that the insurance company wasn't

11   going to like the deal, we didn't even write it.  There's no

12   sense.  We didn't have another funding source.  So we kind of

13   know what the insurance company will take and what they

14   won't.  So there were some that we lost because we knew not

15   to even contract.  There was no sense.

16        Q.   But you think -- is it your position that SCS would

17   have done those deals?

18        A.   It's a very high likelihood.  I don't see why they

19   wouldn't have.  They're not as picky as the insurance company

20   is.  The insurance company -- just to clarify what I'm

21   saying -- I'm sorry to interrupt -- they do have saturation

22   limits, they do have a portfolio that they're filling up, and

23   what not.  So, whereas SCS sells to different people and

24   Tovey, I don't think Tovey has those concerns.  I believe

25   Tovey's wealth is well above anything that I could fathom.

Page 209

 1   So I think that's why.

 2        Q.   Do you have any idea how many of those deals

 3   Advance Funding was not able to secure funding for allegedly

 4   because of this lawsuit?

 5        A.   It would take me a long time to try and figure it

 6   out.  I could eventually probably find it, but there's no

 7   guarantee I could quantify that.  That's why I didn't include

 8   it.

 9        Q.   As you sit here today, you don't know how many of

10   those deals there are?

11        A.   No.  I wasn't going through my daily workday

12   thinking how I was going to get BOFI back for this deal or

13   that deal.  It was just business as usual.

14        Q.   Advance Funding states that it had reached a level

15   of confidence and satisfaction with SCS before BOFI's

16   interference caused a breach in the relationship.  Is Advance

17   Funding suggesting that the filing of this lawsuit caused SCS

18   to lose confidence and satisfaction in Advance Funding?

19        A.   I think both, both incidences, yes.  I think they

20   both have impacted that, both the phone call and the ensuing

21   lawsuit.

22        Q.   What's your basis for that view?

23        A.   The fact that I haven't been able to repair the

24   relationship, that, despite our winning both motions for

25   summary judgment, they're still not buying deals from us.  So

Page 210

1    it's going to be an ongoing process, and it's probably going

2    to be starting again from ground zero and building back, and

3    it's going to take time, if it happens at all.

4        Q.    Advance Funding alleges that, "In some instances,

5    there were additional fees and/or AF was forced to seek deals

6    net of state tax, i.e., AF absorbed the state tax

7    withholding."  What additional fees is Advance Funding

8    referring to here?

9        A.    Specifically, Great West.  That's one of our

10   industrial funders, and they're very well-known throughout

11   the industry.  The only problem is not everybody can get a

12   relationship with Great West because you have to have

13   financials in a certain -- financial background and a basis

14   for them to accept your warranties, your indemnification,

15   et cetera, et cetera.  Advance does not have that; however,

16   it can get funding through Northeastern.  Now, that's one of

17   the instances where Northeastern is in the chain, is the one

18   that assigns to Great West, and, actually, more often than

19   not, we'll make money on that transaction, even from his

20   brother, but, for the most part, he doesn't take any money

21   from his brother.

22            So, in Great West deals, they have a spreadsheet

23   that has an average life.  It's very comprehensive.  I'm not

24   a numbers person.  I would be lying if I told you I

25   understand everything.  It has a biannual, it has an annual

Page 211

1    rate, it has a Moody rating fee, and then it has sometimes a

2    fee if the first payment that you're buying is within a

3    certain proximity of closing, and that happens a lot.  So we

4    would be paying that additional fee, we would be paying the

5    Moody fee, and, on top of that, Great West requires an

6    outside legal opinion, and the financial cost is borne by us.

7    And that ranges anywhere from 3 to $6,000 per transaction.

8    So a lot of times that would price Great West out of it.

9    Whereas, their initial rate looks really attractive, but,

10   with the additional fees, not so attractive.

11        Q.   Are there any deals listed in Exhibit 7 where Great

12   West provided the funding?

13        A.   I'm not going to be able to determine that.  Oh,

14   actually, I will be able to determine that because I know

15   what deals -- what states they buy.  I'm not going to be able

16   to tell from initials.  If I could see the client's name, I

17   would remember.  I won't be able to tell from this list.

18        Q.   Is Advance Funding claiming these additional fees

19   as part of its damages claim?

20        A.   I didn't incorporate any of that.

21        Q.   So no, okay.

22        A.   I'm not saying that we wouldn't.  I'm just saying

23   that I didn't incorporate any of that in these numbers that

24   you see.

25        Q.   And I guess the same question with regard for

Page 212

1  Advance Funding's allegation that it was forced to seek deals

2  net of state tax or it would absorb the state tax

3  withholding; are the additional costs associated with that,

4  absorbing the state tax withholding, is that part of Advance

5  Funding's damages claim?

6      A.   It is not in that spreadsheet.  I didn't calculate

7  any additional costs.  That's just pure difference in rates.

8      Q.   Advance Funding alleges that, "In addition to lost

9  deals and lost profits, AF has been damaged in its reputation

10  with its funder, as was the intent of BOFI."  How does

11  Advance Funding claim that it has been damaged in its

12  reputation with its funder?

13      A.   Apparently, Eshel made comments to Scott Miller

14  that we had horrible files, unclean documents, made lots of

15  nasty, false allegations, and that clouded their mind.  I'm

16  sure that they're second-guessing our files now.

17      Q.   How do you know they're second-guessing your files?

18      A.   They've told me.

19      Q.   They've told you they're second-guessing your

20  files?

21      A.   They've told me that they're not as comfortable, is

22  what I am saying.

23      Q.   And that's because of what Mr. Bar-Adon told them?

24      A.   Yes.

25      Q.   That lack of comfort has to do with what exactly,

Page 213

1    with Advance Funding's files?

2         A.   If I told you that file that I just sold to you, I

3    think some of those documents were doctored, or I think, you

4    know, that they don't send right things, or they don't --

5    there were a lot of nasty things said about the quality of

6    our documents and what we present.  That would lead anybody

7    with a reasonable mind to question things that they've

8    already bought, much less things that they would buy in the

9    future.  I think that's probably why he said to sell all 14

10   files, we don't want to own anything from Advance Funding.

11        Q.   What did Mr. Bar-Adon say regarding the quality of

12   Advance Funding's documentation, to your knowledge?

13        A.   I wish I could recite exactly.  I had this

14   conversation, but I had several conversations preparing for

15   this deposition.  He basically said that we were underhanded,

16   that -- I would be guessing.  I can't recall the exact words.

17        Q.   In response to Interrogatory No. 18, what evidence

18   does Advance Funding have that BOFI contacted SCS with the

19   intent of damaging Advance Funding's business relations with

20   SCS?

21        A.   Oh, I can answer that one rather easily.  For one,

22   that's not business practice normal in our industry, as I had

23   testified earlier.  The normal thing to do, when you think

24   you've been wronged is to contact the other factoring

25   company.  Eshel has all of our numbers, has our cell phone

Page 214

```
1   numbers, has no problem contacting us normally.  For this

2   deal, however, he chose to go directly to the funder, which

3   he knows very well has absolutely nothing to do with the

4   transaction, merely purchased a closing binder.  So that, in

5   and of itself, shows his intent because he clearly would have

6   come to us and said, hey, you guys are trampling on my

7   rights, here's what I think.  We may or may not have argued

8   back -- I can tell you we would have argued back -- but that

9   conversation would have been with us, not with SCS.

10       Q.   But SCS was involved in the transaction because SCS

11  became the beneficiary under the life insurance policy,

12  correct?

13       A.   Ultimately, after the transaction.

14       Q.   Right.  And Mr. Bar-Adon didn't contact Scott

15  Miller until March 2014?

16       A.   Correct.

17       Q.   Well after SCS had become the beneficiary under

18  that policy, correct?

19       A.   March of 2014?  The deal closed in 2013.  So that

20  would have been well after.

21       Q.   Right.  So SCS was involved in the transaction as

22  more than just a broker?

23       A.   And how exactly would Eshel have known that?

24       Q.   Do you know that he didn't know it?

25       A.   I don't know any legal way he would have known it.
```

BOFI Federal Bank v. Advance Funding LLC, et al.   Monica L. Ray 30(b)(6)                     September 22, 2015

Page 215

1        Q.   But do you know that he didn't know it?

2        A.   How would I know if I haven't had any conversation

3   with Eshel about it?

4        Q.   Okay.  So the answer to the question is you didn't

5   know one way or the other whether he had knowledge that SCS

6   had become the beneficiary under the life insurance policy?

7        A.   I have everything else that tells me that he

8   didn't.

9        Q.   Advance Funding alleges that, "BOFI filed a

10  Complaint without performing even minimal background

11  investigation into the facts and circumstances leading to

12  AF's securing said statutorily required court authorization

13  of its lottery assignment from Ms. Venzant, which

14  investigation would have disproven all of the allegations

15  contained in BOFI's Complaint."  Why does Advance Funding

16  assert that BOFI did not perform even minimal background

17  investigation into the facts and circumstances?

18       A.   Oh, that's, quite honestly, a fact.  They didn't

19  call Sheena one time to ask her, and supposedly she was still

20  in communication, such that she was still asking them for

21  advances, pursuant what they said, and they thought that the

22  transaction was still ongoing.  So, if they thought that

23  there was something that we had done to induce her to get out

24  of that contract and enter a contract with Advance, that's

25  one person they could have asked that supposedly had a really

Page 215, line 9 – page 216, line 2: Irrelevant, speculation, lack of personal knowledge, hearsay

BOFI Federal Bank v. Advance Funding LLC, et al.     Monica L. Ray 30(b)(6)                    September 22, 2015

Page 215, line 9 – page 216, line 2:
Irrelevant, speculation, lack of personal
knowledge, hearsay

Page 216

1     good relationship and was waiting for money from them.  The

2     second -- I can go further.

3          Q.   Yeah, let me stop you, and then you can continue.

4     How do you know they didn't reach out to Ms. Venzant?

5          A.   We absolutely asked sales to find out.

6          Q.   And they spoke with Ms. Venzant?

7          A.   Yes.

8          Q.   And she said, no, I haven't talked to them?

9          A.   They never asked me that.

10         Q.   They never asked -- I'm sorry, you have to clarify.

11         A.   Whether or not -- you said that we never

12    contacted -- or he never contacted Sheena Venzant to see if

13    they had trampled or we had trampled on their rights or what

14    have you.  That was never a discussion that they had with

15    their own client.

16         Q.   My question is:  Do you know if BOFI tried to reach

17    out to Ms. Venzant?

18         A.   I don't know what tried means.

19         Q.   Attempt to call her.

20         A.   Okay.  She he has answering machine; she has text;

21    she has e-mail.  I can tell you that they made no attempt in

22    either of those, pursuant to what she told sales.

23         Q.   That's my question.

24         A.   Yes.  That's my answer.

25         Q.   So sales contacted Ms. Venzant, and she said, they

BOFI Federal Bank v. Advance Funding LLC, et al.    Monica L. Ray 30(b)(6)                    September 22, 2015

Page 217

1    have not contacted me, and, based on that --

2         A.   Not that they have not contacted me, that they have

3    not contacted me in this regard.

4         Q.   Okay.  Do you know when sales spoke with

5    Ms. Venzant about that?

6         A.   I spoke with sales in preparation for this

7    deposition.  So I have no idea of the actual date, but there

8    was definitely conversation.

9         Q.   So go ahead.  So one basis for this contention that

10   BOFI didn't conduct an adequate investigation is that they

11   didn't communicate with Ms. Venzant?

12        A.   Right.

13        Q.   What's another reason?

14        A.   The second one would be Mr. Onwubere.

15             THE WITNESS:  I'll spell that one for you.

16        A.   That was their, we now know, ex-employee, but, at

17   the time of their transaction, was the current employee.  And

18   he could have communicated that he was the one that told her

19   how to cancel and had no involvement with us.  She hadn't

20   even contacted us at that point.  That right there would have

21   told them there's no way that Advance could have induced her

22   to do anything.  We hadn't even come back into the picture

23   since her initial win.

24             Third, the insurance agent.  Supposedly, that's how

25   they found out, was when any -- something with the insurance,

Page 217, line 13 – page 218, line 9:
Irrelevant, speculation, lack of personal
knowledge, hearsay

BOFI Federal Bank v. Advance Funding LLC, et al.    Monica L. Ray 30(b)(6)                September 22, 2015

Page 218

Page 217, line 13 - page 218, line
9: Irrelevant, speculation, lack
of personal knowledge, hearsay

1    is what they said.  Well, they never made the second premium

2    payment, and they knew that she couldn't make that premium

3    payment, and, knowing that they can't invest in speculative

4    investments, why would they not have contacted the insurance

5    company to make sure that that second premium was paid, as

6    that's the only insurance for that transaction?  So, if

7    they're still doing a deal with her and still thought that

8    they were going to close, that insurance policy would have

9    been paramount to their transaction.

10        Q.   The second invoice on the policy, where did it go;

11   do you know?  Where was it sent?

12        A.   I'm not involved with the insurance company, so --

13        Q.   You don't know where it was sent?

14        A.   But, from what I understand, they were the ones

15   that put her in touch with the group that she got the policy

16   from.  It was not Advance.

17        Q.   Sorry.  BOFI put Ms. Venzant in touch with the

18   group that she got the policy from; that's what you

19   understood?

20        A.   That's my understanding.  They facilitated the

21   insurance policy, yes, sir.  That was not a policy that she

22   had prior to the BOFI transaction.

23        Q.   This was in connection with the BOFI transaction,

24   you're talking about?

25        A.   Yes, and they paid the initial premium.

Page 219

1      Q.    Right.  But do you have any idea where the second

2   the invoice for the second annual premium was sent?

3      A.    No, but I know that I would have at least

4   calendared the premium payments, knowing that that was such a

5   paramount document, and provided the security that I need to

6   do a transaction.  She was clearly asking for advances, so

7   they knew well that she wasn't going to pay that premium.

8      Q.    Anything else?  Any other facts that you can cite

9   to support Advance Funding's assertion that BOFI conducted an

10  inadequate investigation?

11     A.    No.  I think that about sums it up.

12     Q.    Some of these issues we've talked about in the

13  context of our discussion over the last few minutes, but,

14  other than what you've just discussed, how else would that

15  investigation have disproven all of the allegations contained

16  in BOFI's Complaint?

17     A.    How else would the -- the time line wouldn't have

18  changed.  Clearly, they would have known by discussing with

19  Sheena herself, or with Onwubere, that they were talking, and

20  Advance wasn't involved.  That's very clear.

21     Q.    So, if they had spoke -- your view is that, if they

22  had spoken with Ms. Venzant and spoken with Mr. Onwubere --

23     A.    Or, one or the out.

24     Q.    One or the other -- that whatever Ms. Venzant or

25  Mr. Onwubere told them would have cleared everything up, BOFI

BOFI Federal Bank v. Advance Funding LLC, et al.    Monica L. Ray 30(b)(6)                September 22, 2015

                                                                    Page 220

1    could have trusted what they told them, and should have just

2    moved on at that point?

3         A.   Oh, I'm not saying that's the only thing.  I gave

4    you several things.

5         Q.   Okay.  So what else would --

6         A.   You need more than three?

7         Q.   In what other way would a more comprehensive

8    investigation have disproven all of the allegations contained

9    in BOFI's Complaint?

10        A.   Basically, all their allegations come from a

11   tortious interference.  Tortious interference is a legal

12   term, requires contract rights.  Eshel is a lawyer; he knows

13   he didn't have those contract rights.  He was simply mad

14   because we did what he could not, and there's bad blood

15   between the companies, and he intentionally went and damaged

16   our funding source.  There's no other reason that he would go

17   directly to a funder, who has absolutely nothing to do with

18   the transaction.

19             BOFI, initially, in this industry, was a funder

20   only.  It was only after they changed their structure that

21   they began initiating originating deals.  And, with the

22   complement of Eshel, who has a wealth of experience in both

23   structured and lottery, he knows very well.  There is no

24   other conclusion I can draw, than this was malicious,

25   willful, intentional, and he succeeded.

Page 220, lines 7-25: Irrelevant, speculation, lack of personal knowledge, hearsay, legal conclusion

Page 221

1                    MR. MANVILLE:  I think those are all the

2    questions I have.

3                    MS. FOX:  We're done.

4                    MR. MANVILLE:   Thank you.

5                    THE WITNESS:   Thank you.

6                    THE VIDEOGRAPHER:   We are going off the

7    record.   The time is 4:35 p.m.   This is the end of Disc

8    No. 4.

9                         (Signature reserved.)

10                     (Deposition concluded at 4:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 222

                        A F F I D A V I T


STATE OF WASHINGTON )
                    )  ss.
COUNTY OF KING      )




        I, MONICA L. RAY, hereby declare under penalty of

perjury that I have read the foregoing deposition and that

the testimony contained herein is a true and correct

transcript of my testimony, noting the corrections attached.




                        MONICA L. RAY




Date:

Page 223

C E R T I F I C A T E

STATE OF WASHINGTON )
                    )  ss
COUNTY OF KING      )


        I, the undersigned Washington Certified Court
Reporter, pursuant to RCW 5.28.010, authorized to administer
oaths and affirmations in and for the State of Washington, do
hereby certify:  That the foregoing deposition of the witness
named herein was taken stenographically before me and reduced
to a typed format under my direction;

        That, according to CR 30(e), the witness was given
the opportunity to examine, read and sign the deposition
after same was transcribed, unless indicated in the record
that the review was waived;

        That I am not a relative or employee of any
attorney or counsel or participant and that I am not
financially or otherwise interested in the action or the
outcome herein;

        That the deposition, as transcribed, is a full,
true and correct transcript of the testimony, including

questions and answers and all objections, motions and

examinations and said transcript was prepared pursuant to the

Washington Administrative Code 308-14-135 preparation

guidelines.




                        Wade J. Johnson, Certified Court

                        Reporter 2574 for the State of Washington

                        residing at Seattle, Washington.

                        My CCR certification expires on 09/18/16.

Page  224

SRS │ PREMIER REALTIME
2200 SIXTH AVENUE, SUITE 425
SEATTLE, WASHINGTON, 98121
206.389.9321


September 25, 2015


To:  SUSAN RAE FOX
     Ryan Swanson
     1201 3rd Avenue, Suite 3400
     Seattle, WA 98101-3034
     fox@ryanlaw.com

Re:  BOFI Federal Bank v. Advance Funding LLC, et al.
Deposition of:  MONICA L. RAY
Date Taken:  September 22, 2015
Cause No. 2:14-CV-00484-BJR

             PLEASE TAKE NOTICE THAT:


Enclosed are two forms: "Affidavit" and a "Correction Sheet."
Instruct the deponent to review the deposition, record any
corrections over his signature on the Correction Sheet, and
sign the Affidavit.  If there are corrections, please furnish
other counsel with copies.  Return both forms to this office
for their inclusion in the original transcript.
The transcript will be forwarded to the appropriate party
                      .


Thank you for your assistance in obtaining signature.



          By:  Wade J. Johnson, RPR




cc:  Duncan E. Manville

Page 225

SRS | PREMIER REALTIME
2200 SIXTH AVENUE, SUITE 425
SEATTLE, WASHINGTON, 98121
206.389.9321

_____

C O R R E C T I O N   S H E E T

_____

PLEASE NOTE ALL CHANGES OR CORRECTIONS ON THIS SHEET
BY PAGE AND LINE NUMBER, AND THE REASON THEREFOR.

_____

PAGE        LINE            CORRECTION AND REASON
_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

# EXHIBIT B

***BofI Federal Bank v. Advance Funding LLC, et al.***
United States District Court for the Western District of Washington
Cause No. 2:14-cv-00484-BJR

## SCHEDULE OF WITNESSES

| Witnesses Proposed by Plaintiff BofI Federal Bank | | | |
|---|---|---|---|
| Name | Description of Testimony | Objections | Length |
| Daniel Hefner | Mr. Hefner will testify as to the following and related matters:<br>o Background regarding the Lottery Payment Assignment Agreement between BofI Federal Bank ("BofI") and Sheena Venzant and the Life Contingent Payment Addendum between BofI and Ms. Venzant, both effective as of March 7, 2012 (collectively the "BofI Agreement"); and the existence, terms and validity of the BofI Agreement.<br>o Other communications and documents before and after the effective date of the BofI Agreement relating to the BofI Agreement.<br>o The UCC statements that BofI filed in an effort to protect its investment in the lottery income stream that was the subject of the BofI Agreement.<br>o The life insurance policy that BofI obtained to pay benefits to BofI should she Ms. Venzant die prematurely (the "Policy").<br>o BofI's holding off on obtaining a court a court order pursuant to RCW 67.70.100 approving Ms. Venzant's assignment of lottery installments to BofI and on making the lump-sum payment to Ms. Venzant, pending expiration of the contestability period and suicide exclusion in | Defendants will object to any proffered testimony from this witness that is not based on personal knowledge, that is irrelevant or immaterial to the issues in the case, and which constitutes hearsay. | 2 hours on direct |

| Witnesses Proposed by Plaintiff BofI Federal Bank | | | |
|---|---|---|---|
| Name | Description of Testimony | Objections | Length |
| | the Policy.<br>○ Cash advances requested by Ms. Venzant and paid by BofI.<br>○ BofI's non-receipt from Ms. Venzant of any communication purporting to cancel the BofI Agreement.<br>○ BofI's non-receipt from Defendants of any notice of their lottery assignment transaction with Ms. Venzant or of the action filed by Advance Funding LLC ("Advance") to obtain the Thurston County Superior Court's approval of Ms. Venzant's assignment of lottery installment payments to Advance. | | |
| Richard E. Miller III | Mr. Miller will testify as to the following and related matters:<br>○ Communications between Settlement Collection Service, LLC ("SCS"), on behalf of itself and the Kirk A. Tovey Revocable Trust ("Tovey"), about providing funding for Defendants' lottery assignment transaction with Ms. Venzant.<br>○ The agency relationship between SCS and Ms. Schwartz.<br>○ Funding provided by Tovey for Defendants' transaction with Ms. Venzant.<br>○ The transfer of ownership of Ms. Venzant's life insurance policy to SCS.<br>○ Profits earned by SCS and Tovey on the Venzant transaction. | Defendants object to any proffered testimony that is irrelevant to issues in the case | 2 hours on direct |

| Witnesses Proposed by Defendants Kirk A. Tovey, Individually and as Trustee of the Kirk A. Tovey Revocable Trust, and Settlement Collection Service, LLC | | | |
| --- | --- | --- | --- |
| Name | Description of Testimony | Objections | Length |
| Sheena Venzant | Live or by Declaration regarding the cancellation of her Agreement with BofI | BofI will object to any proffered testimony from this witness that is not based on personal knowledge, that is irrelevant or immaterial to the issues in the case, and that constitutes hearsay. | If live testimony is required, estimated 2 hours on direct |
| Richard Miller, III | Mr. Miller will testify regarding facts to refute the plaintiff's allegations and alleged damages, including facts surrounding the lottery assignment transaction from Sheena Venzant | BofI will object to any proffered testimony from this witness that is not based on personal knowledge, that is irrelevant or immaterial to the issues in the case, and that constitutes hearsay. | 1.5 hours on direct |
| Monica Ray | Ms. Ray may testify, via video link if necessary to authenticate documents to be offered as exhibits | BofI will object to any proffered testimony from this witness that is not based on personal knowledge, that is irrelevant or immaterial to the issues in the case, and that constitutes hearsay. | ½ hour on direct |

# EXHIBIT C

***BofI Federal Bank v. Advance Funding LLC, et al.***
United States District Court for the Western District of Washington
Cause No. 2:14-cv-00484-BJR

**PLAINTIFF BOFI FEDERAL BANK'S EXHIBIT LIST**

| Exhibit Number | Description | Objections |
|---|---|---|
| P1 | Lucky for Life Scratch Game 1068 Prize Payment Options form dated November 16, 2011 (Dkt. 39, Ex. A) | |
| P2 | Notes made by current and former employees of BofI Federal Bank regarding their communications with Sheena Venzant (Dkt. 39, Ex. B) | Hearsay, lack of proper authentication |
| P3 | Lottery Payment Assignment Agreement between BofI Federal Bank and Sheena Venzant, effective as of March 7, 2012 (Dkt. 39, Ex. C) | |
| P4 | Life Contingent Payment Addendum between BofI Federal Bank and Sheena Venzant, effective as of March 7, 2012 (Dkt. 39, Ex. D) | Lack of proper authentication |
| P5 | Declaration executed by Sheena Venzant on March 13, 2012 to support BofI Federal Bank's application, pursuant to RCW 67.70.100, for court order approving her assignment of lottery installment payments to BofI (Dkt. 39, Ex. E) | Hearsay, lack of proper authentication; Declarant has repudiated declaration |
| P6 | One-page disclosure statement that BofI Federal Bank provided to Sheena Venzant, pursuant to RCW 67.70.100(2)(c)(iii), before Ms. Venzant executed her March 13, 2012 declaration (Dkt. 39, Ex. F) | |
| P7 | UCC Financing Statement that BofI Federal Bank filed on March 9, 2012 (Dkt. 39, Ex. G) | |
| P8 | UCC Financing Statement Amendment that BofI Federal Bank filed on March 14, 2012 (Dkt. 39, Ex. H) | |
| P9 | Reliastar Life Insurance Company Policy No. AD20532551, insuring Sheena Venzant's life effective June 21, 2012 (Dkt. 39, Ex. I) | |
| P10 | Email string between Sheena Venzant, McLloyd Onwubere, Eshel Bar-Adon and Michael Popper, dated from August 25, 2012 | |

| Exhibit Number | Description | Objections |
|---|---|---|
|  | to August 28, 2012 (Dkt. 39, Ex. J) |  |
| P11 | Email string between Sheena Venzant, McLloyd Onwubere, Eshel Bar-Adon and Michael Popper, dated August 29, 2012 (Dkt. 39, Ex. K) |  |
| P12 | Email string between Sheena Venzant and Chris Husong, dated from February 19, 2014 to February 21, 2014 (Dkt. 39, Ex. L) | Hearsay, lack of proper authentication |
| P13 | Defendant Advance Funding, LLC's Responses and Objections to Plaintiff's First Interrogatories and Requests for Production | Not relevant, hearsay, improper exhibit |
| P14 | Defendant Settlement Collection Service, LLC's Responses to Plaintiff's First Interrogatories and Requests for Production | Not relevant, hearsay, improper exhibit |
| P15 | Defendant Kirk A. Tovey, as Trustee of the Kirk A. Tovey Revocable Trust, Responses to Plaintiff's First Interrogatories and Requests for Production | Not relevant, hearsay, improper exhibit |
| P16 | Complaint for Tortious Interference with Contract, Unjust Enrichment, Declaratory Relief and Jury Demand (Dkt. 1) | Not relevant, cumulative, improper exhibit |
| P17 | Defendants' Answer, Affirmative Defenses and Advance Funding LLC's Counterclaims | Not relevant, improper exhibit |
| P18 | August 12, 2013 letter from Andrea Simantz to Sheena Venzant (Bates No. Defs 000119) | Not relevant, lack of authentication |
| P19 | Email string last dated June 28, 2013 between Monica L. Ray, Richard E. Miller Jr., Richard E. Miller III, Scott Miller and Amy Schwartz (Bates Nos. Defs 000334-000336) |  |
| P20 | September 23, 2013 letter from ING ReliaStar Life Insurance Company to Sheena Venzant (Bates No. Defs 000118) | Hearsay, lack of proper authentication |
| P21 | Defendant Advance Funding LLC's Supplemental Responses to Interrogatories 17 and 18, with attachments | Not relevant, improper exhibit |
| P22 | Email string last dated February 19, 2014 between Sheena Venzant, Chris Husong and Michael Popper (Bates No. BOFI-00096) |  |
| P23 | Email string last dated July 2, 2013 between Elyse Edwards, Monica L. Ray, Amy |  |

| Exhibit Number | Description | Objections |
|---|---|---|
| | Schwartz, Richard E. Miller III, Richard E. Miller Jr., Scott Miller and Connie Younan, with attachments (Bates Nos. Defs 000559-000565) | |
| P24 | Email string last dated July 12, 2013 between Monica L. Ray, Connie Younan, Elyse Edwards and Richard E. Miller III (Bates Nos. Defs 000477-000478) | Not relevant, hearsay |
| P25 | Email string last dated February 12, 2014 between Chris Husong and Sheena Venzant (Bates Nos. BOFI-00091 – BOFI00094) | |
| P26 | February 18, 2014 email message from Chris Husong to Sheena Venzant (Bates No. BOFI-00095) | Hearsay, lack of proper authentication |
| P27 | July 11, 2013 fax cover sheet and letter from Scott Miller to ING Customer Service Center (Bates Nos. Defs 000122, 000121, 000124-000128) | Not relevant |
| P28 | Resolutions of Settlement Collection Services, LLC, dated February 8, 2008 (Bates No. Defs 000123) | Not relevant |
| P29 | Email string dated May 13, 2013 and ending with an email message from Monica L. Ray to Jessica Elster and Elyse Edwards (Bates No. Defs 00706) | Hearsay, lack of proper authentication, not relevant, out of context |
| P30 | Email string last dated May 14, 2013 and ending with an email message from Monica L. Ray to Barbara Guerra and Elyse Edwards (Bates No. Defs 00590) | Hearsay, lack of proper authentication, not relevant, out of context |
| P31 | Email string last dated May 22, 2013 between Monica L. Ray, Richard E. Miller III, Richard E. Miller Jr. and Scott Miller (Bates Nos. Defs 000513-000516, AF FRCP 30(b)(6) Deposition, Ex. 2) | |
| P32 | Email string last dated March 13, 2014 between Monica L. Ray, Richard E. Miller Jr., Richard E. Miller III, Scott Miller and Amy Schwartz (Bates Nos. Defs 000284-000290, AF FRCP 30(b)(6) Deposition, Ex. 3) | |
| P33 | Email string last dated March 12, 2014 between Monica L. Ray, Amy Schwartz, | |

| Exhibit Number | Description | Objections |
|---|---|---|
| | Richard E. Miller III, Richard E. Miller Jr. and Scott Miller (Bates Nos. Defs 000497-000499, AF FRCP 30(b)(6) Deposition, Ex. 5) | |
| P34 | Lottery Prize Assignment Agreement between Sheena Venzant and Advance Funding LLC (AF FRCP 30(b)(6) Deposition, Ex. 6) | |
| P35 | Order Granting Petition and Approving Lottery Prize Assignment, dated June 14, 2013 | |
| P36 | Table of lottery assignment transactions (Bates No. Defs 00584, AF FRCP 30(b)(6) Deposition, Ex. 7) | Not relevant |
| P37 | Table of lottery assignment transactions (Bates No. 00583, AF FRCP 30(b)(6) Deposition, Ex. 8) | Not relevant |
| P38 | Table of lottery assignment transactions (Bates No. 000183, AF FRCP 30(b)(6) Deposition, Ex. 9) | Not relevant |
| P39 | Table of lottery assignment transactions (Bates No. 000184, AF FRCP 30(b)(6) Deposition, Ex. 10) | Not relevant |
| P40 | Email chain ending on August 21, 2012 (Bates Nos. BOFI-00055-00056) | |
| P41 | Email chain ending October 18, 2012 (Bates Nos. BOFI-00029-00041) | Hearsay, lack of proper authentication, cumulative and duplicative |
| P42 | Email from McLloyd Onwubere to Michael Popper (Bates Nos. BOFI-00053-00054) | |
| P43 | Petition for Order Approving Lottery Prize Assignment (Bates Nos. Defs 52-84) | |
| P44 | Email string between Monica Ray, Richard E. Miller Jr., Richard E. Miller III, Scott Miller, Amy Schwartz, Connie Younan and Elyse Edwards, with attachments (Bates Nos. Defs 337-442) | |
| P45 | Email string ending on July 1, 2013 (Bates Nos. Defs 00587-00589) | |
| P46 | Email string ending on July 1, 2013 (Bates Nos. Defs 00596-00598) | |
| P47 | Email string between Elyse Edwards, Monica Ray, Amy Schwartz, Richard E. Miller III, | |

| Exhibit Number | Description | Objections |
|---|---|---|
| | Richard E. Miller Jr. and Scott Miller, with attachment (Bates Nos. Defs 493-496) | |

### DEFENDANTS' EXHIBIT LIST

| Exhibit Number | Description | Objections |
|---|---|---|
| D1 | Loan Agreement dated March 7, 2012 (BOFI 00009-14) | |
| D2 | Demand Promissory Note dated March 7, 2012 (BOFI 00015-18) | |
| D3 | First Amendment of Loan Agreement dated July 2012 (BOFI 00019-20) | |
| D4 | Second Amendment of Loan Agreement dated September 2012 (BOFI 00021-23) | |
| D5 | Declaration of Sheena Venzant, with exhibits (DKT 30) | Hearsay |
| D6 | Email chain ending August 3, 2012 (BOFI 00035-37) | Not a complete exhibit |
| D7 | Email from Sheena Venzant dated August 21, 2012 (BOFI 00055-56) | |
| D8 | Email from Onwubere dated August 21, 2012 (DKT. 111, p. 12) | Not a complete exhibit |
| D9 | Email chain ending August 28, 2012 (DKT 111 p. 14-15) | |
| D10 | Email chain ending August 29, 2012 (DKT 111, p. 17) | |
| D11 | Sheena Venzant's Handwritten cancellation letter dated February 5, 2013 (Defs 000571-572) | |
| D12 | Email chain ending February 12, 2013 (BOFI 00082-83) | |
| D13 | Email from Sheena Venzant dated May 15, 2013 (Defs 00600-601) | |
| D14 | Email from Barbara Guerra dated May 16, 2013 (Defs 00703-704) | |
| D15 | Email from Sheena Venzant dated July 1, 2013 (Defs 00597-598) | Not a complete exhibit |
| D16 | Email from Sheena Venzant dated July 1, | Not a complete exhibit |

| Exhibit Number | Description | Objections |
|---|---|---|
| | 2013 (Defs 00588-89) | |
| D17 | Email from Sheena Venzant dated February 12, 2014 (BOFI 00084) | |
| D18 | Email from Sheena Venzant dated February 19, 2014 (DKT 111, p.32) | |
| D19 | Fully executed Stipulation Regarding Amended Order, In re Petition of Advance Funding LLC, Thurston County Superior Court Cause No. 13-2-01206-2, dated February 18, 2016 | |
| D20 | First Amended Order Granting Petition and Approving Lottery Prize Assignment, In re Petition of Advance Funding LLC, Thurston County Superior Court Cause No. 13-2-01206-2, dated February 18, 2016 | |